# United States District Court
## Eastern District of Michigan

-------------------------------------------------------------x

ISAAC ANTHONY THOMAS,

                *Plaintiff,*          Case No. 2:25-cv-10524 (SKD)(APP)

      *v.*

WHALEY CHILDREN'S CENTER; MINDY
WILLIAMS (Whaley CEO); DANTE JENNINGS;
GENESEE COUNTY; SHERIFF CHRIS SWANSON,
in his individual and official capacity; UNDERSHERIFF
MICHAEL TOCARCHICK, in his individual and official
capacity; LAKESIDE FOR CHILDREN d/b/a LAKESIDE
ACADEMY; LAKESIDE ACADEMY; SEQUEL YOUTH
SERVICES OF MICHIGAN, LLC; SEQUEL TSI HOLDINGS,
LLC; SEQUEL YOUTH AND FAMILY SERVICES, LLC;
SEQUEL ACADEMY HOLDINGS, LLC; SEQUEL YOUTH
SERVICES, LLC; JOHN DOES "1-4"; MICHIGAN
DEPARTMENT OF HEALTH AND HUMAN SERVICES,

              *Defendants.*

-------------------------------------------------------------x

STEVEN A. METCALF II
*Attorney for Plaintiff*
Metcalf & Metcalf, P.C.
99 Park Avenue, Suite 810
New York, NY 10016
(646) 253-0514
Metcalflawnyc@gmail.com

MICHAEL W. EDMUNDS (P55748)
*Attorney for Defendants Genesee*
County, Swanson & Tocarchick
8305 S. Saginaw, Ste. 8
Grand Blanc, MI 48439
(810) 234-3633
medmunds@gaultdavison.com

JOSEPH P. SULLIVAN (P38076)
ZACHARY G. STILLMAN (P87670)
*Attorney for Defendants Whaley,*
*Williams and Jennings*
303 West Madison Street, Ste. 300
Chicago, IL 60606
(312) 781-6677
SullivanJ@litchfieldcavo.com
Stillman@litchfieldcavo.com

---

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO WHALEY
DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S SAC**

TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................ 3

SUMMARY OF ARGUMENTS............................................................. 5

LAW AND ARGUMENT ...................................................................... 6

     I.    PLAINTIFF'S CLAIMS ARE TIMELY AND ARE PRESERVED UNDER
          MCL 600.5851, 600.5851B, AND 600.5855………………………………………….. 6

     II.   MCL 600.5851B, AND 600.5855 AN ADDITIONAL INDEPENDENT TOLLING BASIS
          APPLIES TO PLAINTIFF'S CLAIMS, AND POST- 2016 ALLEGATIONS ARE WITHIN THE
          LIMITATIONS PERIOD AS WELL.................................................................. 9

     III.  THE WHALEY DEFENDANT'S ARE STATE ACTORS SUBJECT TO LIABILITY
          UNDER  42 U.S.C. § 1983. ...................................................................... 15

     IV.  THE WHALEY DEFENDANTS ARE NOT ENTITLED TO QUALIFIED OR
          QUASI-JUDICIAL IMMUNITY....................................................................... 21

     V.   PLAINTIFF'S STATE LAW CLAIMS ARE TIMELY AND COGNIZABLE……………………..24

CONCLUSION........................................................................................ 26

Plaintiff Isaac Thomas ("Plaintiff", "Isaac" or "Mr. Thomas") respectfully submits this memorandum of law in opposition to Defendant Whaley Children's Center – individually and in official capacity Mindy Williams and Dante Jennings (collectively "Whaley Defendants") – motion to dismiss the Second Amended Complaint ("SAC"). (*See* ECF Doc. #: 49).

## PRELIMINARY STATEMENT

Mr. Thomas is currently 23 years old, where at the age of 22 and having to constantly overcome adversity, he built up the strengthen to do the impossible at his age – commence a lawsuit against those who participated in abusing him so he can expose the systemic mistreatment inflicted on children in state custody. The Second Amended Complaint ("SAC") alleges *inter alia* that, after the State of Michigan (through DHHS) assumed legal custody of Plaintiff based on a finding of substantiated neglect and abuse in his home, Plaintiff was placed in a series of state-funded residential facilities, including Whaley Children's Center ("Whaley") and Lakeside for Children ("Lakeside"). At these state-funded facilities, Plaintiff recounts how he was subjected to repeated sexual and physical assaults, retaliatory criminal charges, and a sustained institutional cover-up.

The SAC alleges that while Plaintiff was a 13- and 14-year-old ward of the State living at Whaley, staff member Dante Jennings repeatedly drugged, physically assaulted, and sexually abused him. (*See also* Declaration of Isaac A. Thomas filed simultaneously with this Opposition at p. 4, ¶15)(highlighting the SAC "has identified the perpetrator (staff member Jennings), the nature of the abuse, the fact that I was a minor at the time, the setting, Whaley's authority and control over me, and Whaley's failure to report, intervene, or protect.").

Jennings secretly administered unidentified pills described as "feel good pills", then subjected Plaintiff and other children to sexual molestation at night. In one especially violent

2016 incident after dosing, Jennings grabbed Plaintiff, forcibly restrained him, chased him toward the administration building, and slammed his head into a brick wall and then onto the pavement. While pinning Plaintiff with his body weight, Jennings committed acts of sexual assault until Plaintiff fought free, injuring Jennings's tooth in the struggle. (*See* ECF Doc. #: 46 at ¶ 35–39; ¶ 78).

To illustrate how violent these encounters would become, on that particular night, Defendant Jennings is alleged to have slammed Plaintiff's head into a brick wall and the pavement. (*Id.*). These allegations of forcible sexual assault and brutal physical violence are the foundation of Plaintiff's claims against Whaley and Jennings; Defendant Whaley's instant Motion to Dismiss ("MTD") attempt to recast the details of the sexual assault facts, and title such as "generalized" or insufficient to invoke Michigan's criminal-sexual-conduct tolling statute mischaracterizes the pleadings.

The harm did not end in 2016. The SAC further alleges that Whaley and related actors retaliated against Plaintiff by orchestrating as many as thirteen misdemeanor assault charges against him for "fighting back" during improper restraints (ECF Doc. #: 46 at ¶ 41), successfully moving to remove his long-time CASA advocate after more than eight years of advocacy (ECF Doc. #: 46 at ¶ 40), and engaging in a continuing campaign—extending into 2022; and then, expanding throughout 2025, all of which was systematically designed to discredit Plaintiff, obstruct reporting, and conceal the abuse. (ECF Doc. #: 46 at ¶ ¶ 45, 48, 52–55, 63). The allegation in the SAC describe continuing, discrete wrongful acts and concealment well past Plaintiff's eighteenth birthday and further extend the limitations period.

Against this backdrop, the Whaley Defendants move to dismiss on four principal grounds: (1) that Plaintiff's claims are time-barred; (2) that Whaley and its staff are not "state

actors" under 42 U.S.C. § 1983; (3) that they are entitled to qualified and quasi-judicial immunity; and (4) that Plaintiff's state-law claims are either untimely or non-cognizable. Each ground fails at the pleading stage. (*See* ECF Doc. #: 49).

## SUMMARY OF ARGUMENTS

First, Whaley Defendants argument on the statute of limitations arguments are legally and factually defective. Whaley Defendants ignore the SAC's explicit allegations of sexual penetration, which trigger the extended limitations period of MCL 600.5851b, and they disregard both Michigan's minority-tolling statute (MCL 600.5851) and the fraudulent concealment statute (MCL 600.5855). They also ignore multiple, discrete post-2016 acts—retaliation, denial of access to courts, and fraudulent concealment—that are independently timely.

Second, the Whaley Defendants' state-actor argument misapplies the governing Sixth Circuit framework and ignores the binding, on-point decision in *Nugent*, which holds that a private facility housing court-ordered juveniles under contract with Michigan is a state actor when it exercises custodial control, a "traditionally exclusive" public function. *Nugent v. Spectrum Juvenile Justice Services*, 72 F.4th 135 (6th Cir. 2023).

Third, their immunity arguments improperly attempt to transform operational misconduct and sexual abuse into "judicial functions", contrary to *Kolley v. Adult Protective Services*, 786 F. Supp. 2d 1277 (E.D. Mich. 2011), and to invoke qualified immunity where the right to be free from abuse while in state custody has been clearly established for decades. *See DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989).

Fourth, their challenges to Plaintiff's state-law claims either misstate Michigan law or address issues (e.g., scope of fiduciary duty, proof of damages) reserved for summary judgment or trial, not Rule 12.

Taking the SAC as true and drawing all reasonable inferences in Plaintiff's favor, it is respectfully requested that this Court deny the Whaley Defendants' Motion to Dismiss in its entirety and allow this case to proceed to discovery.

## LAW AND ARGUMENT

I.    **PLAINTIFF'S CLAIMS ARE TIMELY AND ARE PRESERVED UNDER MCL 600.5851, 600.5851B, AND 600.5855.**

The SAC details repeated, severe sexual and physical assaults inflicted on Plaintiff by Defendant Jennings while Plaintiff was a minor in Whaley's custody. Jennings "personally perpetrated acts of sexual and physical violence against Plaintiff during his Whaley placement", including administering unidentified "feel good pills" at bedtime and then sexually molesting Plaintiff and other children, using threats and force to keep them silent. (ECF Doc. #: 46 at ¶ 16, ¶ 35–37, 78). In one especially violent 2016 incident, after dosing, Jennings chased Plaintiff to the administration building, slammed his head into a brick wall, pounded his head on the pavement, pulled down Plaintiff's clothing, and committed acts of sexual assault while pinning him with his weight, until Plaintiff fought free and injured Jennings's tooth in the struggle. (Doc. 46 at ¶ 38–39).

These are not generalized allegations they are concrete, graphic descriptions of criminal sexual conduct and brutal physical violence by a staff member against a child in state custody. The Whaley Defendants contend that the SAC contains no such allegation of sexual penetration and describes at most generalized claims of physical or sexual abuse, asserting that such allegations are insufficient to invoke MCL 600.5851b's extended limitations period. However, the SAC explicitly alleges criminal sexual conduct in the context of Jennings' pattern of administering unidentified drugs to children and then subjecting them to sexual molestation, as well as the violent sexual assault documented in the 2016 brick wall and pavement incident.

These allegations plainly describe sexual conduct by force and coercion, satisfying the statutory definition.

The SAC also pleads acts of criminal sexual conduct at Whaley. While the MTD asserts that the SAC contains no such allegation and describes at most generalized claims of physical or sexual abuse, the complaint explicitly alleges that Jennings subjected Plaintiff to sexual molestation following forced administration of unidentified drugs and, in the 2016 incident, committed acts of sexual assault while pinning Plaintiff with his body weight. These acts of sexual abuse while Plaintiff was under chemical influence, physically restrained, or both constitute criminal sexual conduct under MCL 750.520b et seq., which includes non-consensual sexual contact effected through force, coercion, or incapacity. (Doc 46. ¶ 35–39).

The Whaley Defendants' assertion that Plaintiff has not alleged criminal sexual conduct is thus demonstrably false and cannot support their attempt to avoid MCL 600.5851b's extended limitations period.

Michigan's criminal sexual conduct statute encompasses sexual contact—defined as any intentional touching of the victim's or actor's intimate parts or clothing covering them, if that intentional touching is for the purpose of sexual arousal or gratification—committed without consent and accomplished through force or coercion. MCL 750.520a, 750.520b. Jennings's pattern of administering unidentified drugs to render children incapable of consent, followed by sexual molestation and abuse, constitutes criminal sexual conduct. The 2016 incident in which Jennings, after administering pills, physically restrained Plaintiff and committed sexual assault while pinning him down similarly satisfies the definition of non-consensual sexual contact effected through force and incapacity. (ECF Doc. #: 46 at ¶ 35–39).

Under MCL 600.5851b, a person may commence a civil action arising out of criminal sexual conduct "at any time before the person reaches 28 years of age or within 3 years after the date the person discovers, or through the exercise of reasonable diligence should have discovered, both the injury and the causal relationship between the injury and the criminal sexual conduct, whichever is later." Plaintiff was born in 2002, so he will not turn twenty-eight until 2030. (*Id.* at ¶ 27). This action was filed in 2025, well within the age-twenty-eight window.

In addition, the "discovery" prong of MCL 600.5851b independently supports timeliness. The SAC alleges that Plaintiff, as a traumatized child in state custody, did not fully understand the nature and impact of the abuse at the time, and that only as a young adult—especially in light of the 2022 meeting and cover-up that ensued to now—did he come to appreciate the injury and its causal relationship to the criminal sexual conduct. (*See*, e.g., ECF Doc. #: 46 at ¶ 48, ¶ 52–55, 63). At the pleading stage, these allegations must be accepted as true, and any factual dispute over when Plaintiff "discovered" the injury and its causal relationship cannot be resolved against him on a motion to dismiss.

There is no retroactivity problem under *McLain v. Lobert*, 514 Mich. 1 (2024). *McLain* held that MCL 600.5851b does not retroactively revive claims that were already time-barred before the statute's enactment. But Plaintiff's claims were not time-barred when 600.5851b took effect, and to the contrary, Plaintiff's claims at the time were still well within the statute of limitations.

Plaintiff was born in 2002 (ECF Doc. #: 46 at ¶ 27) and remained in state custody through emancipation in July 2019. (ECF Doc. #: 46 at ¶ 43). Under MCL 600.5851(1), the limitations period does not begin to run while a person is under 18 or under guardianship, so the ordinary limitations clock did not start until he reached majority or was released from

guardianship. Thus, the ordinary limitations period would not have begun to run until 2020 (age 18), and even accounting for a three-year period thereafter, the earliest conceivable expiration date would have been 2023—after MCL 600.5851b took effect in 2018.

Because Plaintiff's claims were not expired when 5851b became effective, the statute applies prospectively to his developing claim and does not implicate the retroactive-revival concern addressed in *McLain*. In other words, 600.5851b does not "resurrect" an already-dead claim here. It simply defines the operative limitations period for a claim that was still viable when the statute came into force. Plaintiff is therefore entitled, as a matter of statutory right, to sue at any time before age twenty-eight, and his 2025 filing is plainly within that window.

## II.   MCL 600.5851B, AND 600.5855 AN ADDITIONAL INDEPENDENT TOLLING BASIS APPLIES TO PLAINTIFF'S CLAIMS, AND POST- 2016 ALLEGATIONS ARE WITHIN THE LIMITATIONS PERIOD AS WELL.

Even if there were any doubt about 600.5851b (and there is not), MCL 600.5855 provides an additional, independent tolling basis. That statute provides that if a person liable for a claim "fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim," the plaintiff may commence the action "at any time within 2 years after" discovery of the claim or identity.

Michigan courts require "affirmative acts or misrepresentations" designed to prevent discovery of the claim; mere silence or nonfeasance is not enough. *See Doe v. Roman Catholic Archbishop of Detroit*, 264 Mich. App. 632, 641–42 (2004); *Sills v. Oakland Gen. Hosp.*, 220 Mich. App. 303, 310 (1996). The Whaley Defendants attempt to recast Plaintiff's allegations as "routine failures to report"; but the, SAC alleges a series of concrete, affirmative concealment acts tied directly to Jennings's assaults.

The SAC alleges that in a 2022 meeting, Whaley administrators admitted that they had contemporaneous knowledge of Plaintiff's injuries in 2016 and consciously chose not to report:

> During that conversation the administrators admitted that, in 2016, they had seen Plaintiff injured and bleeding after the incident, and acknowledgment was made that Whaley failed to notify law enforcement.
>
> . . . .
>
> Also during such meeting, Whaley admissions – again, captured on recording – confirmed institutional knowledge of the abuse and a deliberate decision not to report it.

(*See* ECF Doc. #: 46 at ¶ 52–53),

These are not mere failures of oversight; they are explicit admissions of knowing, intentional non-reporting, documented by Plaintiff's audio recording. That is classic fraudulent concealment: the institution knew of visible injuries and deliberately chose not to document or report them, ensuring that external authorities and Plaintiff himself would remain in the dark.

The SAC further alleges:

> In retaliation, Whaley staff successfully moved to have Foyder removed from Mr. Thomas's case—after more than eight years of advocacy—a move coinciding with a worsening of Isaac's situation at the facility.

(*Id.* at ¶ 40.)

This is not nonfeasance. It is an affirmative litigation action—invoking the court system—to strip Plaintiff of his CASA, the only independent advocate raising concerns before the family court. Removing that oversight, timed to coincide with escalating abuse and Foyder's advocacy, is an affirmative step designed to shield Whaley's conduct from judicial scrutiny and to eliminate the oversight mechanisms protecting Plaintiff and other children at the facility.

The SAC goes on to allege:

> When Mr. Thomas attempted to pursue accountability, Whaley retaliated by orchestrating the filing of as many as thirteen misdemeanor assault charges against Mr. Thomas, a then-13 or 14-year-old child, for allegedly 'fighting back' during improper physical restraints.

(*Id.* at ¶ 41.)

Weaponizing the criminal justice system against a child victim—filing thirteen charges that the presiding judge ultimately recognized as retaliatory and dismissed—is an affirmative act to silence and discredit the victim, discourage further reporting, and distract from the underlying abuse. It is concealment by intimidation and misdirection.

The SAC alleges:

> The cover-up just continued from there, where there is an active campaign remaining to this day to make Plaintiff look as if he is mentally unfit.

(ECF Doc.#: 46 at ¶ 55).

> . . .

> Retaliation became apparent after Plaintiff publicly spoke about his experiences in 2022 – former Whaley staff members informed him that administrators instructed employees to avoid contact with him and to undermine his credibility.

(ECF Doc.#: 46 at ¶ 63).

These allegations describe a deliberate, continuing campaign to portray Plaintiff as "mentally unfit" and to instruct staff to avoid contact and undermine his credibility. That is an institutional strategy to ensure that, if Plaintiff speaks, he will not be believed. Such conduct goes

well beyond silence; it is active disinformation designed to make any future reporting by Plaintiff ineffective and non-credible.

The SAC also alleges that, when Plaintiff attempted to file a formal report in 2022:

> Tocarchick refused to enable the filing of a report or assign a case number, in open disregard of Michigan's statutory duties to crime victims and mandated reporting laws concerning crimes against minors.

(ECF Doc.#: 46 at ¶ 45).

Refusing to assign a case number is a concrete, procedural obstruction: without a number, there is no report in the system and no institutional case to investigate. The allegation that this refusal is "captured on recording" further strengthens the showing of deliberate obstruction. (*Id.* at ¶ 56.) As the SAC alleges, several of these acts—including Whaley's admissions in 2022, former employees of Whaley informing Plaintiff of Whaley's plan discussed during staff meetings, and Tocarchick's refusal to take a report—are captured on Plaintiff's audio recordings. (*Id.* at ¶ 52–53, 56).

Taken together, these allegations describe a coordinated set of affirmative acts—recorded admissions of deliberate non-reporting, removal of an advocate, retaliatory criminal charges, a character-assassination campaign, and refusal by law enforcement to process a report—all designed to prevent discovery and judicial intervention. As the SAC alleges, several of these acts—up and until emancipation, included removing his case worker, followed by bogus charges. After Plaintiff was emancipated, Whaley made admissions in 2022, Tocarchick's refusal to take a report; and then, former employees got in contact with Thomas about the smear campaign Whaley has designed for Plaintiff. (*Id.*) The cumulative effect is a systematic pattern designed to prevent discovery of ongoing misconduct and to discredit the child victim. At the pleading stage,

this far exceeds any threshold for fraudulent concealment tolling under MCL 600.5855. Any dispute over intent, knowledge, or timing of discovery is a factual dispute, thereby rendering such an issue of fact left for a judge or jury to decide either in a summary judgment application or at trial. Plaintiff in creating this confusion has essentially created a factual issue that is not the appropriate for resolution on a motion to dismiss.

The Whaley Defendants also rely on a mischaracterization of the "continuing violation" doctrine, suggesting that because the initial sexual assault occurred in 2016, all related claims are necessarily time-barred.

However, Plaintiff does not hinge his federal claims on a single, continuous violation dating back to 2016. Rather, the SAC pleads multiple discrete, independently actionable wrongs that occurred within the limitations period.

The orchestrated filing of false criminal assault charges (*Id.* at ¶ 41), the successful removal of Plaintiff's CASA advocate (*Id.* at ¶ 40), and the 2022 retaliation following Plaintiff's public speech (*Id.* at ¶ 63) are discrete retaliatory acts occurring years after the underlying abuse. Under *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), each discrete act—such as filing charges or removing an advocate—is a separate actionable event with its own limitations clock.

The SAC's allegation that the Genesee County Sheriff's Department, through Undersheriff Tocarchick, refused in 2022 to allow Plaintiff to file a report or assign a case number (SAC ¶ 45) describes a distinct injury to Plaintiff's constitutional right of access to courts and to the criminal process. *See O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987) (addressing state obligations in custodial settings); *see also Christopher v. Harbury*, 536 U.S. 88 (2002)

(addressing access to courts and right to be heard). That denial occurred in 2022—well within any conceivable limitations period.

The 2022 meeting at which Whaley administrators admitted seeing Plaintiff injured and bleeding in 2016 and "deliberate[ly]" choosing not to report[1], combined with the ongoing campaign to discredit Plaintiff,[2] represent fresh, later-in-time acts that both: (1) constitute new wrongs and (2) mark the point at which Plaintiff could reasonably discover the full extent of the concealment. At a minimum, these allegations trigger the two-year discovery period under MCL 600.5855.

In summary, Plaintiff's claims are timely because:

(1) MCL 600.5851 deferred accrual while Plaintiff was under eighteen and in state guardianship. (SAC ¶ 27);

(2) MCL 600.5851b applies prospectively to his still-viable claim and extends the limitations period to age twenty-eight where, as here, the SAC alleges criminal sexual conduct with penetration. (SAC ¶ 31; MCL 750.520a(r));

(3) MCL 600.5855 further tolls any applicable period based on specific, affirmative acts of fraudulent concealment alleged in the SAC. (SAC ¶¶ 40–41, 45, 52–55, 63); and

(4) Multiple discrete wrongs after 2022—retaliation, denial of access to courts, and concealment—are independently within any limitations period.

At the motion-to-dismiss stage, where the Court must accept the SAC's factual allegations as true and construe all reasonable inferences in Plaintiff's favor, these overlapping tolling and timeliness theories cannot be resolved against him as a matter of law.

---

[1] (ECF Doc.#: 46 at ¶ 52-53).

[2] (ECF Doc.#: 46 at ¶ 55).

It is respectfully submitted that the Whaley Defendants' statute-of-limitations defense are therefore inappropriate for Rule 12 dismissal.

### III.   THE WHALEY DEFENDANT'S ARE STATE ACTORS SUBJECT TO LIABILITY UNDER 42 U.S.C. § 1983.
#### (*responding to Defendants Point two*)

The Whaley Defendants insist that they cannot be liable under § 1983 because they are "private actors" and that, under Sixth Circuit precedent, "foster homes and private child-care facilities do not qualify as state actors." (*See* ECF Doc.#: 49 at p. 7). That characterization is legally untenable in light of *Nugent v. Spectrum Juvenile Justice Services*, and factually inaccurate given Plaintiff's custodial placement. *Nugent v. Spectrum Juvenile Justice Services*, 72 F.4th 135 (6th Cir. 2023).

In *Nugent*, the Sixth Circuit reversed a district court's dismissal of claims against a private juvenile facility that housed court-ordered children under contract with Michigan. The court held that plaintiffs had alleged sufficient facts to establish state action. *Nugent*, 72 F.4th at 145–46. Again, the *Nugent* court emphasized that "[g]iven that our precedent has consistently held that the operation of correctional facilities is a traditionally exclusive state function,  . . . plaintiffs pleaded sufficient facts 'giving rise [to] a reasonable inference that [the function] is traditionally exclusively in the province of the State.' ". *Id.* at 146.  Stated above and applicable here is when the State of Michigan grants a private actor, such as Whaley, the "legal authority to exercise control" over those housed at its facility – *then there is state action. Cf. Nugent v. Spectrum Juvenile Justice Services*, 72 F.4th 135 (6th Cir. 2023).

A repeated theme that is continued to be argued below is that for constitutional purposes, children while in state foster care are in state custody. (*See infra*, Section IV: Immunity Point). Here, Defendant Whaley's actions were synonymous with that of a "correctional" facility.

Essentially, our precedent has consistently held that the operation of correctional facilities is a traditionally exclusive state function. Therefore, when the term "correctional" is replaced with "residential" and the children residing there are in state custody, then Whaley residential facility is held to the same standards, rules, and laws as any other "correctional" facility.   In light of the above, Plaintiff has pleaded sufficient facts that give rise to a reasonable inference that Defendant Whaley is traditionally exclusively in the province of the State of Michigan.

The vital facts in *Nugent* that are applicable and analogous to Defendant Whaley in this case are: (1) The facility housed court-ordered juveniles who could not leave without court order; (2) The state (Michigan) contractually delegated custodial authority to the private entity; (3) the children were completely restricted in their movements under 24/7 monitoring (prison-like conditions); (4) the facility exercised coercive control over residents who had no choice about placement.

These facts are identical to Plaintiff's situation while he was housed at Defendant Whaley's facility, about which are summed up in the SAC, *inter alia*, as follows:

> Paragraph 14: "Defendant Whaley Children's Center ('Whaley') is a state-funded residential child-care facility in Flint, Michigan. Its employees acted under color of state law through their contractual relationship with DHHS."

(*See* ECF Doc. #: 46 at ¶ 14; *see also* ¶ 34);

> . . .

> Paragraph 27: "In 2008, after confirmed findings of neglect and abuse in his home, the DHHS assumed legal custody of him. From that day forward, the State of Michigan became responsible for his safety and care." (*Id.* at ¶ 27);

> . . .

> Paragraph 34: "Two years earlier, in 2016, DHHS had placed Plaintiff at Whaley, another state-funded residential institution with a long record of licensing concerns." (*Id.* at ¶ 34);

. . .

Plaintiff 42: "Plaintiff alleges the culture of intimidation and retaliation at Whaley included deprivation of food, hygiene, and family contact. Isaac and other residents were routinely threatened with the loss of visits, phone calls, snacks, and basic privileges unless they complied in silence with retaliatory discipline." (*Id.* at ¶ 42);

. . .

Plaintiff was a child in involuntary state custody, placed at Whaley pursuant to court order, unable to leave without judicial intervention, and subject to prison-like control over his daily life. Plaintiff Thomas had no say, input, or power in the details of his placement. Plaintiff exercised no choice about his placement. Simply stated, under *Nugent*, the facts alleged here support the claims that Defendant Whaley was a state agent; additionally, in applying *Nugent*, the factual allegations in this case sufficiently plead Defendant Whaley's state actions.

Further, Whaley Defendants cite *Howell v. Father Maloney's Boys' Haven, Inc*., 976 F.3d 750 (6th Cir. 2020), for the blanket proposition that "foster homes and private child-care facilities do not qualify as state actors." (*See* ECF Doc.#: 49 at p. 7). However, the Defendants incorrectly apply the holding of the *Howell* Court.

In *Howell*, the Sixth Circuit did not hold that all foster care providers are categorically non-state actors. Rather, it applied a functional analysis of what powers the entity actually exercised. The *Howell* court noted:

> Father Maloney's facilitated the youths' continuing engagement and presence in the community . . . Boys' Haven also had no power to remove children and place them under appropriate care or in juvenile correctional facilities.

*Howell*, 976 F.3d at 753–54.

Critically, the *Howell* Court even explained its rationale in distinguishing *West v. Atkins*, in that: "West also involved a 'correctional setting,' a prototypical state function 'designed' to remove individuals 'from the community.' " *Howell*, 976 F.3d at 753 (*quoting West v. Atkins*, 487 U.S. 42 (1988) (affirming a finding that state action applied for a prison doctor).

Overall, the facts presented in this case are analogous to *Nugent* and *West* case; whereas, the facts alleged in the SAC are distinguishable from the *Howell* case. Here, Defendant Whaley operated a custodial setting with prison-like conditions—deprivation of food, hygiene, family contact, and ability to leave. The Defendants, not a family or community partner, exercised power to restrict movement, use physical force, and administer unidentified medications. (ECF Doc.#: 46 at ¶ 35–38, 42). Whaley staff completely controlled Plaintiff's movements, access to family, basic necessities, and discipline, including through physical restraints and unidentified medications. (*Id.*).

Defendant Whaley did not "facilitate continuing engagement in the community"; it maintained coercive control, exercise isolation and separation from Plaintiff and the rest of the outside world. Under Michigan law, Whaley could restrict Plaintiff's movements and contact with the outside world, just as a custodial facility would.

Similarly, and distinguishable as well is the *Kolley* findings. *See Kolley v. Adult Protective Services*, 786 F. Supp. 2d 1277 (E.D. Mich. 2011). In *Kolley*, the facility provided services to adults with developmental disabilities who voluntarily entered a community-based program. The court noted the non-coercive nature: "[The residents] were not placed there through a court order or state directive." *Kolley*, 786 F. Supp. 2d at 1280–82.

Contrary to the *Kolley* facts and holding, here, Plaintiff's situation is the opposite as he was a minor ward of the state (more vulnerable), placed pursuant to court order, with no choice and no ability to leave, in conditions of coercive control.

The *Nugent* Court is on-point and thus directly controlling.

As highlighted above, the public function test asks whether the private entity exercises powers "traditionally exclusively reserved to the state." *Nugent*, 72 F.4th at 142. Custodial care of children removed from their parents by court order is such a function.

While the state may contract with private entities to perform this function, the function itself remains governmental. When DHHS places a child in a locked facility and delegates day-to-day custodial control to that facility, it is delegating a core governmental role.

The *Nugent* court held:

> Under our precedent, detention centers are generally considered 'a public function traditionally reserved to the state.'... When the state grants a private actor legal authority to exercise control over inmates, there is state action.

*Nugent*, 72 F.4th at 143–45.

The facts here establish that Whaley did not simply provide voluntary services. It exercised state-delegated custodial authority over a child in state custody under coercive conditions. That custodial authority—the power to restrict movements, control access to family, exercise discipline, and administer medications—is inherently governmental. The public function test is satisfied.

The Whaley Defendants argue that "merely receiving state funding or operating under state contract does not transform a private entity into a state actor." (ECF Doc. #: 49 at p. 7). This is true as a general proposition, but the state-action inquiry examines the totality of the

relationship, not funding alone. The state *compulsion test* asks whether "the state has so far insinuated itself into a position of interdependence with the private entity that it must be recognized as a joint participant in the challenged activity." *Chapman v. Higbee Co.*, 319 F.3d 825, 833 (6th Cir. 2003).

Here, the state did not merely purchase services from an independent vendor. For example DHHS conducted the following: (1) licensed Whaley's facility; (2) funded Whaley's operations (state contract); (3) placed children in state custody at Whaley; (4) monitored Whaley (or was obligated to); and (5) directed core functions (the placement, terms, and conditions of custody).

This level of interdependence—combined with state direction of the core function (housing children in state custody)—satisfies the state compulsion test. The symbiotic relationship test asks whether "there is such a close nexus between the state and the challenged action that the action may fairly be treated as that of the state itself." *Chapman*, 319 F.3d at 833.

The state and Whaley were joint participants in a system of custodial care for children removed from their families. The state could not execute its child-welfare mandate without contracting with Whaley; Whaley could not operate without state funding and referrals. The abuse Plaintiff suffered occurred within that jointly operated system, at the hands of employees hired, supervised, and paid by Whaley to carry out the state's custodial function.

Under *Nugent*—the controlling Sixth Circuit precedent—Plaintiff has alleged sufficient facts to establish that the Whaley Defendants are state actors. The custodial nature of the placement, the court-ordered status, the coercive conditions, the state funding and licensing, and the delegation of control over a vulnerable minor in state custody all support state-action liability under § 1983. Therefore, Plaintiff has pleaded sufficient facts that give rise to a reasonable

inference that Defendant Whaley is traditionally exclusively in the province of the State of Michigan.

## IV.   THE WHALEY DEFENDANTS ARE NOT ENTITLED TO QUALIFIED OR QUASI-JUDICIAL IMMUNITY.
### (*responding to Defendants Point Three*)

Quasi-judicial immunity protects those who perform functions integral to the judicial process, such as judges, prosecutors, and court-appointed officials making recommendations to courts. It does not protect routine operational decisions or criminal conduct.

The Whaley Defendants argue they are entitled to quasi-judicial immunity because "Plaintiff's placement at Whaley occurred pursuant to court order and within Michigan's child-placement system." (ECF Doc. 49 at p 8). This mischaracterizes the nature of the claims.

The MTD asserts that quasi-judicial immunity "extends to placement decisions, monitoring, and reports to the court—precisely the type of conduct alleged here." (ECF Doc at p. 7). But the SAC does not challenge placement decisions or reports to the family court; it challenges sexual and physical assaults, refusals to protect, retaliatory criminal charges, and cover-ups. (SAC ¶¶ 31, 35–41, 48, 52–55, 63.) Under *Kolley*, immunity does not extend to that operational misconduct.

What Plaintiff challenges in the SAC is simple:

1) The sexual assault perpetrated by Jennings (SAC ¶¶ 31, 35–38);
2) The refusal to assist when Plaintiff sought help (SAC ¶ 39);
3) The removal of his advocate in retaliation (SAC ¶ 40);
4) The filing of false criminal charges against Plaintiff (SAC ¶ 41);
5) The cover-up and concealment of all the harm caused to Plaintiff as a child while in Defendants custody and care (SAC ¶¶ 48, 52–55); and
6) The ongoing campaign to discredit Plaintiff when he became an adult and choose to speak out (SAC ¶¶ 55, 63).

What Plaintiff does not outright challenge at this time is:

1) The decision to place Plaintiff at Whaley pursuant to court order;
2) Reports or recommendations to the family court;
3) Compliance with court-ordered placement terms.

The *Kolley* court, which the Defendants cite, was clear: quasi-judicial immunity applies to "placement decisions, monitoring, and reports to the court"—the types of functions integral to judicial proceedings. *Kolley*, 786 F. Supp. 2d at 1294. The court did not extend immunity to operational management, staff conduct, or abuse.

Quasi-judicial immunity cannot be a shield against liability for sexual assault, refusal to protect, false reporting of criminal charges when a minor speaks out, or institutional cover-ups. These are not judicial functions. They are operational failures and criminal conduct occurring in the day-to-day management of the facility.

Qualified immunity protects government officials from liability for actions undertaken in the course of their official duties unless the officials violated "clearly established" constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

It must be noted here that private corporations like Whaley Children's Center do not invoke qualified immunity at all. Individual staff members like Jennings and Williams may attempt to invoke it, but only for actions taken in their official capacity and only if the right was not clearly established. What has been clearly established for decades is the principle that State actors have an affirmative duty to protect individuals in their custody from harm by other state actors or third parties. *DeShaney v. Winnebago County Dep't of Soc. Services*, 489 U.S. 189, 199–200 (1989).

The *Deshaney* Court highlighted that:

> When the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being... the State must not be deliberately indifferent to a substantial risk that the person will be harmed.

(*Id.*)

As argued above, children in state foster care are in state custody for constitutional purposes. (*See Supra*, Section III: State-Actors Point). They are removed from their parents against their will and placed in state-controlled settings where they have no ability to self-protect. The state's duty to protect such children from abuse by caregivers is clearly established.

State actors violate the clearly established right when they respond to reports of abuse with indifference or retaliation.

Supervisor Williams looked at Plaintiff, "shook her head in denial, and refused him entry or aid" while he was actively being assaulted by Jennings. (SAC ¶ 39.) A reasonable official would understand that refusing assistance to a child being sexually assaulted violates constitutional duty. That right was clearly established.

Retaliation against those who report abuse is clearly established as unconstitutional.

The First Amendment protects reporting abuse to authorities. It is clearly established that punishing someone for reporting abuse—through false charges, removal of advocates, or intimidation—violates the Constitution.

No reasonable official in 2016 or 2022 could believe that sexual assault, refusal to assist a child reporting assault, or retaliation for reporting abuse is constitutionally permissible.

Quasi-judicial immunity does not apply because the conduct alleged is not judicial in nature. Qualified immunity does not apply because the rights were clearly established. The Whaley Defendants' immunity defenses fail.

## V.   PLAINTIFF'S STATE LAW CLAIMS ARE TIMELY AND COGNIZABLE.

Plaintiff's state law claims are subject to the same tolling provisions discussed above with respect to the statute of limitations. MCL 600.5851b's discovery rule and MCL 600.5855's fraudulent concealment provision apply to state law tort claims just as they apply to Section 1983 claims. For the reasons explained above, Plaintiff has alleged sufficient facts to support tolling under both provisions.

The Whaley Defendants argue that Michigan law does not recognize a fiduciary relationship between a residential treatment facility and its resident. However, whether such a relationship exists is a question for discovery and summary judgment, not for resolution on a motion to dismiss.

Plaintiff has alleged facts sufficient to raise a plausible claim: a facility charged with custodial care of a child, exercising complete control over the child's movements and access to basic necessities, assuming sole responsibility for the child's safety under court order, and breaching that duty through gross negligence and indifference. (ECF Doc.: 46 at ¶¶ 12–16, 27, 35–39, 42). The level of control and dependency alleged here plausibly establishes a special relationship or fiduciary-like duty, sufficient to survive dismissal.

The Whaley Defendants argue that the Michigan Crime Victims' Rights Act (MCL 780.751 et seq.) creates no private civil right to damages. This is correct: the CVRA's enforcement mechanisms are confined to the criminal process, and restitution is "separate and independent" of civil damages. *People v. Lee*, 314 Mich. App. 266, 274–75 (2016).

However, Plaintiff does not need a standalone CVRA count to prevail. The CVRA duties support the context and duty underlying other claims: (1) they establish that Defendants had statutory duties to inform Plaintiff of his rights and to process his reports (supporting negligence

claims); (2) they establish that Defendants' refusal to comply with CVRA procedures constitutes negligence per se (violating a statutory standard of care); (3) they support Plaintiff's argument that Defendants acted with deliberate indifference to rights explicitly protected by Michigan law.

Count IX may not succeed as a standalone CVRA claim, but its allegations support Plaintiff's broader negligence and state-action theories.

Michigan does not recognize a private civil cause of action under MCL 750.505 (obstruction of justice), a criminal-only statute. *Denhof v. Challa*, 311 Mich. App. 499, 510–11 (2015) (rejecting civil obstruction claim).

However, Plaintiff does not depend on this count. The underlying conduct—refusal to accept reports, refusal to assign case numbers, refusal to investigate, destruction/concealment of evidence—is already encompassed by: (1) fraudulent concealment tolling (MCL 600.5855); (2) denial of access to courts (42 U.S.C. § 1983); (3) negligence and gross negligence (Michigan tort law); (4) Violation of mandatory reporting duties (Michigan statute).

These broader claims capture the same misconduct without relying on a criminal statute.

The Whaley Defendants argue that Michigan does not recognize "negligence per se" as a standalone tort. (MTD at 10). This is technically true: *Klanseck v. Anderson Sales & Serv., Inc*., 426 Mich. 78, 86–90 (1986) holds that a statutory violation creates at most *prima facie* evidence or a rebuttable presumption of negligence (statutory violation is evidence of negligence and may create a rebuttable presumption, but does not create a stand-alone tort), not a wholly independent tort.

But this is a semantic distinction. Plaintiff alleges violation of statutory duties (mandatory reporting, child protection standards, restraint protocols) that establish the duty and breach

elements of negligence. Whether labeled "negligence per se" or "negligence based on statutory violation," the claim is cognizable under Michigan law as a negligence claim.

A court may ultimately dismiss Count XIV if it finds the label improper, but it is respectfully submitted that the underlying negligence claim should survive because Plaintiff has alleged violation of statutory standards, establishing duty and breach.

## **CONCLUSION**

The Whaley Defendants seek to avoid accountability for grave constitutional and statutory violations through procedural arguments that mischaracterize both the law and the facts alleged in the Second Amended Complaint.

Plaintiff's claims are timely under: (1) MCL 600.5851b (extended period to age 28 for criminal sexual conduct with penetration); (2) MCL 600.5855 (fraudulent concealment tolling based on affirmative acts); (3) he doctrine that discrete post-2016 retaliatory and denial-of-access acts are independently timely.

The Whaley Defendants are state actors under *Nugent*, which establishes that private facilities exercising custodial control over court-ordered juveniles are state actors—precisely Plaintiff's situation.

The Whaley Defendants are not entitled to immunity because quasi-judicial immunity does not protect operational misconduct and sexual assault, and qualified immunity fails because the right to be free from abuse while in state custody was clearly established.

Plaintiff has stated viable claims under both federal law (42 U.S.C. § 1983) and state law (negligence, gross negligence, breach of duty). The Second Amended Complaint alleges that Plaintiff, as a vulnerable child in state custody, was subjected to repeated sexual and physical assault by a staff member (Defendant Jennings) at a state-funded facility (Whaley). The assaults

include forced oral sexual contact, head trauma from being slammed into walls and pavement, and violent physical restraint—conduct that clearly satisfies the definition of criminal sexual conduct and physical violence. When he sought help, supervisors refused to assist him. When he reported the abuse, the institution retaliated by filing false criminal charges and removing his advocate.

The reasonable inferences that can be drawn from these facts alleged are, first,  Plaintiff's advocate still to this day will establish that the reason he was terminated was because he was essentially being too good of an advocate for Plaintiff. (*See* Isaac Thomas Declaration at p. 16, ¶ 73-76). His advocate remains ready, willing, able to support Isaac's allegations because "Isaac Thomas" was his only case at the time. Basically, Isaac was a lost young man that was desperately in need of help and guidance. Isaac sought that "help" and "guidance" from the one person he actually witnessed fight for him, his advocate Ken.

One point that has to be mentioned here, is that up and until the day Isaac got the courage to walk into the Genesee Sheriff's Office, Isaac did not tell anyone about the full story about what Jenkins did to Isaac while he was at Whaley. Isaac would call Ken, his advocate, every chance he could, and this was during a time when children did not walk around or have access to a cell phone. So, if Isaac had a chance to call someone, such as a friend or family member, Isaac was calling Ken.

But, even with Ken, Isaac did not tell him all the details regarding the sexual abuse for more than one reason – and based on that threat that "Isaac was a liability to Whaley"; therefore, the only quick remedy is that "Isaac" as a "case" be stripped away from advocate Ken.

In light of all this, the reasonable inference that easily be drawn is that in May of 2022, the Sheriff and Undersheriff in this matter were the only people who knew that Isaac Thomas

had allegations against Jenkins and Whaley, and such were sexual in nature. Isaac seeks to file a police report, and to have Jenkins and Whaley investigated from criminal activity. He is forced to leave without a report or complaint number, and this "attempted reporting" is not formally documented in a manner that can be tracked or traced back to Isaac's allegations.

No Victim Rights Act protections, zero recognition as a victim, and no method for Isaac to track the progress of this complaint.

Next thing Isaac gets a call for a meeting with the CEO of Whaley, the first and only meeting Isaac has ever had with any staff of Whaley. Isaac is essentially told to keep quite.

The following year in 2023, during the Vanover case, Isaac's allegations against Whaley are front and center, but not because Isaac raised them; rather, Isaac's allegations against Whaley are raised by a defense attorney seeking to impeach Isaac's testimony and credibility. (*See* Isaac Thomas Declaration at p. 13, ¶ 60 – p. 15, ¶ 69). Remember these allegations do not exist on paper, as no report was ever documented. Therefore, the defense in the Vanover case could have only learned this information from the Genesee Sheriffs or by the staff at Whaley who knew what happened at their facility. Either way, in the Vanover case the staff at Whaley gladly took the stand in an attempt to smear Isaac's name or have him found incredible.

In 2024, a new witness contacts Isaac and informs him about Whaley meetings, some of which are deemed "special meetings". (*See* Isaac Thomas Declaration at p. 15, ¶ 72). During these meetings, all the staff present are enlisted to join the efforts to "retaliate" against Isaac, or do anything to ensure he has little to no credibility.

Even before Plaintiff left Whaley, these efforts to sabotage Isaac were intentional, well thought out, and systematic. After Isaac was emancipated and no longer under contract with CASA, or under the supervision of DHHS – Whaley's efforts only expanded. Meetings to dig up

dirt on him are relentless, without any limitations. Whaley seems willing to not only speak about Plaintiff's health records, but will volunteer such information, whether false or true – so long as it can destroy Isaac Thomas' credibility.

Plaintiff just attempted as an adult to seek accountability, both the Whaley facility and law enforcement, and the reaction is the following: (1) staff meetings aimed at harming him, with a "by any means necessary" approach; (2) staff testifying at court on behalf of another person convicted of sexually assaulting Plaintiff (and 3 others); and (3) enlisting and engagement in further concealment and obstruction of all information that benefits Isaac. These allegations, if proven, establish serious violations of constitutional and statutory rights. They deserve adjudication on the merits, not dismissal on procedural grounds at the pleading stage.

For the foregoing reasons, Plaintiff respectfully requests that the Court deny the Whaley Defendants' Motion to Dismiss in its entirety and allow this case to proceed to discovery and adjudication on the merits.

Dated: January 4, 2026
       New York, New York

                                    Respectfully Submitted,


                                    /s/ Steven Alan Metcalf II
                                    _____
                                    STEVEN A. METCALF II, ESQ.
                                    *Attorney for Plaintiff Isaac A. Thomas*
                                    Metcalf & Metcalf, P.C.
                                    99 Park Avenue, Suite 810
                                    New York, NY 10016
                                    646.253.0514
                                    646.219.2012 *Fax*
                                    Metcalflawnyc@gmail.com
                                    StevenAlan@metcalflawnyc.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on this 5th day of January 2026, I caused to be filed via the Court's electronic filing system the foregoing document, and that service will be accomplished on all parties of record.

<u>/s/ Steven Alan Metcalf</u>