UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

------------------------------------------------------------x

ISAAC ANTHONY THOMAS,

*Plaintiff,*

*v.*

WHALEY CHILDREN'S CENTER *et al.*,

*Defendants.*

------------------------------------------------------------x

Case No. 2:25-cv-10524 (SKD)(APP)

**DECLARATION OF ISAAC A. THOMAS IN SUPPORT OPPOSITION TO DEFENDANT WHALEY'S MOTION TO DISMISS**

**ISAAC ANTHONY THOMAS**, declare under 28 U.S.C. § 1746 that the following, to the best of my knowledge, the following statements are true and correct:

1. I am the Plaintiff in this action against Whaley Children's Center, its Chief Executive Officer Mindy Williams, Dante Jennings, Lakeside Academy (its subsidiary "Sequel"), the Genesee County Sheriff's Office, and other defendants for their roles in the physical and sexual abuse I suffered while in foster care in the State of Michigan. All of these organizations and individuals who operate these entities are all protected under the umbrella of the Michigan Department of Health.

2. I make this statement freely and voluntarily because every day I am forced to live with the abuse committed against me, dating back to when I was a young child and either was – a defenseless child without any resources; or, I was a child who was led to believe that these traumatic experiences were partially my fault.

3. I am no longer imprisoned to the negative thoughts that held me down or to confront those I know and believed allowed me to suffer such harm – and have knowingly

made the choice to stand up for what is right. In light of this, I have a full understanding of all the facts described in the proceedings in this case – and also submit this declaration as one having personal knowledge of the facts stated herein.

**Background**

4. Regarding my story, I was born in 2002 in Flint, Michigan. At a very young age I entered the system, and in 2008, when I was six years old, Court proceedings confirmed findings of neglect and abuse in my home.

5. After these Court rulings, the Michigan Department of Health and Human Services assumed legal custody of me. From that moment forward, the State of Michigan became responsible for my safety, custody, and care. Also, from there, the assaults and abused I sustained remained ramped and persisted from placement to placement.

6. Over the next decade, Michigan State placed me in more than forty (40) different foster homes, shelters, and residential institutions as I moved through the foster care system. Many of these placements were already known to the Department of Health and Human Services for staff misconduct and unsafe conditions.

7. Each time I was transferred to a new placement, my entire life was disrupted – thereby causing negative changes to my development. With each placement, the following disruptions took place to my: (1) schooling, (2) medical treatment, (3) mental health therapy, (4) stability, and (5) safety, or any feelings I had of being safe and not in constant danger.

8. Overall, it is well known that disruption to a child's life leads to risks of anxiety, depression, academic issues, and the difficulty forming healthy attachments and relationships in the future. Here, I experienced each of these negative developments based also on the

cumulation of all the disruptions surrounding each of my placements. These repeated displacements compounded the trauma that state custody was supposed to prevent.

9. If I could stop one child from having a similar experience such as myself, and not suffer from sexual assault and mental and physical abuse while in the State's custody and care – then I achieved my goal. My other goal is to hold those accountable for the harm they caused to children, especially when placed in a role of trust and to protect those same children they harmed. Lastly, the facilities must be shut-down that financially benefit from housing children at its location, while allowing such abuse to children to remain at such location.

**Defendant Whaley Children's Center**

10. In 2016, the State placed me at Whaley Children's Center ("Whaley") in Flint, Michigan. I was approximately thirteen years old when I arrived at this residential facility. My time at Whaley consisted of me feeling trapped and helpless, surrounded by other children in similar situations. All of us children were vulnerable and dependent on adults who were supposed to protect us.

11. My experiences with Mr. Dante Jennings began shortly after my arrival. Mr. Jennings was a staff member at Whaley who had direct access to children at all hours.

12. I detailed my experiences, with specificity to my attorney Steven Alan Metcalf because he was one of the first people, let alone an attorney – who I trusted to confine this information to regardless of my prior attempts to allege these facts in a complaint form. Now having undergone that process, I understand the difficulty in alleging sufficient facts to adequately set forth a cause of action.

13. My placement at Whaley did consist of the year 2016 – beginning when I was thirteen years old. The Whaley motion to dismiss seems to forget that in the State of Michigan,

I was not an adult until the age of eighteen years old, and my allegations in the Second Amended Complaint consists of "sexual penetration". The Motion to Dismiss applies (1) a misapplication of Michigan's tolling statute for childhood sexual abuse, and (2) sets forth an improper demand for heightened pleading standards.

14. To be clear, the statutes regarding "sexual penetration" are referenced in the Second Amended Complaint, where the criminal sexual abuse and conduct I substantiated while at Whaley falls under the definition of M.C.L. 750.520a(r), and thus triggering M.C.L. 5851b – thereby extending the filing period to my twenty-eight (28) birthday.

15. To set the record straight, I will fill in all any potential void regarding the facts that either is broadly stated in the Second Amended Complaint, or that I asked my attorney to not include such a detailed level of specificity as Rule 8 establishes. In balancing the level of detail that the world can see about my most personal, traumatic, experiences, the Second Amended Complaint under the Rule 8 standard has identified the perpetrator (staff member Jennings), the nature of the abuse, the fact that I was a minor at the time, the setting, Whaley's authority and control over me, and Whaley's failure to report, intervene, or protect. These allegations easily should satisfy federal pleading requirements.

16. In further explaining my rationale as to M.C.L. 750.520a(r), and extended filing period under M.C.L. 5851b applying to Whaley Defendants, I will explain more details about these events. Defendant Jennings began a pattern of systematic abuse that would escalate over the months I remained there.

17. Initially, Jennings came to my room very often at nighttime to give me what he called "feel good pills." He would tell me these were just medications, but he would give them to me in secret with explicit instructions not to tell anyone else that he was giving them to me. I

remember feeling confused and frightened about these pills. I did not know what they were or why he was being so secretive about them. But as a child in his care with no one to turn to, I complied.

18. After giving me these pills, Mr. Jennings would molest me. This happened repeatedly over months of my placement at Whaley. The pills seemed to make it harder for me to resist or fully understand what was happening to me. The pattern was consistent and deliberate, and Jennings used the darkness of night and the secrecy of my room to perpetrate this abuse.

19. Jennings also subjected me to physical assaults, at times threatening with further retaliation if I reported what he was doing or if I resisted his advances. He made it clear that if I told anyone about the pills or the abuse, there would be serious consequences for me. He said things designed to make me feel that no one would believe me, that I would be blamed, that my family would never take me home if I told anyone, and that I would end up in worse situations.

20. There came a particular day in 2016 when things escalated in a way that I will never forget. After dinner and after receiving medication from Jennings, he entered my room and attempted to escalate the sexual assault beyond what had happened before. He wanted to do things to me that I had refused on prior encounters. He told me “to try putting it in me”, referring to his genitals. I was terrified and confused, and I told him I was too scared and that I didn't want to. But he didn't stop. He kept persisting, saying things like "come on just let me try it" and "we just have to take it easy and get you ready."

21. When he persisted and tried to position me in a way where he was forcing me to sit on him, I became overwhelmed with terror. I understood that this situation was going to become even more violently abusive than what had come before.

22. I was terrified for my life. I managed to jump up and ran out the door.

23. I ran through the emergency exit and made my way to the administration building where I desperately pounded on the door, crying for help.

24. Without question, anyone viewing me at the time could tell I was in acute distress, fleeing from what I believed would be a serious violent sexual assault. In frantically running around, I was seeking help from the adults in charge, the supervisors who were supposed to protect me and the other children in that facility.

25. Defendant Mindy Williams, a Whaley supervisor, and another supervisor known as Brandi came to the door. When Williams looked directly at me through the door, she looked me in the eye and shook her head in denial. She deliberately refused to let me in to provide me any assistance or protection. She simply turned away and told me to go back to my "staff"—Mr. Jennings, the same man I was running away from, who just "molested", "sexually assaulted", and literally just committed a sexual crime against me.

26. That was when Jennings caught up with me. He grabbed me by my hair. He slammed my head hard into a brick wall. The impact was severe, the pain immediate. He then threw me to the ground and pounded my head on the pavement repeatedly. While I was on the ground, he pulled my sweatpants halfway down. I was helpless, pinned under his weight as he committed acts of sexual assault against me using his fingers on my backside.

27. I was terrified beyond measure, specifically believing that Jennings was going to kill me. In my desperation and fear, I managed to fight back. During the struggle, I headbutted Jemmings and chipped his tooth. I know that Jennings' injuries and the memories of such remain to this day.

28. An ordinary person would think that after a 13-year-old boy was frantically running throughout the facility, bleeding, and seen by supervisors – after a staff member was attempting to sexually abuse the young teen – that an investigation would ensue. What followed this sexual assault was not an investigation or protection; rather, the event was followed up with indifference towards me and concealment of the event all together.

29. The adults at Whaley who witnessed my injuries—my bleeding, my trauma—did nothing. There was no emergency medical evaluation, or even documentation of what happened. There was no report to law enforcement or to child protective services.

30. This entire mental, emotional, physical, sexual abuse episode by staff against a young teen in the facilities care ended up as an undocumented incident. Thus, it was not even an incident at all. Jennings was not removed from his position at Whaley, and continued his work there as if he was not disciplined at all.

31. Most importantly, his daily contact with children remained the same, as if nothing ever happened.

32. For months after the assault, I attempted to report the ongoing abuse to various staff members at Whaley, to my Department of Human Services caseworker named Jordan Dortman, and to my court-appointed special advocate named Ken Foyder. I made every effort to seek assistance, to have my concerns addressed, and to secure protection for myself and the other children.

33. When my advocate, Ken Foyder, raised alarms before the family court about my mistreatment at Whaley and moved for my removal from the facility, Whaley staff retaliated by successfully moving to have Ken Foyder removed from my case. Ken had been my advocate for more than eight years, and his removal coincided directly with a worsening of my situation

at the facility. Losing Ken felt like losing my only voice – the only person who truly spoke up for me at the time, and was genuine about his concerns for my safety and protection.

34. When I attempted to pursue accountability for what happened to me, Whaley orchestrated the filing of approximately thirteen misdemeanor assault charges against me—a thirteen-year-old child—for allegedly fighting back during improper physical restraints. These charges were clearly retaliatory. At the hearing, the presiding foster care judge recognized that these charges were retaliatory in nature and dismissed every single charge weaponized against me and that Whaley fabricated. The judge ordered my transfer to another facility in recognition of what was happening to me.

35. But despite the judge's recognition of retaliation, despite the dismissal of these fabricated charges, nothing changed at Whaley. Jennings was not terminated. He remained in contact with children. There was no notification of authorities regarding staff misconduct as required by law. The facility simply continued operating as if nothing had happened.

**After Emancipation**

36. Upon emancipation in July 2019, at age sixteen, I was released from state custody. But I had no stable housing, no family to visit or stay with at their home. I had profound trauma from my experiences at places such as Whaley and Lakeside. Without a place to live, I had to attempt to navigate the world as a young adult without support, without stability, without resources or understanding of my legal remedies.

37. Processing the trauma of what happened to me was overwhelming. The abuse, the violence, the betrayal by adults who were supposed to protect me—it was too much. I was experiencing the delayed recognition of trauma that is frequently observed among survivors of

childhood abuse. It took time for me to understand the full scope of what had been done to me, to connect my current symptoms and struggles to the abuse I had suffered.

38. I found courage upon obtaining community support as an advocate. I decided it was time to report what happened to me to law enforcement.

39. I went to the Genesee County Sheriff's Department, where I provided detailed allegations of the sexual and physical abuse I suffered at Whaley. I specifically identified Jennings as my abuser, even though I did not know his last name at the time. I described the specific assault in 2016 – and how I knew Defendant Williams saw me at that door, a frightened young buy, and she still refused to help me at that precise time I was screaming and reaching out for her assistance. I requested a welfare check for residents currently at Whaley. I specifically asked them to investigate Jennings and refer the matter to the Genesee Human Oppression Strike Team, the local child abuse task force.

40. A detective initially acknowledged the seriousness of my report. He indicated that my complaint might be referred to the child abuse task force. I waited in the lobby for over an hour thinking that my report was being processed, that someone was finally going to help me.

41. But when I asked what was happening, I was told that no case number had been assigned to my report. Without a case number, my complaint could not enter the criminal justice system. Without a case number, there could be no investigation. Without a case number, there could be no victim tracking, no prosecutor notification, no official record that I had even tried to report a crime.

42. I could not fathom that this was happening yet again, this time I was not entrapped in Whaley's facility, but they still had power over me – even when I was the victim and I was in a police station.

43. I asked for further explanation. Instead of receiving assistance, I was met by Undersheriff Michael Tocarchick. He escorted me outside of the building. Then he berated me. He called me "annoying." He told me dismissively, "We don't think anything's happening at Whaley." He threatened me by saying, "You're going to get yourself in trouble." He refused to allow me to file a report, and be assigned a case number. Just like that the Undersheriff ordered me to leave.

44. I tried to escalate the matter. I reached out directly to Sheriff Chris Swanson. But Sheriff Swanson simply confirmed Undersheriff Tocarchick's temperament. Sheriff Swamson continued to inform me that no investigation would occur. He refused to accept my audio evidence of the abuse or my recordings of my encounters with law enforcement. Neither Sheriff Swanson nor Undersheriff Tocarchick ever made the legally required notifications to child protective services. Neither of them ever referred my case to the child abuse task force.

45. Within two weeks after law enforcement completely rejected my honest allegations, I was contacted by the Chief Executive Officer of Whaley and summoned to a meeting.

46. **This timeframe is extremely relevant because Whaley's conduct continued and carried over to 2022, the time this call and meeting was made and scheduled**.

47. Out of fear for continued retaliation, I brought an independent victim advocate with me. The advocate witnessed the meeting and made an audio recording of the entire conversation, which I still possess.

48. During that meeting, Defendant Mindy Williams and other Whaley administrators heard my general allegations of abuse. But what was remarkable was their own admissions, where they told me that, in 2016, they had seen me injured and bleeding after the incident with Jennings. They acknowledged that they had witnessed my trauma, and that Whaley failed to notify law enforcement of the assault despite clear legal obligations to do so.

49. These admissions, captured on audio, confirmed what I had suspected all along—the adults at Whaley knew what had happened to me and would stop at nothing to cover this up. They knew Jennings had assaulted me, that I was injured as a result. Whaley deliberately chose not to report my abuse, seek emergency medical care, or any care for my future well-being. They deliberately chose not to remove the perpetrator from the facility.

50. Yet despite these recorded admissions and my detailed account of the abuse I suffered, the Whaley administrators took no corrective action. They took no meaningful steps to help me or to protect other children. Instead, they suggested that I should not publicly speak about the abuse I had suffered at their facility. The message was clear—they wanted me to be silent.

51. The retaliation did not end there. The cover-up has just continued.

52. There is an active campaign that **continues to this day** designed to make me look as if I am mentally unfit. After I publicly spoke about my experiences in 2022, former staff members from Whaley informed me that administrators conducted a meeting. At such meeting, and the others that followed, Whaley management instructed employees to avoid contact with me and to undermine my credibility. This is a coordinated effort to ensure that if I speak about my abuse, I will not be believed. The suggestion to target me on social media was even conveyed to Whaley staff.

53. The cover-up and retaliation stretches beyond the walls of Whaley's facility, where separately Undersheriff Tocarchick specifically dismissed my attempt to file a formal complaint, and referred to me as "annoying". As a child sex abuse victim, being called annoying for trying to report that such crimes were committed against me – is one of the biggest insults one can say to a victim. Undersheriff warned me not to return to the Sheriff's Department. Even these dismissals and insults further establish the official interference with my right to seek justice.

54. The refusal of Whaley administrators and law enforcement officials to take action has not only denied me justice. This situation has continued to create conditions where other children at these facilities are left without adequate protection.

55. The trauma of a result of these sexual assaults of my experiences at Whaley has profoundly affected every aspect of my life.

56. I experience intrusive memories of these sexual assaults, filled with hyperventilating and constant anxiety. I have episodes of depression and panic attacks, and forming relationships has been extremely difficult because of the betrayal and abuse I experienced from those who were supposed to protect me.

57. Again, the repeated transfers through the foster care system disrupted my education. I attended numerous schools across the state, each using different curricula. Credits failed to transfer, where I fell short of graduation requirements despite years of coursework. Every time I moved, my psychiatric care was interrupted, where each new placement came with an assigned a new counselor and new medication plan – preventing any consistent treatment for trauma and anxiety.

58. Medical records were lost in transfer, causing lapses in prescriptions and therapy sessions. The absence of stable education and medical care deprived me of the basic developmental support that the Constitution requires for individuals in state custody.

59. I am pursuing my education and my recovery, but with this type of trauma it is an ongoing struggle. The cumulative impact of years in unsafe placements has left me with severe and chronic psychological injuries that will likely affect me for the rest of my life. The "unsafe" places I speak of, include but are not limited to, the nights at Whaley, where I was physically and sexually assaulted. Moreover, the unsafe nights at Whaley consisted of staff, who were wholly unqualified for their position, to be in charge of these children.

**My Reporting of Whaley Then Gets Intertwined with the Vanover Matter**

60. By now, the picture of my childhood while under DHS and these placements (Whaley and Lakeside), hopefully is becoming clearer with regards to the assaults and trauma I substantiated while in the care of "adults". But, in addition to Lakeside and Whaley – I was also sexually assaulted at a forester care home involving the Vanover s family (in this statement I will refer to "Christopher Vanover's abuse" as the "Vanover matter" or the "Vanover Case").

61. The Vanover case involved criminal charges in the Seventh Circuit court before Judge Bell in the Genesee County courthouse. I was 1 of 4 victims in the Vanover case.

62. To briefly circle back, in May of 2022, I made a report with the Genesee County Sheriffs – where I was seeking to report Defendant Jenkins at Whaley, and such report was denied. Shortly thereafter, Whaley contacted me, and the meeting with the CEO mentioned throughout these proceedings took place. It's around this same time that I attended court, as a victim, to observe the pre-trial proceedings in the Vanover case.

63. Fast forward, the Vanover case went to trial in July of 2023. During the pre-trial stages and at the trial the defense attorney on the Vanover case sought to discredit me as a witness. In attempting to do so, the defense attorney called a witness from Whaley.

64. Whaley Staff member, Ms. Brandy (and multiple other staff members) testified at the Vanover case as defense witness, claiming I lied about my complaints about what happened to me at Whaley's facilities. Also, my cross examination consisted of a handful of questions about me trying to make a criminal complaint about Jenkins and Whaley.

65. Neither of these tactics, even together were successful for the defense and the Vanover case resulted in a conviction.

66. Two immediate concerns are raised with this story.

67. First, the probability of Defendant CEO Mindy Williams calling me, then setting up a meeting to speak with me about a week after I went to the Genesee Sheriff to file a criminal complaint, are basically non-existing. Further, Williams could not have possibly known about my complaint to the Sheriff because my report was refused to even be taken. Therefore, there were no notes or a formally written complaint, or so much as a case number that Whaley or Williams could have learned about, without obtaining that information directly from the Sheriff.

68. The second concern is how could a defense attorney in the Vanover case obtain this information as well. Again, there was no complaint number or report number. I was essentially kicked out of the Sheriff station, and my report was refused to even be taken, so there was no writings that could have been obtained by the defense attorney.

69. These are other examples of the lengths the defendants in this case will go to for the sole purpose of smearing my reputation. They will conspire with anyone or work with information that legally should not be discussed or known.

**Conclusion**

70. In sum, Whaley was grossly negligent, and reckless in their supervision, hiring, and firing of its staff members – and it took extreme measures for the higher ups to get involved, such as a near-death experience of a child for anyone to even investigate what was taking place at Whaley.

71. Throughout the process of me commencing this case until presently, I have secured as witnesses the following: first, the female, Michele Sheeran, who attended the 2022 meeting with myself and Whaley. Ms. Sheeran, not only participated in such meeting, but heard the comments and admissions of Whaley – through its CEO – that were conveyed to me during such meeting.

72. Second, I have a former employee of Whaley, who I can only refer to as "P.R." at this time, out of caution. P.R. expressed a willingness to testify that during numerous meetings, including a "special meeting" at Whaley, the entire staff were informed about the Isaac Thomas allegations against Whaley. The staff were all directed to assist in a plan that can only be described as "retaliation" against me. The scope of this plan is still – to this day – designed to make me an incredible, untrustworthy person – who suffers from mental illness. Whaley will break HIPPA rules, and violate any of my medical rights if that is how these lies have to be told. Since 2024 the efforts have been made to make me incredible should my story become public.

73. Third, I have reconnected with Ken Foyder, my CASA worker who can detail that he was terminated for only the case of "Isaac Thomas". Ken knows the entire corporate structure of the facilities where I was placed, all the details accounted to the Court's through DHHS reports, and has also maintained all the details of my complaints and what was happening to me at placements such as Whaley. Importantly, Ken's documents were made in real-time and at during the times these disputes were ongoing. Ken still is of the belief that the only reason he was terminated was because he spoke up for me, Isaac Thomas.

74. I spoke with Ken over the holidays and he is providing me and my attorney all of the letters Ken wrote about being terminated because he was advocating for me. He explained locating a letter he sent to the Michigan CEO of CASA. In return, he received an email back "explaining the turmoil occurring in the Weiss Advocacy Program". This response was significant because Ken wanted to help me during a troubled time at Whaley, where the facility was having obviously other problems.

75. Ken never had contact with the CEO for Whaley, where lies had to be told about Ken to get him off my case. Ken's termination letter was from Matthew Graham, who also was new to CASA and had no idea about what the policies of national and state CASA. The policy then and now is that once I was appointed to a CASA, my advocate Ken must follows me, no matter where I go until such time my contract with CASA is finalized.

76. These three individuals are all eager to assist me, and expose what has transpired pertaining to this matter, but are also being cautious because of their own concerns. These three and more are willing to provide statements, and then be witnesses, but want to do so when it's necessary for all of their person information to be disclosed.

77. The information provided herein, is just the tip of the iceberg, and merely explain the statute of limitations aspects, from the harm caused me, to the meeting in 2022 – all the way through the 2025 efforts to cover-up my allegations.

78. The facts I have described in this declaration are true to the best of my understanding. I have made this declaration voluntarily and with full understanding of its legal significance.

79. I believe these facts, which are my true accounting and not exaggerated, warrant the validity of the Second Amended Complaint, and therefore warrant Defendant Whaley's motion being denied in its entirety.

I declare this 3rd day of January 2026, under the penalties of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: Flint, Michigan

Respectfully submitted,

Isaac Thomas

______________________________

ISAAC ANTHONY THOMAS