𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔇𝔦𝔰𝔱𝔯𝔦𝔠𝔱 ℭ𝔬𝔲𝔯𝔱
𝔈𝔞𝔰𝔱𝔢𝔯𝔫 𝔇𝔦𝔰𝔱𝔯𝔦𝔠𝔱 𝔬𝔣 𝔐𝔦𝔠𝔥𝔦𝔤𝔞𝔫

-------------------------------------------------------------------------------x

ISAAC ANTHONY THOMAS,

                    *Plaintiff,*                      Case No.:

         *v.*                            2:25-cv-10524 (SKD)(APP)

WHALEY CHILDREN'S CENTER; MINDY
WILLIAMS (Whaley CEO); DANTE JENNINGS;
GENESEE COUNTY; SHERIFF CHRIS SWANSON,
in his individual and official capacity; UNDERSHERIFF
MICHAEL TOCARCHICK, in his individual and official
capacity; LAKESIDE FOR CHILDREN d/b/a LAKESIDE
ACADEMY; LAKESIDE ACADEMY; SEQUEL YOUTH
SERVICES OF MICHIGAN, LLC; SEQUEL TSI HOLDINGS,
LLC; SEQUEL YOUTH AND FAMILY SERVICES, LLC;
SEQUEL ACADEMY HOLDINGS, LLC; SEQUEL YOUTH
SERVICES, LLC; JOHN DOES "1-4"; MICHIGAN
DEPARTMENT OF HEALTH AND HUMAN SERVICES,

                    *Defendants.*

-------------------------------------------------------------------------------x

STEVEN A. METCALF II                   MICHAEL W. EDMUNDS (P55748)
*Attorney for Plaintiff*               *Attorney for Defendants Genesee*
Metcalf & Metcalf, P.C.              County, Swanson & Tocarchick
99 Park Avenue, Suite 810          8305 S. Saginaw, Suite 8
New York, NY 10016               Grand Blanc, MI 48439
(646) 253-0514                    (810) 234-3633
*Metcalflawnyc@gmail.com*         *medmunds@gaultdavison.com*

---

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO GENESEE COUNTY
DEFENDANTS' MOTION TO DISMISS**

---

**TABLE OF CONTENTS**

I. PRELIMINARY STATEMENT ................................................................................. 1

II. COUNTER-STATEMENT OF FACTS ................................................................. 4

    A. PLAINTIFF'S CHILDHOOD IN STATE CUSTODY ........................................................ 4

    B. ABUSE AT WHALEY CHILDREN'S CENTER ............................................................ 4

    C. RETALIATION AND COVER-UP AT WHALEY ............................................................ 5

    D. PLAINTIFF'S ATTEMPT TO REPORT AS AN ADULT AND THE COUNTY
        DEFENDANTS' RESPONSE ................................................................................. 6

    E. THE 2022 MEETING WITH WHALEY AND ONGOING RETALIATION ............................ 8

III. STANDARD OF REVIEW ...................................................................................... 9

IV. LAW AND ARGUMENT ........................................................................................ 10

POINT ONE:  THE GENESEE COUNTY DEFENDANTS' "NO DUTY TO INVESTIGATE"
ARGUMENT MISAPPLIES THE TUCKER CASE AND IGNORES PLAINTIFF'S ACTUAL CLAIMS .......... 10

    A. THE TUCKER CASE IS INAPPOSITE AND ADDRESSES STANDING TO COMPEL
        CRIMINAL PROSECUTION, NOT CONSTITUTIONAL VIOLATIONS ............................ 10

    B. PLAINTIFF'S CLAIMS ARE BASED ON AFFIRMATIVE
        MISCONDUCT, NOT MERE INACTION ............................................................ 11

    C. TUCKER DOES NOT ADDRESS THE VIOLATION OF ESTABLISHED
        VICTIM RIGHTS ........................................................................................... 13

POINT TWO: PLAINTIFF HAS ALLEGED VIOLATIONS OF CLEARLY ESTABLISHED
CONSTITUTIONAL RIGHTS, DEFEATING QUALIFIED IMMUNITY AT THE PLEADING
STAGE ............................................................................................................... 14

    A. QUALIFIED IMMUNITY SHOULD RARELY BE GRANTED
        AT THE MOTION TO DISMISS STAGE ............................................................ 14

    B. PLAINTIFF ALLEGES VIOLATIONS OF MULTIPLE
        CLEARLY ESTABLISHED RIGHTS ................................................................... 15

        I. THE RIGHT TO REPORT CRIME WITHOUT RETALIATION,
          AND TO BE FREE FROM THREATS AND INTIMIDATION WHEN SEEKING
        POLICE  ASSISTANCE ................................................................... 16

II. THE RIGHT TO ACCESS THE CRIMINAL JUSTICE
SYSTEM AND TO HAVE REPORTS PROCESSED      ......................................... 16

III. THE IMPROPER APPLICATION OF QUASI-JUDICIAL
IMMUNITY TO OPERATIONAL MISCONDUCT...................................................... 17

C.  DEFENDANTS ARE NOT ENTITLED TO QUASI-JUDICIAL IMMUNITY
BECAUSE THEIR MISCONDUCT WAS NOT INTIMATELY ASSOCIATED
WITH THE JUDICIAL PHASE ........................................ 19

POINT THREE:  THE GENESEE COUNTY DEFENDANTS' GOVERNMENTAL IMMUNITY
DEFENSE IS PREMATURE AND FACTUALLY DISPUTED ........................................... 20

A. GROSS NEGLIGENCE FINDINGS ARE PREMATURE  ................................. 20

B. PROXIMATE CAUSE PRESENTS FACTUAL DISPUTES THAT CANNOT
BE RESOLVED ON A MOTION TO DISMISS ............................................ 22

POINT FOUR: PLAINTIFF'S SECTION 1983 CLAIMS STATE VALID CAUSES OF ACTION
INDEPENDENT OF ANY DUTY TO INVESTIGATE      ........................................... ... 25

A. COUNT 2: FAILURE TO PROTECT  ......................................................... 25

B. COUNT 3: STATE-CREATED DANGER  ............................................... 26

I. CREATION OR ENHANCEMENT OF DANGER  ................................... .. 27

II. CONSCIENCE-SHOCKING CONDUCT ........................................... .. 27

III. DIRECT CAUSAL LINK  ........................................... 28

C. COUNT 4: FIRST AMENDMENT RETALIATION  .............................. ... 28

D. COUNT 5: DENIAL OF ACCESS TO COURTS  ........................................ … 29

POINT FIVE:  THE FAILURE TO PROTECT CLAIM IS PROPERLY PLEADED
UNDER THE SPECIAL RELATIONSHIP DOCTRINE      ....................................... ... 31

A. CHILDREN AT WHALEY WERE IN STATE CUSTODY  ............................. … 31

B. THE COUNTY DEFENDANTS' COMPLETE INACTION CONSTITUTES
DELIBERATE INDIFFERENCE      ........................................................ 32

POINT SIX:  THE STATE-CREATED DANGER CLAIM IS ADEQUATELY PLEADED  .................. 33

POINT SEVEN:  THE FIRST AMENDMENT RETALIATION CLAIM STATES
A COGNIZABLE CLAIM ..................................................................... ... 34

POINT EIGHT:  THE DENIAL OF ACCESS TO COURTS CLAIM IS PROPERLY PLEADED................ 34

POINT NINE: PLAINTIFF HAS PLAUSIBLY PLEADED MONELL LIABILITY
AGAINST BOTH GENESEE COUNTY AND WHALEY CHILDREN'S CENTER      ........................... 35

A. MONELL LIABILITY AGAINST GENESEE COUNTY ...................................... 35

B. MONELL LIABILITY AGAINST WHALEY CHILDREN'S CENTER
   AS A PRIVATE STATE ACTOR ...................................................... 36

CONCLUSION           ...................................................................................... 37

CERTIFICATE OF SERVICE         ................................................................... 37

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................................   10

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .....................................................   10

*Bounds v. Smith*, 430 U.S. 817 (1977) ....................................................................   17

*Carey v. Piphus*, 435 U.S. 247 (1978) .....................................................................   23

*Christopher v. Harbury*, 536 U.S. 88 (2002) ...............................................   14, 17, 29

*Conley v. Gibson*, 355 U.S. 41 (1957) ....................................................................   10

*County of Sacramento v. Lewis*, 523 U.S. 833 (1998) ..............................................   27

*DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189 (1989) ............ 13, 25, 30

*Farmer v. Brennan*, 511 U.S. 825 (1994) .................................................................   31

*Hope v. Pelzer*, 536 U.S. 730 (2002) ......................................................................   20

*Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir. 1998) ................................   26

*Kolley v. Adult Protective Services*, 786 F. Supp. 2d 1277 (E.D. Mich. 2011) ..................... 18, 21

*Mattera v. Baffert*, 100 F.4th 734 (6th Cir. 2024) ....................................................   10

*Nugent v. Spectrum Juvenile Justice Services*, 72 F.4th 135 (6th Cir. 2023) .............................   30

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986) ................................................   35

*Republican Party of N.C. v. Martin*, 980 F.2d 943 (4th Cir. 1992) .........................   10

*Robinson v. Detroit*, 462 Mich. 439 (2000) ........................................................   22, 23

*Saucier v. Katz*, 533 U.S. 194 (2001) .....................................................................   10

*Street v. Corr. Corp. of Am.*, 102 F.3d 810 (6th Cir. 1996) .....................................   35

*Thaddeus-X v. Blatter*, 175 F.3d 378 (6th Cir. 1999) .........................................   16, 28

*Tucker v. FBI Headquarters*, 2020 WL 2059866 (E.D. Mich. 2020) .....................................   12

*United States v. Nixon*, 418 U.S. 683 (1974) ............................................................... 12

*Wesley v. Campbell*, 779 F.3d 421 (6th Cir. 2015) ...................................................... 15

**<u>Statutes and Rules</u>**

42 U.S.C. § 1983 .................................................................... 1, 12–15, 25, 35

Michigan Crime Victims Rights Act, MCL 780.751 et seq.         ........................ 13, 14, 17, 20

Michigan Child Protection Law, MCL 722.623 et seq.         ........................................ 13, 20, 22

Michigan Governmental Immunity Statute, MCL 691.1407         ................................ 22, 23

U.S. Constitution, First Amendment         ................................................. 16, 28, 33

U.S. Constitution, Due Process Clause         ........................................................ 13, 25, 30

Plaintiff Isaac Thomas ("Plaintiff", "Isaac" or "Mr. Thomas") respectfully submits this Memorandum of Law in opposition to Defendant Genesee County, Sheriff Chris Swanson, and Undersheriff Michael Tocarchick (collectively "Genesee County Defendants" or "County Defendants") – Motion to Dismiss ("MTD" at ECF Doc.#: 51 – ECF 51-7) the Second Amended Complaint (hereafter referred to as "SAC" at ECF Doc. #: 46).

## I.   PRELIMINARY STATEMENT

Genesee County Defendants seek dismissal of the claims alleged in the SAC[1] based on what can only be described as a misunderstand or mischaracterization of Plaintiff's claims. Defendants took a claim in isolation, where without context allegations of "failure to investigate" coupled with statements in substance that Plaintiff is attempting to tell officers what to investigate and how to spend their time – does admittedly appear as a weak claim. However, this case is much bigger.

This case is about minor details, and when each detail and piece is stacked up, it's all these details that seem minor at first – but when added up, create a mountain and the crux of this case.

Again, in the instant motion, Defendants frame this case as merely about a "failure to investigate" a historical complaint, citing inapposite cases involving requests for criminal prosecution. (*See* ECF Doc. #: 51 at p. 3-6). But Plaintiff's claims involve far more than a simple refusal to investigate—they involve active obstruction, denial of victim rights, retaliation, and affirmative interference with Plaintiff's constitutional rights at a critical juncture when he sought help as an adult survivor of childhood sexual abuse.

---

[1] As a quick summary:

| | |
|---|---|
| ECF Doc. #: 46 | "SAC" |
| ECF Doc. #: 51 – 51-7 | MTD (instant motion) by "Genesee County Defendants" |
| ECF Doc. #: 52 | Plaintiff Opposition to Whaley Defendants MTD |
| ECF Doc. #: 52-1 | Plaintiff Isaac A. Thomas Declaration (cited herein) |

This case presents the following factual scenario: First, in May 2022, Plaintiff, then 19 years old and recently emancipated from state custody, went to the Genesee County Sheriff's Department to report heinous sexual and physical abuse he suffered as a minor ward of the state at Whaley Children's Center. (*See* ECF Doc. #: 46 at ¶ 44-45). Second, Plaintiff provided detailed, specific allegations identifying his abuser (staff member Dante Jennings), describing violent sexual assaults including a 2016 incident where he was drugged, chased, had his head slammed into a brick wall and pavement, and was sexually assaulted while pinned down. (*Id.* at ¶ 35-39). Third, as a young adult, Plaintiff even showed how concerned he was in requesting a welfare check for children currently at Whaley and asked that the matter be referred to the Genesee Human Oppression Strike Team (GHOST), the local child abuse task force. (*See* Declaration of Isaac A. Thomas at ECF 52-1 at ¶ 39).

Fourth, Plaintiff recounted how he explained years and years of abuse to Defendants. To capture this into words, he recounted in his recent Declaration how it took a substantial amount of time for him "to understand the full scope of what had been done to me, to connect my current symptoms and struggles to the abuse I had suffered." (*See* ECF Doc. #: 52-1 at ¶ 37). Plaintiff suffered and relived the "abuse", violence, and "betrayal" by all those in position to protect him; the result was Plaintiff was experiencing the "recognition of trauma" associated with "survivors of childhood abuse". (*Id.*).

All of this was put into words, as Plaintiff poured out his heart before Defendants – the response, "your being annoying" and to essentially stop or even as a victim he will find himself in trouble. (*See* ECF 52-1 at ¶ 42-43).

Specifically, instead of processing his report, Undersheriff Tocarchick refused to assign a case number—effectively ensuring no investigation could occur and no record would exist. (*See*

ECF Doc. #: 46 at ¶ 46). Tocarchick then berated Plaintiff, called him "annoying," told him "we don't think anything's happening at Whaley," threatened him by saying "you're going to get yourself in trouble," and ordered him to leave. (ECF 46 at ¶ 42-43). Sheriff Swanson confirmed this refusal and declined to accept Plaintiff's audio evidence or make legally required notifications to child protective services. (*Id.* at ¶ 46).

The steps that followed are the concerning aspects, and should have never been deduced to writing, but the timing requires such to be alleged. Instead of Plaintiff obtaining a victim tracking number or police report, within weeks he was summoned to a meeting by the CEO of Defendant Whaley – the same organization that has never reached out to Plaintiff to see how he was doing since he left. (*See* ECF 52-1 at ¶ 45, 48-50). Over a period of time, Plaintiff's beliefs were confirmed to him when others approached Plaintiff and stating that there was an "active campaign" designed to destroy Plaintiff's credibility if he were to ever go public. (*Id.* at ¶ 51-53). Additionally, this conduct—refusing to create any record of a child sexual abuse report, threatening a victim, denying statutorily mandated victim rights, and affirmatively obstructing access to the criminal justice system—goes far beyond a mere discretionary decision not to investigate, or "failure to investigate". It constitutes actionable constitutional violations under multiple doctrines that the County Defendants' motion fails to address.

Taking the Second Amended Complaint's allegations as true and drawing all reasonable inferences in Plaintiff's favor, it is clear that he has stated plausible claims for relief under 42 U.S.C. § 1983.

Therefore, respectfully County Defendants' Motion to Dismiss should be denied in its entirety.

## II.   COUNTER-STATEMENT OF FACTS

### A.   PLAINTIFF'S CHILDHOOD IN STATE CUSTODY

Isaac Thomas was born in 2002 in Flint, Michigan. (ECF Doc. #: 46 at ¶ 27).   In 2008, when he was six years old, the Michigan Department of Health and Human Services ("DHHS") assumed legal custody of him based on confirmed findings of neglect and abuse in his home. *Id*. From that moment forward, the State of Michigan became responsible for his safety, custody, and care. *Id*.

Over the next decade, the State of Michigan placed Plaintiff in more than forty different foster homes, shelters, and residential institutions as he moved through the foster care system. (*See* ECF 52-1 at ¶ 6). Many of these placements were already known to DHHS for staff misconduct and unsafe conditions. *Id*.

### B.   ABUSE AT WHALEY CHILDREN'S CENTER

In 2016, when Plaintiff was thirteen years old, DHHS placed him at Whaley Children's Center ("Whaley"), a state-funded residential facility in Flint, Michigan. (ECF Doc. #: 46 at ¶ 34). While there, Plaintiff was subjected to repeated sexual and physical abuse by staff member Dante Jennings. (*Id.* at ¶ 35-39).

Jennings established a pattern of abuse, where he would appear at Plaintiff's room at night, secretly administer unidentified pills he called "feel good pills," and then sexually molest Plaintiff. (*Id.* at ¶ 35-37; ECF 52-1, Thomas Decl., at ¶ 17-18). Jennings threatened retaliation if Plaintiff reported the abuse, telling him no one would believe him and that his family would never take him home if he told anyone. (ECF 52-1 at ¶ 19).

In a particularly violent 2016 incident, after administering pills to Plaintiff, Jennings attempted to escalate the sexual assault beyond prior encounters. (ECF 52-1 at ¶ 20). When Plaintiff resisted and fled, Jennings chased him across the facility grounds. (ECF 52-1 at ¶ 38).

Plaintiff ran to the administration building, desperately pounding on the door and crying for help. (ECF Doc.#: 52-1 at ¶ 23-24).

Defendant Mindy Williams, Whaley CEO, and another supervisor came to the door. (ECF 52-1 at ¶ 25). Williams looked directly at Plaintiff—a terrified 13-year-old child in acute distress, fleeing assault—and deliberately refused to open the door or provide assistance. (ECF 46 at ¶ 39). She shook her head in denial and told Plaintiff to go back to his "staff" – Mr. Jennings, the very person he was fleeing from. *Id*.

Jennings then caught Plaintiff. He grabbed Plaintiff by the hair, slammed his head hard into a brick wall, threw him to the ground, and pounded his head on the pavement repeatedly. (ECF 46 at ¶ 38). While Plaintiff was on the ground, Jennings pulled his sweatpants halfway down and committed acts of sexual assault while pinning him with his body weight. *Id.* During the struggle, Plaintiff managed to fight back and chipped Jennings's tooth. (*Id.*; ECF 52-1, Thomas Decl., at ¶ 27).

The adults at Whaley who witnessed Plaintiff's injuries—his bleeding, his trauma—did nothing to stop it from happening, or from reoccurring – rather, the abuse was swept completely under the rug. (ECF 46 at ¶ 39). There was no emergency medical evaluation, no documentation, no report to law enforcement or child protective services. (ECF 52-1, Thomas Decl., at ¶ 29). What Plaintiff stresses is that Jennings was not removed from his position and continued working at Whaley with daily access to children. (ECF 52-1, Thomas Decl., at ¶ 31-32).

C. **RETALIATION AND COVER-UP AT WHALEY**

For months after the assault, Plaintiff attempted to report the ongoing abuse to various staff members at Whaley, to his DHHS caseworker, and to his court-appointed special advocate (CASA), Ken Foyder. (ECF 52-1, Thomas Decl., at ¶ 32). When Foyder raised alarms before the

family court about Plaintiff's mistreatment and moved for his removal from Whaley, Whaley staff retaliated by successfully moving to have Foyder removed from Plaintiff's case after more than eight years of advocacy. (ECF 46 at ¶ 40; ECF 52-1 at ¶ 33).

Whaley also orchestrated the filing of approximately thirteen misdemeanor assault charges against Plaintiff—a thirteen-year-old child—for allegedly fighting back during improper physical restraints. (ECF 46 at ¶ 41; ECF 52-1 at ¶ 34). The presiding foster care judge recognized these charges as retaliatory and dismissed every single one, ordering Plaintiff's transfer to another facility. *Id.*

Despite the judge's recognition of retaliation and dismissal of all fabricated charges, nothing changed at Whaley. Jennings was not terminated and remained in contact with children. (ECF 52-1 at ¶ 35). There was no notification to authorities regarding staff misconduct as required by Michigan law. *Id.*

D. **PLAINTIFF'S ATTEMPT TO REPORT AS AN ADULT AND THE COUNTY DEFENDANTS' RESPONSE**

Upon emancipation in July 2019 at age sixteen, Plaintiff was released from state custody. (ECF 46 at ¶ 43; ECF 52-1, Thomas Decl., at ¶ 36). He had no stable housing, no family to stay with, and profound trauma from his experiences. (ECF 52-1, Thomas Decl., at ¶ 36). Processing the trauma took time, and as a young adult without support or resources, he struggled to understand the full scope of what had been done to him. (ECF 52-1, Thomas Decl., at ¶ 37).

In May 2022, Plaintiff built up the strength to walk into the police department and tell on all of his abusers. Plaintiff went to the Genesee County Sheriff's Department to report what had happened to him at Whaley. (*Id.* at ¶ 38-39). He provided detailed allegations of the sexual and

physical abuse, specifically identified Jennings as his abuser[2], described the violent 2016 assault, and explained that Defendant Williams had seen him at the door seeking help and refused to assist him. (*Id.* at ¶ 39).

Plaintiff was never given an answer. In being told to leave, he was informed of a local child abuse task force. *Id.* A detective initially acknowledged the seriousness of Plaintiff's report and indicated it might be referred to the child abuse task force. (ECF 52-1, Thomas Decl. at ¶ 40). Plaintiff waited in the lobby for over an hour, believing his report was being processed. *Id.*

But when Plaintiff inquired about the status, he was told that no case number had been assigned to his report. (ECF 52-1, Thomas Decl., at ¶ 41). Without a case number, Plaintiff's complaint could not enter the criminal justice system, there could be no investigation, no victim tracking, no prosecutor notification, and no official record that he had even attempted to report a crime. *Id.*

Plaintiff asked for an explanation. (ECF 52-1, Thomas Decl., at ¶ 43). Instead of receiving assistance, Undersheriff Tocarchick escorted Plaintiff outside the building. *Id.* Tocarchick then berated Plaintiff, called him "annoying," told him dismissively "we don't think anything's happening at Whaley," threatened him by saying "you're going to get yourself in trouble," and refused to allow him to file a report or be assigned a case number. (ECF 46 at ¶ 45; ECF 52-1 at ¶ 53).

Tocarchick ordered Plaintiff to leave. *Id.*[3]

---

[2] It is not alleged herein or in this action that, at the time Plaintiff made such complaints about Jennings to County Defendants – Plaintiff did not know his accusers last name at the time.

[3] *See* ECF 46 at ¶ 56 (admitting that he recorded this entire encounter—from Plaintiff's arrival at the Sheriff's Department to his forced departure without a case number).

Plaintiff tried to gain further insight and reached out directly to Sheriff Swanson. (ECF 52-1 at ¶ 44). But Sheriff Swanson simply confirmed Undersheriff Tocarchick's position, stating that no investigation would occur. (ECF 46 at ¶ 46). Swanson refused to accept Plaintiff's audio evidence or his recordings of encounters with law enforcement. (ECF 52-1, Thomas Decl., at ¶ 44). Neither Swanson nor Tocarchick made the legally required notifications to child protective services or referred the case to the child abuse task force. *Id.*

### E. THE 2022 MEETING WITH WHALEY AND ONGOING RETALIATION

Within two weeks after the County Defendants completely rejected Plaintiff's allegations, Plaintiff was contacted by Mindy Williams, the CEO of Whaley, and summoned to a meeting. (ECF 46 at ¶ 48; ECF 52-1, Thomas Decl., at ¶ 45-47). The timing is significant in that how could Williams have known about Plaintiff's complaint to the Sheriff when no report was taken, no notes were made, and no case number was assigned. (ECF 52-1, Thomas Decl., at ¶ 67).

Plaintiff feared retaliation, so he brought his own witness to the meeting. (ECF 52-1 at ¶ 47). At the meeting, CEO Williams and other Whaley administrators heard Plaintiff's allegations and made remarkable admissions, in that it was conveyed to Plaintiff that in 2016, he was seen injured and bleeding after the incident with Jennings. Another acknowledgement was that Whaley had failed to notify law enforcement despite legal obligations. (ECF 46 at ¶ 52-53; ECF 52-1 at ¶ 48).

Of course, Plaintiff recorded the meeting. (*Id.*; ECF 52-1 at ¶ 48-49). Despite these recorded admissions and Plaintiff's detailed account, Whaley administrators took no corrective action. (ECF 52-1 at ¶ 50). Instead, administrators showed their true concern upon suggesting Plaintiff should not publicly speak about the abuse he suffered at their facility. *Id.*

Plaintiff got the message: if he knew better he would apply advise I have provided him in the past, such as to "remain silent". *Id.*[4]

### III.    STANDARD OF REVIEW

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept all well-pleaded factual allegations as true and construe the complaint in the light most favorable to the plaintiff. *Mattera v. Baffert*, 100 F.4th 734, 739 (6th Cir. 2024). To survive dismissal, a complaint need only contain sufficient facts, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

A claim is plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Iqbal*, 556 U.S. at 678.

The Court should not dismiss a complaint for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 360 (6th Cir. 2001).

At this stage, the Court does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses. *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). Factual disputes, including those concerning qualified immunity and governmental

---

[4] Again, this case alleges how collectively, Defendants have continued to retaliate against Plaintiff, where former Whaley employees have approached Plaintiff and informed that: Whaley higher staff conducted meetings instructing employees to avoid contact with Plaintiff and the plan to undermine his credibility— a coordinated campaign to ensure that if Plaintiff spoke about his abuse, he would not be believed. (ECF 46 at ¶ 63; ECF 52-1, Thomas Decl. at ¶ 51-52).

immunity, are not properly resolved on a motion to dismiss. *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (highlighting qualified immunity is "an immunity from suit rather than a mere defense to liability" but does not shield defendants when factual disputes exist).

## IV.  LAW AND ARGUMENT

### POINT ONE:
**THE GENESEE COUNTY DEFENDANTS' "NO DUTY TO INVESTIGATE" ARGUMENT MISAPPLIES THE <u>TUCKER</u> CASE AND IGNORES PLINTIFF'S ACTUAL CLAIMS**

The County Defendants' lead argument—that they had no duty to investigate and therefore cannot be liable. However, this argument fundamentally misapprehends the nature of Plaintiff's claims and misapplies the case law they cite. (ECF Doc.#: 51 at p. 3-6).

A.  **THE <u>TUCKER</u> CASE IS INAPPOSITE AND ADDRESSES STANDING TO COMPEL CRIMINAL PROSECUTION, NOT CONSTITUTIONAL VIOLATIONS**

The County Defendants rely heavily on *Tucker*, for the proposition that Plaintiff lacks standing to sue for failure to investigate. ECF No. 51 at p 4-5 (*citing Tucker v. FBI Headquarters*, 2020 WL 2059866 (E.D. Mich. 2020). But *Tucker* is factually and legally distinguishable.

*Tucker* involved an "extremely litigious pro per plaintiff" who sued the FBI based on "verbose, discursive rantings" about "fantastic or delusional scenarios" involving alleged "electronic warfare" and "neural weapons." *Tucker*, 2020 WL 2059866, at p. 1-2. The court dismissed the case as frivolous, finding the plaintiff lacked standing to compel federal agencies to investigate or prosecute crimes—a principle rooted in separation of powers. *Id.* at p. 2 (*citing United States v. Nixon*, 418 U.S. 683, 693 (1974)).

The holding in *Tucker* is narrow, where a private citizen has no standing to direct the Executive Branch's prosecutorial discretion. That principle does not remotely apply here.

First, Plaintiff does not seek to compel criminal prosecution or direct law enforcement's investigative priorities. He seeks damages under 42 U.S.C. § 1983 for constitutional violations that occurred when the County Defendants affirmatively obstructed his right to report a crime, denied him statutorily protected victim rights, retaliated against him for attempting to report abuse, and interfered with his access to the criminal justice system. Second, *Tucker* addressed standing—a jurisdictional question about whether the court has authority to hear a particular type of claim.

Here, there is no standing issue. Plaintiff has alleged concrete, particularized injuries caused by the County Defendants' conduct, in the form of denial of victim rights under Michigan law, denial of access to courts, retaliation for protected speech, and psychological harm from being threatened and dismissed when seeking help. (ECF 46 at ¶ 44-46; Thomas Decl. at ¶ 42-44, 55-57). These are actual injuries sufficient to establish Article III standing.

Third, the Sixth Circuit has recognized that § 1983 claims based on procedural denials or interference with the criminal justice system are cognizable even when they do not compel investigation or prosecution. *Christopher v. Harbury*, 536 U.S. 88, 105 (2002) (recognizing access-to-courts claims where official acts impede presentation of claims).

Plaintiff's claims fall squarely within this doctrine.

B. **PLAINTIFF'S CLAIMS ARE BASED ON AFFIRMATIVE MISCONDUCT, NOT MERE INACTION**

The fatal flaw in the County Defendants' argument is that the arguments stop short and do not extend past characterizing this case as involving only a "failure to investigate." (ECF No. 51 at p. 3-6). But the Second Amended Complaint ("SAC") alleges far more than passive inaction.

The *Due Process Clause* does not impose a duty to protect individuals from private violence. *DeShaney v. Winnebago Cnty. Dept. of Soc. Services*, 489 U.S. 189, 195-96 (1989). Meaning that the State is not required to protect citizens from harm inflicted by private actors,

even if state officials know someone is in danger – the Constitution does not impose a duty for the State to step in. *Id.*

Here, the allegations pertaining to the County Defendants engaging in affirmative misconduct consists of Officers:

(1) Refusing to create any record of Plaintiff's report by denying him a case number, (ECF 46 at ¶ 45);

(2) Threatening Plaintiff and calling him "annoying" when he sought help as a crime victim who was sexually abused since he was a minor, (ECF 52-1, Thomas Decl., at ¶ 43);

(3) Affirmatively stating disbelief and expressing their believe that "we don't think anything's happening at Whaley", (*Id.*);

(4) Warning Plaintiff "you're going to get yourself in trouble" for attempting to report that he was sexually abused while he was at Whaley, (*Id.*);

(5) Ordering Plaintiff to leave the premises, (*Id.*);

(6) Refusing to make statutorily mandated notifications to child protective services, (ECF 46 at ¶ 46);

(7) Refusing to refer the matter to the GHOST child abuse task force as requested, (ECF 52-1, Thomas Decl., at ¶ 39); and

(8) Refusing to accept evidence Plaintiff had of such alleged abuse, (ECF 46 at ¶ 46).

The distinction between inaction and affirmative obstruction is critical. In *DeShaney*, the Supreme Court held that the Due Process Clause generally does not impose affirmative duties on the state to protect citizens. *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 195-96 (1989). But the Court recognized exceptions, including when the state affirmatively acts to create or enhance danger. *Id.* at 201. Stated differently, even though the State's failure to protect an individual does not violate the Due Process clause – there are exceptions that apply such as a "custodial relationship". *DeShaney*, 489 U.S. 195-196 (1989). The Court recognized

exceptions, include when the state affirmatively acts to create or the state officials knowingly enhance danger. *Id.* at 201.

Here, the actions detailed above go far beyond a mere discretionary decision not to investigate. For example, the allegations amount to a: (1) Denial of statutory victim rights under the Michigan's Crime Victims Rights Act, MCL 780.751 et seq.; (2) Violation of mandatory reporting duties under Michigan's Child Protection Law, MCL 722.623 et seq.; (3) Retaliation against Plaintiff for exercising his First Amendment right to report crime and seek redress; (4) Denial of access to the criminal justice system in violation of Plaintiff's *due process rights*; and (5) State-created danger by dismissing serious allegations and preventing welfare checks on children at Whaley.

Here, the County Defendants did not simply decline to act—they affirmatively prevented Plaintiff from accessing the criminal justice system, threatened him, and failed to make mandatory reports that might have protected other children.

This affirmative obstruction states valid § 1983 claims.

C. **TUCKER DOES NOT ADDRESS THE VIOLATION OF ESTABLISHED VICTIM RIGHTS**

Even if *Tucker*'s general principle applied (which it does not), that case did not involve—and thus did not address—situations where state law creates specific, enforceable rights for crime victims.

Michigan's Crime Victims Rights Act, MCL 780.751 *et seq.*, creates substantive rights for victims of crime, including the right to be treated with dignity and respect, the right to be informed of case progress, and the right to have complaints processed according to law. MCL 780.752. While the CVRA may not create a standalone private right of action for damages, the violation of

these statutory rights can form the basis of negligence *per se* claims and support § 1983 claims for denial of procedural due process.

When law enforcement officers refuse to even create a record of a crime report—denying a victim any case number or documentation—they deprive that person of all CVRA protections and any ability to track whether their complaint is being addressed. This goes beyond declining to investigate; it erases the victim's report entirely, as if no crime was ever alleged.

The County Defendants cite no case—and there is none—holding that law enforcement may refuse to document crime reports, deny case numbers to victims, threaten victims who attempt to report, and violate mandatory reporting duties, all without constitutional consequence.

## POINT TWO:

**PLAINTIFF HAS ALLEGED VIOLATIONS OF CLEARLY ESTABLISHED CONSTITUTIONAL RIGHTS, DEFEATING QUALIFIED IMMUNITY AT THE PLEADING STAGE**

The County Defendants argue they are entitled to qualified immunity because there was no "clearly established right to have a complaint investigated" in May 2022. (*See* ECF No. 51 at p. 6-9). This argument fails for multiple independent reasons.

### A. QUALIFIED IMMUNITY SHOULD RARELY BE GRANTED AT THE MOTION TO DISMISS STAGE

As an initial matter, qualified immunity is generally inappropriate for resolution at the pleading stage when disputed facts exist. While qualified immunity protects government officials from liability unless they violated clearly established rights, courts must accept the plaintiff's factual allegations as true on a motion to dismiss. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Here, critical factual disputes exist regarding:

(1) What Plaintiff told the County Defendants about the abuse;

(2) How detailed and specific his allegations were;

(3) What Tocarchick said to Plaintiff and how he said it;

(4) Whether the County Defendants' conduct was threatening or retaliatory;

(5) Whether the County Defendants had reason to believe children were in danger; and

(6) Whether mandatory reporting duties were triggered.

These disputes cannot be resolved in the County Defendants' favor at the motion to dismiss stage. The Sixth Circuit has repeatedly cautioned against premature qualified immunity determinations. *Wesley v. Campbell*, 779 F.3d 421, 433 (6th Cir. 2015) (holding "[w]hen there are legitimate factual disputes about what occurred, summary judgment on qualified immunity grounds is inappropriate.").

The same principles apply to Plaintiff at this juncture, and Plaintiff's opposition apply with greater force at the pleading stage.

B. **PLAINTIFF ALLEGES VIOLATIONS OF MULTIPLE CLEARLY ESTABLISHED RIGHTS**

Even setting aside the factual disputes, Plaintiff has alleged violations of rights that were clearly established long before May 2022. The County Defendants frame their qualified immunity argument around whether there was a clearly established right to have a complaint investigated. (*See* ECF No. 51 at p. 8). As explained above, that is not what Plaintiff alleges.

Plaintiff alleges violations of clearly established rights, first, which are described below as (a) Report crime without retaliation, and (b) to be free from threats when seeking police help. Second, the next established rights explained are "access the criminal justice system" and to "have crime reports documented according to law." Lastly, the right to "have mandatory reporting duties complied with" is the fifth clearly established right alleged in the SAC.

Each of these rights were clearly established in May 2022. Accordingly, Defendant's characterization of Plaintiff's claims as merely seeking "investigation" is inaccurate. Therefore, Defendant's position of qualified immunity does not apply.

### i. *The Right to Report Crimes Without Retaliation, and to be Free from Threats and Intimidation When Seeking Police Assistance*

The First Amendment protects the right to petition the government for redress of grievances, which includes the right to report crime to law enforcement without facing retaliation. *Thaddeus-X v. Blatter,* 175 F.3d 378, 394 (6th Cir. 1999). This right was clearly established decades before the events in this case.

When Tocarchick threatened Plaintiff in substance: (1) "you're going to get yourself in trouble", (2) called him "annoying," and (3) ordered him to leave after he attempted to report child sexual abuse – each standing alone constituted retaliation for protected First Amendment activity. No reasonable officer in 2022 could have believed such conduct was lawful.

It was clearly established in 2022—and indeed for decades before—that police officers may not threaten or intimidate citizens who seek their help. Tocarchick's statement "you're going to get yourself in trouble" while rejecting Plaintiff's report of sexual abuse constituted a threat designed to silence a victim and deter him from pursuing his complaint.

No reasonable officer could have believed this conduct was lawful. The law does not permit officers to threaten crime victims who come forward to report abuse.

### ii. *The Right to Access the Criminal Justice System and to Have Reports Processed.*

The Supreme Court has long recognized that citizens have a constitutional right of access to courts and the criminal justice system. *Christopher v. Harbury,* 536 U.S. 88, 105 (2002); *Bounds*

Page 16 of 38

*v. Smith*, 430 U.S. 817, 821-22 (1977). While this right is mostly invoked by prisoners, it extends to all citizens seeking to present claims to the legal system.

When the County Defendants refused to assign Plaintiff a case number—thereby preventing his complaint from entering the system at all—they denied him access to the criminal justice process.

Without a case number, Plaintiff could not: (a) Track the progress of his complaint, (b) Exercise victim rights under the CVRA, (c) Obtain documentation that he had reported, (d) Ensure prosecutors were notified, and (e) Follow up on the status of any investigation.

This complete obstruction of access was clearly unconstitutional in 2022.

Moreover, Michigan law establishes mandatory reporting duties when law enforcement officers receive complaints of child abuse. MCL 722.623. These duties exist to protect children and ensure that allegations of abuse are properly investigated by child protective services and specialized units like GHOST.

When the County Defendants refused to document Plaintiff's report, declined to notify DHHS, and failed to refer the matter to GHOST despite Plaintiff's specific request, they violated clearly established statutory duties. While violation of state law alone may not establish a constitutional violation, the deliberate refusal to comply with mandatory child protection laws in a manner that puts children at risk can constitute deliberate indifference under § 1983.

### iii. *The Improper Application of Quasi-Judicial Immunity to Operational Misconduct*

The County Defendants may attempt to claim some form of immunity based on *Kolley v. Adult Protective Services*, 786 F. Supp. 2d 1277 (E.D. Mich. 2011). However, *Kolley* is inopposite and actually supports Plaintiff's position.

In *Kolley*, the court granted absolute quasi-judicial immunity to a guardian ad litem for testimony and recommendations made during probate court proceedings regarding child custody and placement. *Id.* at 1289-1291. The court explained that quasi-judicial immunity protects officials who perform functions "integral to the judicial process," such as filing petitions with the court, providing testimony in hearings, and making recommendations to judges. *Id.*

Critically, *Kolley* distinguished between actions taken as part of the judicial process (protected) and investigatory or operational actions (not protected). The court specifically noted that social workers receive absolute immunity only for "judicial-phase acts like testimony," while investigatory acts are not protected by quasi-judicial immunity. *Id.* at 1291 (*citing Holloway v. Brush*, 220 F.3d 767 (6th Cir. 2000)).

Here, Plaintiff is not suing the County Defendants for any act sanctioned by or integral to a judicial proceeding. The conduct at issue—refusing to document a crime report, threatening a victim, denying a case number, failing to make mandatory notifications, and preventing access to the criminal justice system—occurred entirely outside any court proceeding. No judge authorized Undersheriff Tocarchick to threaten Plaintiff or refuse to assign a case number. No court order directed Sheriff Swanson to dismiss Plaintiff's allegations without investigation.

The County Defendants' operational misconduct in their capacity as law enforcement officers receiving a crime report bears no resemblance to the court-sanctioned guardianship and placement decisions in *Kolley*. If anything, *Kolley* reinforces that immunity does not extend to the type of investigatory and operational failures alleged here.

C. **DEFENDANTS ARE NOT ENTITLED TO QUASI-JUDICIAL IMMUNITY BECAUSE THEIR MISCONDUCT WAS NOT INTIMATELY ASSOCIATED WITH THE JUDICIAL PHASE**

To the extent Defendant Whaley Children's Center or the County Defendants attempt to shield their conduct behind absolute or quasi-judicial immunity, such reliance is entirely misplaced. It is well-established that quasi-judicial immunity only protects state actors or their private equivalents for actions that are "intimately associated with the judicial phase of the proceedings." *Kolley v. Adult Protective Servs.*, 786 F. Supp. 2d 1277, 1298 (E.D. Mich. 2011).

In *Kolley*, the court granted absolute immunity to social workers for the specific act of filing petitions and making recommendations to the probate court. However, the *Kolley* court carefully distinguished those protected acts from "investigatory" or operational actions that occur outside the judicial process, which are not entitled to absolute immunity. *Id.* at 1287-90. Here, Plaintiff is not suing Defendants for executing a family court order placing him at Whaley. Rather, Plaintiff is suing Defendant Jennings's unauthorized, violent sexual assaults, Whaley's deliberate cover-up of those assaults, and the County Defendants' refusal to document the crimes. None of these actions were sanctioned by a judge, nor were they intimately associated with the judicial phase of any proceeding. They were pure operational misconduct. Because sexual assault, threatening a victim, and covering up child abuse are not judicial functions, absolute quasi-judicial immunity does not apply.

The County Defendants cite general principles of qualified immunity but identify no case—none—holding that officers are entitled to immunity for refusing to document crime reports, threatening victims, or violating mandatory reporting duties. (*See* ECF No. 51 at p. 6-9).

Their argument essentially asks the Court to hold that because there is no case specifically stating "officers must investigate complaints," they are immune from all constitutional claims

arising from how they respond to victims. This approach would eviscerate § 1983 liability for police misconduct.

The Supreme Court has rejected such wooden applications of qualified immunity. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (holding "[o]fficials can still be on notice that their conduct violates established law even in novel factual circumstances."). The question is whether the constitutional right was clearly established in the general sense—not whether the precise factual scenario has been addressed.

Here, the rights violated—freedom from retaliation, access to justice, protection under mandatory reporting laws—were clearly established. That they were violated in the specific context of a child sexual abuse report does not grant the County Defendants immunity.

**POINT THREE:**

**THE GENESEE COUNTY DEFENDANTS' GOVERNMENTAL IMMUNITY DEFENSE IS PREMATURE AND FACTUALLY DISPUTED**

The County Defendants argue they are entitled to governmental immunity under Michigan law because: (a) their conduct did not constitute gross negligence, and (b) they were not the proximate cause of Plaintiff's damages. (ECF No. 51 at p. 9-11).

Both arguments fail.

**A.   GROSS NEGLIGENCE FINDINGS ARE PREMATURE**

Overall, Gross Negligence is a fact-intensive determination inappropriate for resolution at this juncture. Michigan's governmental immunity statute provides immunity for negligence but not for gross negligence. MCL 691.1407(2)(c). Gross negligence is defined as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." MCL 691.1407(7)(a).

Whether conduct constitutes gross negligence is ordinarily a question of fact for the jury. *Robinson v. Detroit*, 462 Mich. 439, 462 (2000).  Gross negligence should only be found and decided as a matter of law when reasonable minds could not differ. *Id.*

Here, the County Defendants' conduct plausibly constitutes gross negligence. Specific, Defendants engaged in the following behavior:

(1)    Refusing to document serious allegations of child sexual abuse,
(2)    Declining to make mandatory notifications to child protective services,
(3)    Refusing to refer the matter to a specialized child abuse task force,
(4)    Threatening a young adult survivor of abuse who sought help, and
(5)    Taking no action to protect children currently at the facility where abuse was alleged.

A reasonable jury could find that refusing to create any record of child sexual abuse allegations—particularly when the victim identified an ongoing risk to other children—demonstrates a "substantial lack of concern for whether an injury results." At minimum, this creates a factual dispute that cannot be resolved in the County Defendants' favor on a motion to dismiss.

The County Defendants argue their conduct was not grossly negligent because "Plaintiff had alternatives, i.e. the City of Flint and the Michigan State Police." (ECF No. 51 at p. 10). This argument is both legally and factually wrong.

First, the existence of alternative avenues for reporting does not excuse gross negligence in refusing to accept a report. Michigan law imposes mandatory reporting duties on law enforcement officers who receive child abuse complaints. MCL 722.623. Those duties are not discretionary, nor are they satisfied by telling a victim to go somewhere else.

Second, the County Defendants' argument assumes Plaintiff could easily access these alternatives. But Plaintiff was a traumatized 19-year-old survivor of childhood sexual abuse who had just been threatened and dismissed by the Sheriff's Department. The County Defendants'

suggestion that he should have simply tried somewhere else ignores the psychological harm caused by their conduct and the chilling effect it had on Plaintiff's ability to seek justice.

Third, accepting the County Defendants' logic would mean that law enforcement agencies could refuse to accept crime reports with impunity, so long as other agencies exist. This cannot be the law.

## B. PROXIMATE CAUSE PRESENTS FACTUAL DISPUTES THAT CANNOT BE RESOLVED ON A MOTION TO DISMISS

The County Defendants argue they cannot be the proximate cause of Plaintiff's damages because those damages occurred before May 2022, when Plaintiff attempted to make his report. ECF No. 51 at 10-11.

This argument ignores significant portions of Plaintiff's alleged damages.

First, Defendants wholly ignore the ongoing pyschological harm that Plaintiff is suffering.

Plaintiff's damages include ongoing psychological injuries that were exacerbated by the County Defendants' conduct. (ECF 52-1, Thomas Decl., at ¶ 55-59). When a trauma survivor seeks help and is instead threatened, dismissed, and denied the ability to even have their report documented, this compounds their existing trauma.

Plaintiff alleges he suffers from intrusive memories, hyperventilating, constant anxiety, depression, panic attacks, and difficulty forming relationships. (*Id.* at ¶ 56-57). The County Defendants' treatment of him when he sought help is a proximate cause of the exacerbation and continuation of these injuries.

Second, Defendant's motion is devoid an argument about the claims of a "Denial of Justice" and accountability.

Part of Plaintiff's injury is the denial of his ability to seek accountability through the criminal justice system. When the County Defendants refused to document his report, they foreclosed any possibility of: (1) Investigation of his allegations; (2) Potential prosecution of his abuser; (3) Protection of other children at Whaley; (4) Validation of his experience through official recognition; and (5) Access to victim services and support.

The Supreme Court has recognized that procedural injuries—the denial of processes and protections to which one is entitled—constitute cognizable harm. *Carey v. Piphus*, 435 U.S. 247, 266 (1978). The County Defendants' refusal to process Plaintiff's report is the proximate cause of these procedural injuries.

Third, Plaintiff's claims encompass "harm to other children".

Plaintiff specifically requested a welfare check for children currently at Whaley and asked that the matter be referred to GHOST. (ECF 52-1, Thomas Decl., at ¶ 39). The County Defendants refused. If children at Whaley suffered harm after May 2022 due to the County Defendants' failure to investigate or make mandated reports, that harm is directly traceable to the County Defendants' conduct.

While Plaintiff does not allege he personally suffered ongoing physical abuse after May 2022 (he had been emancipated), he has alleged harm from the County Defendants' refusal to protect other children—a harm that goes to his dignity, his attempt to prevent others from suffering as he did, and his right to participate in the criminal justice process.

Fourth, retaliation and an "on-going cover-up" is the vortex of the Second Amended Complaint, about which is only possible with affirmation actions by all the Defendants, individually and collectively.

The Second Amended Complaint alleges that within two weeks of the County Defendants' refusal to accept Plaintiff's report, Whaley contacted him for a meeting. (*See* ECF

46, "SAC", at ¶ 48, 52-53). The timing suggests the County Defendants may have tipped off Whaley, leading to the meeting and subsequent retaliation campaign. (ECF 52-1, Thomas Decl., at ¶ 67-69).

If the County Defendants' conduct facilitated Whaley's retaliation—by informing Whaley of Plaintiff's complaint or by ensuring no official investigation would occur—then the County Defendants are a proximate cause of that ongoing harm.

Fifth, Defendant's motion is devoid a single argument about Michigan's "Proximate Cause" Standard.

Even accepting the County Defendants' citation to *Robinson v. Detroit*, 462 Mich. 439, 459 (2000), which defines proximate cause as "the one most immediate, efficient, and direct cause," Plaintiff has alleged multiple theories under which the County Defendants' conduct qualifies. Specifically, the County Defendants' refusal to process Plaintiff's report is:

1) The immediate and direct cause of Plaintiff's denial of access to the criminal justice system,

2) The immediate and direct cause of Plaintiff's inability to exercise victim rights,

3) A substantial factor in the exacerbation of his psychological injuries, and

4) A contributing cause to ongoing harm to other children at Whaley.

Whether the County Defendants' conduct is the proximate cause of Plaintiff's damages is a factual question that cannot be resolved in their favor at the pleading stage.

**POINT FOUR:**

**PLAINTIFF'S SECTION 1983 CLAIMS STATE VALID CAUSES OF ACTION INDEPENDENT OF ANY DUTY TO INVESTIGATE**

The County Defendants' Motion spends considerable effort arguing that no duty to investigate exists. Even accepting that premise for purposes of argument (which Plaintiff does not), it does not defeat Plaintiff's § 1983 claims, which are based on affirmative misconduct and violation of specific constitutional rights, not on a mere failure to investigate.

**A.   COUNT 2: FAILURE TO PROTECT**

The County Defendants argue Plaintiff's failure to protect claim fails because Plaintiff was never in the custody of Genesee County. (ECF No. 51 at p. 13-14). This argument misunderstands the claim.

First, while Plaintiff was not in the County Defendants' custody in May 2022, his claim is based on the County Defendants' refusal to investigate credible allegations of ongoing danger to children who were effectively in state custody at Whaley. When law enforcement receives specific, credible allegations that children at a state-funded facility are being abused, and when the victim specifically requests a welfare check and referral to a child abuse task force, the failure to take any protective action can constitute a failure to protect under the special relationship doctrine.

Second, the *DeShaney* Court recognized that while the state generally has no affirmative duty to protect citizens from private violence, the Due Process Clause does impose such a duty when the state has a "special relationship" with the individual. *DeShaney*, 489 U.S. at 197-200. Such a relationship exists when: (1) The state has taken custody of the individual, or (2) The state has created or enhanced the danger to the individual. *Id.*

Here, children at Whaley were in state custody for constitutional purposes. The State of Michigan, through DHHS, had removed them from their families and placed them in Whaley's care. They had no ability to leave and were subject to complete control by state-funded actors. Under *Nugent v. Spectrum Juvenile Justice Services*, 72 F.4th 135, 145-46 (6th Cir. 2023), such children are in state custody, triggering the state's duty to protect them.

When the County Defendants received specific allegations of abuse at Whaley, they had a duty to take reasonable steps to investigate and protect the children there. Their complete refusal to act—not even documenting the complaint or making mandated reports—constitutes deliberate indifference to a known risk.

Third, even if Plaintiff's failure to protect claim is viewed as concerning only Plaintiff himself (rather than other children at Whaley), the County Defendants' refusal to investigate and document his historical abuse can be viewed as a continuing denial of protection. Plaintiff sought validation, investigation, and accountability. The County Defendants' complete refusal denied him the protection of the law.

The failure to protect claim should not be dismissed.

## B. COUNT 3: STATE-CREATED DANGER

The County Defendants argue Plaintiff's state-created danger claim fails because they "did nothing to put Plaintiff in a greater position of danger." (ECF No. 51 at p. 14-15). This argument ignores the allegations in the Second Amended Complaint.

The state-created danger doctrine recognizes that even when the state has no affirmative duty to protect, it can be liable if it affirmatively creates or enhances the danger faced by an individual. *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998). To state a claim, Plaintiff must show: (1) the state actors created or increased the risk of harm; (2) their conduct

shocked the conscience; and (3) there was a direct causal link between the state's action and the injury. *Id.*

Plaintiff has alleged facts supporting each element. Below, each element will be explained individually.

### i.  *Creation or Enhancement of Danger*

The County Defendants enhanced the danger in multiple ways:

(1)  They assured Whaley (implicitly or explicitly through their inaction) that no investigation would occur, emboldening continued cover-up;

(2)  They prevented a welfare check that could have identified ongoing abuse;

(3)  They failed to notify DHHS and GHOST, preventing specialized protective intervention;

(4)  Their threatening and dismissive treatment of Plaintiff sent a message that victims would not be believed or helped, thereby chilling future reports;

(5)  Within two weeks of their refusal, Whaley contacted Plaintiff—suggesting the County Defendants may have tipped them off, enabling retaliation.

These actions affirmatively increased the danger both to Plaintiff (by facilitating retaliation) and to other children at Whaley (by preventing protective intervention).

### ii.  *Conscience-Shocking Conduct*

Whether conduct shocks the conscience depends on the circumstances. In situations where officials have time for deliberation, gross negligence or arbitrary action may suffice. *County of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998).

Here, the County Defendants were not in a split-second emergency. Plaintiff came to the Sheriff's Department, provided detailed allegations, waited for over an hour, and asked for help.

The County Defendants had ample time to deliberate. Their decision to, refuse to create any record; threaten Plaintiff; dismiss credible allegations of child sexual abuse; ignore

mandatory reporting duties; and deny the victim basic dignity and respect plausibly shocks the conscience.

A jury could reasonably find that refusing to even document a child sexual abuse report, then threatening the victim, reflects callous indifference to Plaintiff's rights and safety—and to the safety of children at Whaley.

### iii. *Direct Causal Link*

The County Defendants' conduct directly led to: (1) No investigation or welfare check, (2) No notifications to DHHS or GHOST; (3) Continued concealment by Whaley; (4) Facilitation of retaliation against Plaintiff; and (5) Ongoing danger to children at Whaley.

These constitute direct causal links between the County Defendants' actions and Plaintiff's injuries.

The state-created danger claim is adequately pleaded and should not be dismissed.

## C. COUNT 4: FIRST AMENDMENT RETALIATION

The County Defendants argue Plaintiff has not pled facts constituting retaliation. (ECF No. 51 at 15-16). Once again, this is incorrect.

To state a First Amendment retaliation claim, Plaintiff must show: (1) He engaged in protected First Amendment activity; (2) Defendants' adverse action caused him to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) the adverse action was motivated at least in part by his protected conduct *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).

Plaintiff has alleged each element.

First, Plaintiff has met the "protected activity" element because reporting crime to law enforcement is core First Amendment activity—it is petitioning the government for redress of

grievances. U.S. CONST. AMEND. I. Plaintiff engaged in this protected activity when he went to the Sheriff's Department to report the abuse at Whaley. The second element of "adverse action causing chilling" exists when the County Defendants' conduct constitutes adverse action: (1) Refusing to document his report, (2) calling him "annoying", (3) telling him "we don't think anything's happening at Whaley", (4) threatening him: "you're going to get yourself in trouble", and (5) Ordering him to leave. (ECF 46 at ¶ 45; ECF 52-1 at ¶ 43).

This conduct would chill a person of ordinary firmness from continuing to report. Indeed, it sent the message: "If you continue to pursue this complaint, you will face negative consequences." The threat "you're going to get yourself in trouble" is an explicit warning of retaliation.

The temporal proximity between Plaintiff's report and the County Defendants' adverse actions supports an inference of retaliatory motive. Plaintiff came to report abuse, and immediately upon doing so, he was threatened, dismissed, and denied the ability to have his report documented.

At its core, the retaliation alleged here motivated Defendant to acts wrongfully against Plaintiff, whose every action has been protected conduct.

The County Defendants cannot seriously argue that threatening a victim with "you're going to get yourself in trouble" for reporting abuse is not retaliatory conduct. That is the paradigmatic example of retaliation—punishing someone for exercising their First Amendment right to petition the government.

The retaliation claim is adequately pleaded.

## D.   COUNT 5: DENIAL OF ACCESS TO COURTS

The County Defendants argue that Plaintiff has not pleaded a denial-of-access claim because, even if they had investigated, there is no guarantee that criminal charges would have been filed. (ECF No. 51 at p. 16). That argument misunderstands both Plaintiff's theory and the

Page 29 of 38

nature of the constitutional right at issue. The right of access to courts does not promise any particular outcome; it protects the ability to pursue and present claims through the legal system in the first place. The Supreme Court has recognized that government officials violate this right when they take actions that impede a person from meaningfully presenting claims to the system. *Christopher v. Harbury*, 536 U.S. 403, 415 (2002).

Here, Plaintiff alleges that the County Defendants did not merely decline to pursue his allegations; they affirmatively prevented his report from entering the criminal justice system at all. Specifically, Plaintiff alleges the County Defendants refused to assign him a case number, refused to document his complaint, and refused to create any official record that he had reported sexual abuse—thereby foreclosing any meaningful avenue for follow-up. As Plaintiff pleads, the absence of a case number meant he could not determine whether his complaint was even being reviewed, could not invoke or exercise victim rights under Michigan law, could not effectively follow up with prosecutors, could not obtain basic documentation confirming that he made a report, could not access victim services tied to an official complaint, and could not know whether any investigative steps were taken.

This is therefore not a case in which Plaintiff accessed the system and simply did not receive the result he wanted. Plaintiff alleges he was blocked at the threshold—prevented from accessing the process itself—through official acts that erased his complaint before it could be tracked, reviewed, or acted upon. That type of obstruction is precisely what an access-to-courts claim addresses. Moreover, Plaintiff specifically requested referral to GHOST, the specialized child-abuse task force, and alleges the County Defendants refused that request as well. (ECF 52-1, Thomas Decl., at ¶ 39). Taken as true at the pleading stage, these allegations state a plausible denial-of-access claim, and dismissal is unwarranted.

**POINT FIVE:**

**THE FAILURE TO PROTECT CLAIM IS PROPERLY PLEADED UNDER THE SPECIAL RELATIONSHIP DOCTRINE**

As discussed above in Section IV (A), the County Defendants' argument that Plaintiff was never in their custody misapprehends the failure to protect claim.

**A.   CHILDREN AT WHALEY WERE IN STATE CUSTODY**

The core of Plaintiff's failure to protect claim concerns the County Defendants' refusal to investigate allegations of abuse at Whaley or take action to protect children who were currently at the facility. (ECF 46 at ¶ 44-46; ECF 52-1 at ¶ 39).

These children were in state custody for constitutional purposes. They had been removed from their families by court order, placed in a state-funded facility, and were subject to complete control with no ability to leave. Under *DeShaney*, when the state takes a person into custody, it assumes a corresponding duty to protect their safety. *DeShaney*, 489 U.S. at 199-200.

The Sixth Circuit's recent decision in *Nugent v. Spectrum Juvenile Justice Services*, 72 F.4th 135 (6th Cir. 2023), directly supports this conclusion. *Nugent* held that a private juvenile detention facility operating under contract with Michigan and housing court-ordered juveniles is a state actor exercising a traditionally exclusive public function. *Id.* at 145-46. The children detained there are in state custody, triggering constitutional protections. *Id.*

Whaley is functionally identical to the facility in *Nugent*:

(1)  State-funded residential facility,

(2)  Houses children removed from families by court order,

(3)  Children cannot leave without court approval,

(4)  Operates under contract with DHHS, and

(5)  Exercises complete control over children's daily lives.

Page 31 of 38

(ECF 46 at ¶ 14, 27, 34, 42).

Under *Nugent*, these children are in state custody. When the County Defendants received credible allegations that children in state custody were being abused, they had a duty to take reasonable protective action.

## B. THE COUNTY DEFENDANTS' COMPLETE INACTION CONSTITUTES DELIBERATE INDIFFERENCE.

Even if the Court finds that the special relationship doctrine does not apply, Plaintiff has alleged sufficient facts to support a failure to protect claim under a deliberate indifference standard. Deliberate indifference requires, knowledge of a substantial risk of serious harm and disregard of that risk. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Plaintiff provided the County Defendants with detailed, specific allegations:

1) Staff member Dante Jennings sexually abused him,

2) The abuse involved drugging and violent assault,

3) In a 2016 incident, Plaintiff's head was slammed into a wall and pavement,

4) Supervisor Mindy Williams witnessed Plaintiff seeking help and refused to assist, and

5) Children at Whaley were at ongoing risk.

(ECF 46 at ¶ 35-39, 44-45; ECF 52-1 at ¶ 39).

These allegations provided knowledge of a substantial risk of serious harm to children at Whaley. The County Defendants' response—refusing to document the complaint, declining to make mandated reports, and taking no action whatsoever—demonstrates deliberate indifference to that risk.

The County Defendants cannot credibly argue they were unaware of the risk. Plaintiff provided explicit, detailed allegations and specifically requested a welfare check. Their complete inaction in the face of such allegations plausibly constitutes deliberate indifference.

## POINT SIX:

## THE STATE-CREATED DANGER CLAIM IS ADEQUATELY PLEADED

As discussed in Section IV (B) above, Plaintiff has adequately pleaded a state-created danger claim. The County Defendants' argument that they "did nothing" mischaracterizes their conduct.

The County Defendants did not simply decline to act—they affirmatively acted in ways that enhanced the danger:

1) They assured Whaley (through their inaction and apparent communication) that no investigation would occur;

2) They prevented protective intervention by refusing to notify DHHS and GHOST;

3) They threatened Plaintiff, deterring him from pursuing his complaint; and

4) They potentially tipped off Whaley to Plaintiff's complaint (explaining how Whaley knew to contact him within two weeks).

Each of these actions affirmatively enhanced the danger to Plaintiff and to other children at Whaley. The state-created danger claim should not be dismissed.

Furthermore, the above section entitled "Count 3: State-Created Danger" and its three subsections are incorporated by reference to this point. *See* Point IV (B); *See also* Point IV (B)(i) – Point IV (B)(iii), *supra* at p. 26-28.

**POINT SEVEN:**

**THE FIRST AMENDMENT RETALIATION CLAIM STATES A COGNIZABLE CLAIM**

As discussed in above, threatening a crime victim with "you're going to get yourself in trouble" after he reports abuse is quintessential retaliation for protected First Amendment activity. Going as far as affirmatively notifying higher-ups at Whaley, where the CEO then summoned Plaintiff for an in-person meeting to tell plaintiff to essentially "keep his mouth shut" and to stop making complaints – constitutes conspiracy behavior and liability. Back at this specific time, Plaintiff was not informing anyone of the abuse he suffered as a minor because he naturally was ashamed and dealing with his trauma. Plaintiff was not consulting lawyers, or writing on social media about Whaley. All roads lead to County Defendants affirmatively informing Whaley because going to the police department and reporting crimes committed against him and other young boys was the only way Plaintiff had yet to complain about Whaley.

Absent a bug in the local police department there was literally no other way that Whaley could have known of Plaintiff's complaints. The County Defendants offer no meaningful response to this claim.

Furthermore, the above section entitled "Count 4: First Amendment Retaliation" is respectfully incorporated by reference to this point. *See* Point IV (C), *supra* at p. 28-29.

**POINT EIGHT:**

**THE DENIAL OF ACCESS TO COURTS CLAIM IS PROPERLY PLEADED**

The above section entitled "Count 5: Denial of Access to Courts" is incorporated by reference to this point. *See* Point IV (D), *supra* at p. 29-31. As discussed above, the County Defendants prevented Plaintiff from accessing the criminal justice system by refusing to

document his complaint or assign a case number. This denial of access states a valid constitutional claim.

## POINT NINE:

**PLAINTIFF HAS PLACABLY PLEADED MONELL LIABILITY AGAINST BOTH GENESEE COUNTY AND WHALEY CHILDREN'S CENTER**

### A. MONELL LIABILITY AGAINST GENESEE COUNTY

The County Defendants argue that if the individual defendants did not violate Plaintiff's constitutional rights, the *Monell* claim against Genesee County must be dismissed. While it is true that municipal liability requires an underlying constitutional violation, Plaintiff has adequately pleaded multiple constitutional violations by the individual deputies. *Board of County Commissioners v. Brown*, 520 U.S. 397, 404 (1997).

Furthermore, Plaintiff has alleged sufficient facts to hold Genesee County directly liable under *Monell* through the actions of its final policymaker. Sheriff Swanson, the highest policymaking authority for the Sheriff's Department, personally confirmed and ratified Undersheriff Tocarchick's refusal to investigate, explicitly declining to accept Plaintiff's audio evidence. SAC ¶ 46. Under Sixth Circuit law, when a municipality's final policymaker ratifies the unconstitutional decisions of a subordinate, municipal liability attaches. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). Moreover, the complete refusal by both the Sheriff and Undersheriff to comply with mandatory child abuse reporting statutes demonstrates a deliberate failure to train deputies on statutory victim rights and constitutional protections, constituting deliberate indifference to the rights of abuse survivors.

B. *MONELL* LIABILITY AGAINST WHALEY CHILDREN'S CENTER AS A PRIVATE STATE ACTOR

Defendant Whaley Children's Center is a private entity that operates under a state contract to house children removed from their families by court order. The Sixth Circuit has firmly established that private corporations performing traditional state functions are treated as municipalities for the purposes of § 1983 and are subject to the *Monell* standard of liability. *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 818 (6th Cir. 1996). While Whaley cannot be held liable under a theory of *respondeat superior* solely because its employee (Jennings) committed sexual assaults, it is directly liable because the constitutional violations were caused by Whaley's own corporate policies, customs, and deliberate indifference.

Plaintiff's Second Amended Complaint clearly pleads that the deprivation of his rights was the result of Whaley's institutional custom and practice. First, Defendant Mindy Williams—a Whaley supervisor and later CEO—personally observed Plaintiff seeking help during the 2016 assault and enforced an institutional policy of deliberate indifference by locking the door and refusing medical aid. (ECF 46 at ¶ 39). Second, Whaley engaged in an established custom of retaliatory cover-ups. When Plaintiff's CASA advocate attempted to report the abuse, Whaley orchestrated the advocate's removal and filed thirteen fabricated, retaliatory misdemeanor charges against Plaintiff to discredit him. (*Id.* at ¶ 40-41). Finally, Whaley's administration held coordinated meetings instructing staff to undermine Plaintiff's credibility, demonstrating an official corporate policy of silencing victims rather than reporting staff misconduct to DHHS. (*Id.* at ¶ 63). These allegations easily satisfy the pleading requirements for corporate liability under *Monell* and *Street*.

**CONCLUSION**

The Genesee County Defendants' Motion to Dismiss should be DENIED in its entirety. Plaintiff has stated plausible claims for relief under 42 U.S.C. § 1983 based on multiple constitutional violations that were clearly established in May 2022. The factual disputes inherent in this case—including disputes about what occurred, what was said, and the County Defendants' motivations—cannot be resolved in the County Defendants' favor at the pleading stage.

This case involves serious allegations that a traumatized young adult survivor of childhood sexual abuse sought help from law enforcement and was instead threatened, dismissed, and denied the basic right to have his complaint documented. If these allegations are true—as the Court must assume at this stage—they reflect a profound failure of our justice system and a violation of constitutional rights that must be redressed.

Plaintiff respectfully requests that the Court:

1) DENY the Genesee County Defendants' Motion to Dismiss in its entirety
2) Allow this case to proceed to discovery
3) Award Plaintiff such other and further relief as the Court deems just and proper

Dated:  March 17, 2026
New York, New York

Respectfully submitted,

/s/ *Steven A. Metcalf II*

STEVEN A. METCALF II, ESQ.
*Attorney for Plaintiff Isaac A. Thomas*
**Metcalf & Metcalf, P.C.**
99 Park Avenue, Suite 810
New York, NY 10016
(646) 253-0514
**MetcalfLawNYC@gmail.com**

**CERTIFICATE OF SERVICE**

I hereby certify that on March 18, 2026, I caused the foregoing document to be filed electronically via the Court's CM/ECF system, which will send notification of such filing to all attorneys of record.

/s/ *Steven A. Metcalf II*

Steven A. Metcalf II, Esq.