**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

ISAAC ANTHONY THOMAS,

*Plaintiff*,

v.

WHALEY CHILDREN'S CENTER; MINDY WILLIAMS, in her individual and official capacity; DANTE JENNINGS; GENESEE COUNTY; SHERIFF CHRIS SWANSON, in his individual and official capacity; UNDERSHERIFF MICHAEL TOCARCHICK, in his individual and official capacity; LAKESIDE FOR CHILDREN D/B/A LAKESIDE ACADEMY; LAKESIDE ACADEMY; SEQUEL YOUTH SERVICES OF MICHIGAN, LLC, also known as SYS OF MICHIGAN, LLC; SEQUEL YOUTH AND FAMILY SERVICES, LLC; SYFS INTERMEDIATE HOLDINGS LLC; SEQUEL TSI HOLDINGS, LLC; SEQUEL ACADEMY HOLDINGS, LLC; SEQUEL YOUTH SERVICES, LLC; ALTAMONT CAPITAL PARTNERS; JOHN F. RIPLEY; VIVANT BEHAVIORAL HEALTHCARE, LLC; VIVANT BEHAVIORAL HOLDINGS, LLC; MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES; and JOHN AND JANE DOES 1-8,

*Defendants*.
______________________________________/

Case No. 2:25-cv-10524

Hon. Susan K. DeClercq
(United States District Judge)

Mag. Judge Anthony P. Patti

**JURY TRIAL DEMANDED**

## THIRD AMENDED COMPLAINT AND JURY DEMAND

Plaintiff Isaac Anthony Thomas, by and through his attorney, Steven A. Metcalf II of Metcalf & Metcalf, P.C., alleges as follows:

## PRELIMINARY STATEMENT

1. The State of Michigan took Isaac Thomas into its custody in 2008, when he was six years old, because his own home was not safe. Over the eleven years that followed, the State moved him through more than forty placements. In two of them — the Whaley Children's Center in Flint in 2016, and Lakeside Academy in Kalamazoo in 2018 — he was sexually assaulted, beaten, and physically restrained by the adults the State paid to keep him safe. He was thirteen or fourteen years old at Whaley. He was fifteen or sixteen at Lakeside.

2. This case is about what happened to him inside those facilities, and about the choices — institutional, financial, and governmental — that made those facilities dangerous.

3. At Whaley, Plaintiff alleges that a direct-care worker, Dante Jennings, gave him and other children pills at bedtime and then sexually assaulted them. In 2016, after one such assault escalated, Plaintiff fled his room and ran to the administration building bleeding and screaming for help. Whaley's Chief Executive Officer, Mindy Williams, came to the door, looked at him, shook her head, and refused to let him in. Jennings caught him outside, slammed his head

into a brick wall and then into the pavement, pulled down his clothing, and sexually assaulted him. No one called the police. No one called a doctor. No one filed a report. Instead, Whaley had the child's court-appointed advocate removed, and it initiated a series of misdemeanor assault charges against a thirteen-year-old for resisting the restraints that were used on him — charges a foster-care judge later dismissed as retaliatory.

4. At Lakeside, Plaintiff was placed into a for-profit residential facility that the State already knew was dangerous. Lakeside was operated by the Sequel enterprise, whose business model depended on holding staffing costs down. Two years after Plaintiff left, Lakeside staff held a sixteen-year-old named Cornelius Fredericks face-down on the cafeteria floor for approximately twelve minutes, kneeling on his chest for more than nine of them, because he had thrown a sandwich. Fredericks died. The Kalamazoo County Medical Examiner ruled it a homicide. Michigan revoked Lakeside's license, the Governor ordered the State to sever all ties with Sequel, and Lakeside closed. The State's own investigation identified ten licensing violations, atop a multi-year history of them.

5. The conditions that killed Cornelius Fredericks are the conditions Plaintiff reported while he was confined there and no one acted on.

6. In May 2022, as an adult, Plaintiff walked into the Genesee County Sheriff's Department and tried to report the sexual abuse he had suffered at

Whaley. He was not permitted to make a report. No case number was assigned. He alleges that Undersheriff Michael Tocarchick escorted him out of the building, called him annoying, told him "we don't think anything's happening at Whaley," and warned him that he was going to get himself in trouble. Sheriff Chris Swanson later declined to investigate, refused to accept Plaintiff's audio evidence, and neither official notified the State licensing authorities. Weeks later, Whaley administrators summoned Plaintiff to a meeting in which — on a recording — they acknowledged that they had seen him injured and bleeding in 2016 and had not reported it.

7. This Third Amended Complaint also names, for the first time, the parties who owned and controlled the Sequel enterprise while Plaintiff was inside one of its facilities, and the parties who took its operating business afterward. Altamont Capital Partners, a private equity firm, acquired majority ownership and board control of Sequel in September 2017 and held it throughout the period Plaintiff was confined at Lakeside and through the death of Cornelius Fredericks. In September 2021, Sequel's own Board Chairman, John F. Ripley, formed Vivant Behavioral Healthcare, LLC and bought Sequel's operating facilities, keeping Sequel's management in place. In February 2022, what remained of Sequel was assigned to a liquidating trustee in Delaware, which paid approximately $1 million against roughly $70 million in secured debt and nothing at all to anyone else. The

enterprise that harmed Plaintiff was, in substance, moved out of the reach of the children it harmed. Plaintiff alleges that the law does not permit that result.

8. Plaintiff brings claims under 42 U.S.C. § 1983 and under Michigan law. He seeks compensatory and punitive damages, and the equitable relief described below.

## JURISDICTION AND VENUE

9. This Court has subject-matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (a)(4), because those claims arise under 42 U.S.C. § 1983 and the Fourth, First, and Fourteenth Amendments to the United States Constitution.

10. This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367(a), because those claims form part of the same case or controversy: they arise from the same custodial placements, the same acts of abuse, the same institutional failures, and the same corporate conduct.

11. This Court also has diversity jurisdiction over the state-law claims against the non-Michigan corporate Defendants pursuant to 28 U.S.C. § 1332(a), to the extent the amount in controversy exceeds $75,000 exclusive of interest and costs and complete diversity exists as between Plaintiff and those Defendants.

12. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims — the abuse at the

Whaley Children's Center in Flint, the refusal of the Genesee County Sheriff's Department to take Plaintiff's report, and the placement decisions of the Michigan Department of Health and Human Services — occurred in Genesee County, within the Southern Division of this District.

13. Venue is also proper under 28 U.S.C. § 1391(b)(1) because one or more Defendants reside in this District and all Michigan Defendants are residents of the State of Michigan.

14. This Court has personal jurisdiction over each Defendant. The Michigan Defendants are residents of or do business in Michigan. The non-Michigan corporate Defendants purposefully directed their conduct at Michigan by owning, controlling, operating, financing, or acquiring a State-licensed residential facility for children in Michigan, by contracting to receive Michigan public funds for the care of Michigan children, and by setting the operating and staffing policies under which that Michigan facility housed Michigan children in State custody. Plaintiff's claims arise directly out of that Michigan-directed conduct.

## PARTIES

### A. Plaintiff

15. Plaintiff ISAAC ANTHONY THOMAS is a natural person born in 2002 in Flint, Genesee County, Michigan. He was a minor at all times relevant to the abuse alleged in this Complaint. He was a ward of the State of Michigan, in the

legal custody of the Michigan Department of Health and Human Services or its predecessor, from approximately 2008 until his release from State custody in or about July 2019.

**B. The Whaley Defendants**

16. Defendant WHALEY CHILDREN'S CENTER ("Whaley") is, upon information and belief, a Michigan nonprofit corporation with its principal place of business in Flint, Genesee County, Michigan. Whaley operated a residential child-caring institution licensed by the Michigan Department of Health and Human Services and, at all relevant times, housed children in the legal custody of the State of Michigan under contract with and with funding from the State.

17. Defendant MINDY WILLIAMS is, upon information and belief, a natural person residing in the State of Michigan. At all relevant times she was the Chief Executive Officer of Whaley, with final authority over Whaley's operations, personnel, discipline, incident reporting, and response to allegations of abuse. She is sued in her individual and official capacities.

18. Defendant DANTE JENNINGS is, upon information and belief, a natural person residing in the State of Michigan. At all relevant times in 2016 he was employed by Whaley as a direct-care worker with custodial responsibility for the children housed there, including Plaintiff. He is sued in his individual capacity.

19. Whaley, Williams, and Jennings are referred to collectively as the "Whaley Defendants."

**C. The Genesee County Defendants**

20. Defendant GENESEE COUNTY is a municipal corporation and political subdivision of the State of Michigan. It is responsible for the funding, oversight, policies, customs, and training of the Genesee County Sheriff's Department.

21. Defendant CHRIS SWANSON is, upon information and belief, a natural person residing in the State of Michigan. At all relevant times he was the elected Sheriff of Genesee County and the final policymaker for the Genesee County Sheriff's Department with respect to the receipt, documentation, and investigation of criminal complaints, including complaints of child sexual abuse. He is sued in his individual and official capacities.

22. Defendant MICHAEL TOCARCHICK is, upon information and belief, a natural person residing in the State of Michigan. At all relevant times he was the Undersheriff of Genesee County, second in command of the Sheriff's Department, with supervisory authority over the intake and investigation of criminal complaints. He is sued in his individual and official capacities.

23. Genesee County, Swanson, and Tocarchick are referred to collectively as the "County Defendants."

**D. The Lakeside Facility Defendants**

24. Defendant LAKESIDE FOR CHILDREN D/B/A LAKESIDE ACADEMY ("Lakeside for Children") is, upon information and belief, a Michigan entity that held or was associated with the child-caring-institution license under which the residential facility known as Lakeside Academy operated at 8225 Moorsbridge Road, Portage, Kalamazoo County, Michigan. Upon information and belief, the entity is presently dissolved, and its last resident agent of record was Daniel P. McGlinn at that address.

25. Defendant LAKESIDE ACADEMY is named as the assumed name under which the Lakeside facility operated and, to the extent it exists as a separate legal entity, as a separate Defendant. Upon information and belief, Lakeside Academy is presently dissolved.

26. Defendant SEQUEL YOUTH SERVICES OF MICHIGAN, LLC, also known as SYS OF MICHIGAN, LLC ("Sequel Michigan"), is, upon information and belief, a limited liability company that owned, managed, staffed, and operated the premises and program known as Lakeside Academy. Upon information and belief, Sequel Michigan presently maintains no resident agent of record with the Michigan Department of Licensing and Regulatory Affairs, and it was included among the subsidiaries swept into the Delaware assignment for the benefit of creditors described below.

27. Lakeside for Children, Lakeside Academy, and Sequel Michigan are referred to collectively as the "Lakeside Defendants."

**E. The Sequel Parent Defendants**

28. Defendant SEQUEL YOUTH AND FAMILY SERVICES, LLC ("Sequel Youth") is, upon information and belief, a Delaware limited liability company that maintained its headquarters at 1131 Eagletree Lane, Huntsville, Alabama. Sequel Youth was the parent enterprise that set the operating policies, staffing standards, training curricula, restraint practices, incident-reporting protocols, and financial targets governing its residential facilities, including Lakeside Academy.

29. Defendant SYFS INTERMEDIATE HOLDINGS LLC is, upon information and belief, a Delaware limited liability company, also headquartered at 1131 Eagletree Lane, Huntsville, Alabama, that held the equity of Sequel Youth and through which the enterprise's owners exercised governance and control.

30. Defendant SEQUEL TSI HOLDINGS, LLC is, upon information and belief, a limited liability company within the Sequel corporate family that held or controlled Sequel operating subsidiaries and that was included in the Delaware assignment for the benefit of creditors described below.

31. Defendant SEQUEL ACADEMY HOLDINGS, LLC is, upon information and belief, a limited liability company within the Sequel corporate

family that held or controlled Sequel operating subsidiaries and that was included in that same Delaware assignment.

32. Defendant SEQUEL YOUTH SERVICES, LLC is named to the extent it exists as a legal entity distinct from Sequel Michigan and the other Sequel entities named above.

33. Sequel Youth, SYFS Intermediate Holdings, Sequel TSI Holdings, Sequel Academy Holdings, and Sequel Youth Services, LLC are referred to collectively as the "Sequel Parent Defendants." The Lakeside Defendants and the Sequel Parent Defendants are referred to collectively as the "Sequel Enterprise Defendants."

**F. The Controlling Owner Defendant**

34. Defendant ALTAMONT CAPITAL PARTNERS ("Altamont") is, upon information and belief, a private equity firm with its principal place of business at 400 Hamilton Avenue, Suite 230, Palo Alto, California. Plaintiff names Altamont under the designation by which it has publicly identified itself and by which it has been named as a party in related litigation, and reserves the right to amend to reflect the precise legal name of the entity or fund vehicle through which it held its Sequel interest once that information is obtained.

35. Upon information and belief, in a transaction closing in or about September 2017, Altamont acquired a majority equity interest in and control of the

Sequel enterprise, and thereafter held the power to appoint a majority of the enterprise's board, to approve its budgets and capital structure, and to direct its strategy. Altamont held that control throughout the period Plaintiff was confined at Lakeside Academy in 2018, through the death of Cornelius Fredericks in 2020, and through the 2021 sale of the enterprise's operating facilities.

### G. The Successor Defendants

36. Defendant JOHN F. RIPLEY, also known as Jay Ripley, is, upon information and belief, a natural person who co-founded Sequel in or about 1999, became its majority owner in or about 2014, sold control to Altamont in or about September 2017, and thereafter continued to serve as Chairman of the Board of the Sequel enterprise until the 2021 sale of its operating facilities. Upon information and belief, he formed and controls the Vivant entities named below. He is sued in his individual capacity.

37. Defendant VIVANT BEHAVIORAL HEALTHCARE, LLC ("Vivant Healthcare") is, upon information and belief, a Delaware limited liability company formed in or about September 2021 for the purpose of acquiring the operating business of the Sequel enterprise. Upon information and belief, Vivant Healthcare is the sole member of SYFS SaleCo, LLC, which in turn holds the former Sequel operating entities.

38. Defendant VIVANT BEHAVIORAL HOLDINGS, LLC ("Vivant Holdings") is, upon information and belief, a Delaware limited liability company and the sole member of Vivant Healthcare. Upon information and belief, its members include Ripley Holdings, LLC and John N. Ripley, together with a small number of individuals formerly associated with Sequel's management.

39. Ripley, Vivant Healthcare, and Vivant Holdings are referred to collectively as the "Successor Defendants."

**H. The State Defendant**

40. Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES ("MDHHS") is a department of the State of Michigan. At all relevant times MDHHS held legal custody of Plaintiff, selected and approved his placements, licensed and monitored the residential facilities in which he was placed, contracted with and paid those facilities, and was statutorily responsible for investigating reports of abuse and neglect concerning children in its care.

41. Plaintiff names MDHHS as a Defendant on his state-law claims and, on his federal claims, solely for such prospective equitable relief as may be available consistent with the Eleventh Amendment. Plaintiff does not seek an award of money damages against MDHHS itself under 42 U.S.C. § 1983. Plaintiff's federal damages claims arising from placement and monitoring decisions are asserted

against the individual MDHHS employees identified below as Doe Defendants, in their individual capacities.

**I. The Doe Defendants**

42. Defendants JOHN AND JANE DOES 1 through 4 are direct-care staff, supervisors, program directors, and executives of the Lakeside Defendants and the Sequel Parent Defendants whose true identities are presently unknown to Plaintiff and who participated in, directed, authorized, or knowingly failed to prevent the physical mistreatment and unsafe restraint of Plaintiff at Lakeside Academy in 2018. They are sued in their individual capacities.

43. Defendants JOHN AND JANE DOES 5 through 8 are caseworkers, supervisors, and licensing personnel employed by MDHHS whose true identities are presently unknown to Plaintiff and who selected, approved, or continued Plaintiff's placements at Whaley and Lakeside with knowledge of the danger those placements posed, or who received and disregarded Plaintiff's reports of abuse. Upon information and belief, one such person is the MDHHS caseworker identified to Plaintiff as Jordan Dortman. They are sued in their individual capacities.

44. Plaintiff will seek leave to substitute the true names of the Doe Defendants once discovery permits their identification.

## FACTUAL ALLEGATIONS

### A. Plaintiff enters State custody and is moved through more than forty placements.

45. Plaintiff was born in Flint, Michigan in 2002.

46. In or about 2008, following court-confirmed findings of neglect and abuse in his home, the State of Michigan removed Plaintiff from his family and took him into its legal custody. He was six years old.

47. From that point until his release from State custody in or about July 2019, Plaintiff was a ward of the State. MDHHS held legal custody of him and bore responsibility for his safety, shelter, education, medical care, and psychiatric treatment.

48. Over those eleven years, Plaintiff was placed in more than forty different foster homes, emergency shelters, and residential institutions. Each move interrupted his schooling, his therapy, and his psychiatric medication. He formed no stable attachments and had no consistent adult advocate other than, for a period, a court-appointed special advocate.

49. MDHHS placed Plaintiff, at various times, in settings where he was harmed. In one relative placement, an adult sexually abused multiple children in the home, including Plaintiff, and was later criminally convicted. In another placement, excessive force by an adult fractured Plaintiff's arm; the injury was documented and no corrective action followed.

50. By the time MDHHS placed Plaintiff at Whaley in 2016, it possessed a substantial record concerning that facility's licensing history. By the time it placed him at Lakeside in 2018, it possessed reports concerning excessive restraint, inadequately trained staff, and physical abuse of residents at that facility.

**B. The Whaley Children's Center, 2016: sexual assault by a direct-care worker.**

51. In or about 2016, MDHHS placed Plaintiff at the Whaley Children's Center in Flint. He was thirteen or fourteen years old.

52. Whaley was licensed by MDHHS as a child-caring institution and was paid with public funds to house and care for children in State custody. Its staff exercised complete physical control over the children in its care: where they slept, when they ate, whether they could leave a room, whether they could use a telephone, and whether they could see their families.

53. Defendant Dante Jennings was employed at Whaley as a direct-care worker. He had custodial authority over Plaintiff and the other children in his unit.

54. Plaintiff alleges that Jennings engaged in a pattern of drugging and sexually abusing children in his care. At bedtime, Jennings gave Plaintiff and other children pills that Plaintiff has never been able to identify, describing them as "feel good pills" and instructing the children not to tell anyone that he had given them out.

55. After administering those pills, Jennings sexually molested Plaintiff and, upon information and belief, other children in his care.

56. Jennings also physically assaulted Plaintiff and threatened him with retaliation — loss of privileges, transfer, and physical harm — if he reported the abuse or resisted it.

57. On a date in 2016, after dinner and after Jennings had given Plaintiff medication, Jennings entered Plaintiff's room and escalated the sexual assault. Plaintiff alleges that Jennings attempted to have Plaintiff sit on him, and told Plaintiff to penetrate him.

58. Plaintiff escaped through an emergency exit and ran across the grounds toward Whaley's administration building, crying and screaming for help.

59. Defendant Mindy Williams, Whaley's Chief Executive Officer, came to the door of the administration building together with a supervisor known to Plaintiff as "Brandy." Williams looked directly at Plaintiff, shook her head, and refused to open the door or otherwise render aid.

60. Jennings caught Plaintiff outside the administration building. He grabbed Plaintiff by the hair, slammed Plaintiff's head into a brick wall, threw him to the ground, and pounded his head against the pavement.

61. Jennings then pulled down Plaintiff's clothing, pinned him to the ground, and sexually assaulted him. Plaintiff alleges that during this assault

Jennings inserted his fingers into Plaintiff's anus while Plaintiff was restrained face-down and unable to move.

62. Plaintiff resisted throughout. In the course of resisting he struck Jennings and damaged one of Jennings's teeth.

63. Plaintiff was visibly injured and bleeding. Whaley staff, including Williams, saw him in that condition.

64. At the time of these acts Plaintiff was under the age of sixteen and was in the custody and under the authority of Whaley and its employees. The conduct alleged in the preceding paragraphs constitutes criminal sexual conduct against a minor under Michigan law, including MCL 750.520b and MCL 750.520c.

### C. Whaley's response: no report, no medical care, and retaliation against the child.

65. Whaley did not call the police. Whaley did not call Child Protective Services. Whaley did not report the incident to MDHHS or to its licensing authority. Whaley did not obtain medical treatment or a forensic examination for Plaintiff. Whaley did not remove Jennings from contact with children.

66. Each of these omissions occurred notwithstanding that Whaley and its employees were mandatory reporters under MCL 722.623, obligated to report suspected child abuse immediately upon reasonable cause to suspect it.

67. Plaintiff nonetheless reported the abuse. He reported it to Whaley staff. He reported it to his MDHHS caseworker. He reported it to Ken Foyder, his court-

appointed special advocate, who had advocated for Plaintiff for more than eight years.

68. When Foyder sought Plaintiff's removal from Whaley on the basis of those reports, Whaley moved to have Foyder himself removed from Plaintiff's case. Whaley succeeded. Plaintiff lost the one consistent adult advocate he had.

69. Whaley then initiated or caused to be initiated as many as thirteen misdemeanor assault charges against Plaintiff, then thirteen or fourteen years old, arising from his having fought back while staff physically restrained him.

70. A judge presiding over Plaintiff's foster-care matter determined that those charges were retaliatory, dismissed them, and ordered that Plaintiff be transferred out of Whaley.

71. Throughout this period, Whaley staff withheld food, hygiene items, family contact, visits, telephone calls, and other basic privileges from Plaintiff as a means of intimidating him and discouraging him from reporting.

72. The effect of Whaley's conduct was to conceal Jennings's abuse from the police, from the licensing authority, from the court supervising Plaintiff's custody, and from Plaintiff himself — who was left believing that reporting produced only punishment.

**D. Lakeside Academy, 2018: a facility the State knew was dangerous.**

73. In or about early 2018, MDHHS transferred Plaintiff to Lakeside Academy, a residential treatment facility in Kalamazoo, Michigan, operated by the Sequel Enterprise Defendants. Plaintiff was fifteen or sixteen years old.

74. Upon information and belief, at the time of that transfer MDHHS already possessed reports concerning Lakeside's use of excessive physical restraint, its use of inadequately trained staff, and physical abuse of residents by staff.

75. At Lakeside, Plaintiff was repeatedly subjected to physical mistreatment by staff, including improper physical restraint.

76. Plaintiff also witnessed staff physically restrain and harm other children, including restraints in which multiple staff members placed their body weight on a child who was face-down on the floor.

77. Plaintiff repeatedly reported what was happening — to Lakeside administrators and to his MDHHS caseworker. His reports were not investigated. Instead, Lakeside staff characterized him as a "problem resident," and the reports were treated as behavioral incidents attributable to him rather than as allegations of staff misconduct.

78. Neither the Lakeside Defendants nor the Sequel Parent Defendants nor MDHHS took corrective action in response to Plaintiff's reports.

**E. The Sequel business model: revenue from public placements, controlled by staffing cost.**

79. The Sequel enterprise operated residential facilities for children across the United States, and derived substantially all of its revenue from public payors — state child-welfare and juvenile-justice agencies paying per-child, per-day rates for the placement of children in state custody.

80. Because revenue was fixed by the per-diem rate and the number of children placed, the enterprise's profitability depended principally on controlling its largest variable cost: staffing. Upon information and belief, Ripley described the enterprise's economics in these terms publicly, stating in substance that money could be made in the business if staffing were controlled.

81. The consequences of controlling staffing cost in a residential facility for traumatized children are foreseeable and were foreseen: too few staff for the number of children; staff who were young, inexperienced, and inadequately trained; high turnover; and reliance on physical force and physical restraint as the primary means of managing behavior.

82. Upon information and belief, the Sequel Parent Defendants, and not the individual facilities, set the staffing ratios, wage scales, training curricula, restraint policies, and incident-reporting protocols under which Lakeside Academy operated, and monitored the facilities' financial performance against enterprise budgets.

83. Upon information and belief, throughout the period relevant to this Complaint, facilities across the Sequel enterprise generated repeated reports and findings of excessive restraint, staff-on-resident assault, sexual misconduct by staff, understaffing, and failure to report incidents to state authorities. Those findings were made in multiple states, including Michigan, Ohio, California, Maryland, Oregon, and Washington, and were known to the enterprise's management and owners.

84. A subsequent investigation by the Committee on Finance of the United States Senate examined the Sequel enterprise and its successor and documented systemic failures in staffing, training, and oversight across the enterprise's facilities.

85. The mistreatment Plaintiff suffered at Lakeside in 2018 was not an aberration. It was the predictable operation of a business model that the Sequel Parent Defendants designed and their owner approved.

**F. Altamont acquires and exercises control over the enterprise.**

86. Upon information and belief, in a transaction that closed in or about September 2017, Altamont acquired a majority equity interest in the Sequel enterprise. Upon information and belief, the transaction valued the enterprise at approximately $240 million and was financed in substantial part with debt placed

on the enterprise, including a credit agreement dated on or about September 1, 2017.

87. Upon information and belief, Altamont was not a passive investor. It obtained the right to designate, and did designate, a majority of the members of the enterprise's board of directors, including individuals affiliated with Altamont who served alongside Ripley and members of management. Records in litigation in the Delaware Court of Chancery identify five such Altamont-affiliated designees.

88. Upon information and belief, through those designees and through its rights as controlling equity holder, Altamont approved the enterprise's annual budgets and capital structure, set and monitored financial performance targets, approved or directed material operating decisions, and directed the enterprise's growth and acquisition strategy.

89. Upon information and belief, Altamont invested approximately $40 million in the enterprise over the ensuing three years and publicly described its role as including oversight of the enterprise's operations and a program of continuous improvement in its facilities.

90. Altamont therefore held control of the enterprise during the entire period Plaintiff was confined at Lakeside Academy in 2018.

91. Upon information and belief, Altamont knew or should have known, through its board designees, its financial reporting, its diligence, and the extensive

public and regulatory record, that facilities across the enterprise were understaffed, that staff were inadequately trained in the use of physical restraint, that residents were being physically and sexually abused, and that incidents were not being reported to state authorities as required.

92. Upon information and belief, Altamont nonetheless continued to approve budgets and staffing levels that it knew or should have known were inadequate to keep children in the enterprise's custody safe, and it did not require the enterprise to remedy the conditions of which it was aware.

**G. The death of Cornelius Fredericks confirms what Plaintiff had reported.**

93. On or about April 29, 2020, Cornelius Fredericks, a sixteen-year-old resident of Lakeside Academy, threw a piece of a sandwich at another resident in the facility's cafeteria.

94. Seven Lakeside staff members restrained him. Two of them placed their body weight on his chest and abdomen while he lay on the floor. Upon information and belief, the restraint lasted approximately twelve minutes, and weight was applied to his chest for more than nine of those minutes. Staff did not summon emergency medical assistance until after he had lost consciousness.

95. Cornelius Fredericks died on or about May 1, 2020. The Kalamazoo County Medical Examiner determined that the cause of death was restraint asphyxia and ruled the death a homicide.

96. Upon information and belief, Lakeside staff had subjected Cornelius Fredericks to a similar prolonged restraint in January 2020, involving seven staff members and lasting more than thirty minutes, and had not properly reported that earlier incident to the State.

97. In June 2020, MDHHS suspended Lakeside Academy's license and terminated its contracts. The State's investigation identified ten licensing violations arising from the incident. Upon information and belief, Lakeside had accumulated approximately twenty-six licensing violations in the roughly three years preceding the death.

98. On or about June 20 and 21, 2020, the Governor of Michigan publicly directed MDHHS to take every step necessary to ensure that the Sequel enterprise no longer provided services for facilities licensed by the Department.

99. In July 2020, MDHHS promulgated emergency rules prohibiting prone and face-down restraints and any restraint that restricts breathing at all licensed Michigan child-caring institutions, and imposing new incident-reporting deadlines.

100. Lakeside Academy closed in the summer of 2020. A second Michigan Sequel facility, Starr Albion Prep, also closed. Other states restricted or terminated placements with Sequel facilities during the same period.

101. Two Lakeside staff members were criminally charged with involuntary manslaughter and second-degree child abuse. Both pleaded no contest to involuntary manslaughter and were sentenced in December 2023.

102. Plaintiff knew Cornelius Fredericks. The restraint practices that killed him are the restraint practices Plaintiff had reported, and had witnessed being used on other children, while he was confined at Lakeside two years earlier. Plaintiff alleges that had his reports — and those of other children — been investigated and acted upon, Lakeside's use of dangerous restraint would have been corrected.

### H. The 2021 asset sale: the Chairman buys the business and keeps the management.

103. Upon information and belief, in or about September 2021, Ripley — then the sitting Chairman of the Board of the Sequel enterprise — formed Vivant Behavioral Healthcare, LLC for the purpose of acquiring the enterprise's operating business.

104. Upon information and belief, pursuant to a purchase agreement dated in or about September 2021, Vivant Healthcare or its affiliates acquired a substantial portion of the enterprise's operating facilities, reported as thirteen in the staff report of the Committee on Finance of the United States Senate and as twenty-four in the Delaware wind-down record. Upon information and belief, the consideration included a contingent earnout that ultimately produced no value for the selling entities or their creditors.

105. Upon information and belief, Vivant Healthcare retained many members of the Sequel enterprise's senior leadership, including executives who had held enterprise-wide operating responsibility during the period relevant to this Complaint. Upon information and belief, Vivant's facility footprint overlaps substantially with the footprint of the facilities formerly operated by Sequel, and in a number of instances the same facilities continued to operate under new names.

106. Upon information and belief, the corporate chain of the successor enterprise is as follows: Vivant Behavioral Holdings, LLC, a Delaware limited liability company whose members include Ripley Holdings, LLC and John N. Ripley, is the sole member of Vivant Behavioral Healthcare, LLC, a Delaware limited liability company, which is the sole member of SYFS SaleCo, LLC, a Delaware limited liability company, which holds the former Sequel operating entities. This chain has been set out in a corporate-disclosure filing made under oath in related federal litigation concerning a former Sequel facility in Alabama.

107. Upon information and belief, Vivant Healthcare and Vivant Holdings have no public-facing corporate presence, and Vivant's capitalization was represented to Congress to be entirely private, consisting of Ripley's own capital.

108. Plaintiff alleges that the 2021 transaction transferred the going concern of the Sequel enterprise — its facilities, its state contracts and licenses, its programs, its staff, and its management — to entities owned and controlled by the

enterprise's own Chairman, while leaving behind the enterprise's liabilities to the children it had harmed.

109. In litigation now pending in the United States District Court for the Northern District of Alabama, the court denied Ripley's motion to dismiss on October 14, 2025, on allegations it recited as follows: that Ripley "became the majority owner of Defendant Sequel in 2014 and remained Chairman of its Board of Directors after it was purchased in 2017"; that "[i]n 2021, Defendant Ripley formed Vivant Behavioral Healthcare and purchased a majority of Defendant Sequel's operating facilities"; and that facilities were sold to Vivant "but much of Sequel's corporate management team were retained to operate the same businesses in these facilities." *Bates v. Sequel Youth & Family Servs., LLC*, No. 2:23-cv-01063-RDP (N.D. Ala.).

**I. The 2022 assignment: the remainder is liquidated and the victims are left with nothing.**

110. Upon information and belief, on or about February 28, 2022 — approximately five months after the sale of the operating business to Ripley's new company — Sequel Youth and SYFS Intermediate Holdings executed a general assignment for the benefit of creditors under the then-effective 10 Del. C. §§ 7381 through 7385, commencing a proceeding in the Delaware Court of Chancery docketed as C.A. No. 2022-0198-PAF.

111. Upon information and belief, the assignee was SYFSLLC (ABC), LLC, a Delaware limited liability company formed on February 28, 2022, whose registered agent is Cogency Global Inc., 850 New Burton Road, Suite 201, Dover, Delaware, and whose managing member is an affiliate of a restructuring firm.

112. Upon information and belief, the assignment swept in the Sequel operating subsidiaries, including the Michigan entity that had operated Lakeside Academy, and was made with Altamont's approval and the consent of the enterprise's senior lender.

113. Upon information and belief, at the time of the assignment approximately $70 million remained outstanding under the September 1, 2017 credit agreement; approximately $1 million was ultimately distributed to the secured lender; and no funds remained for general unsecured claims.

114. The practical effect of the 2021 sale and the 2022 assignment, taken together, was that the operating business and management of the Sequel enterprise passed to entities owned by its Chairman, the equity value that had been extracted remained with its owners and lenders, and the entities left to answer for what had been done to children in the enterprise's facilities were emptied of assets.

115. Plaintiff alleges that this sequence was not incidental. It was a means by which the persons and entities responsible for the conditions in Sequel's

facilities sought to separate the enterprise's continuing business from its liability for those conditions.

116. As a further consequence, the corporate Defendants who operated Lakeside Academy no longer maintain resident agents of record capable of accepting process, and Plaintiff has been required to pursue substituted and alternate service in order to bring them before this Court.

**J. Release from State custody, and its aftermath.**

117. In or about July 2019, at the age of sixteen, Plaintiff was released from State custody.

118. He left State custody with no housing, no continuing mental-health treatment, no family support, and no adult advocate — Whaley having succeeded in removing the one advocate he had.

119. Plaintiff was homeless. He was severely traumatized. He had no knowledge of any legal remedy available to him, no means of obtaining counsel, and no capacity, in that condition, to investigate who beyond his immediate abusers might be responsible for what had happened to him.

120. Plaintiff has been diagnosed with post-traumatic stress disorder, major depressive disorder with anxious distress, and obsessive-compulsive disorder. Those conditions arise from and were aggravated by the abuse and instability he experienced in State custody.

### K. May 2022: the Genesee County Sheriff's Department refuses to take Plaintiff's report.

121. On or about May 11, 2022, Plaintiff went to the Genesee County Sheriff's Department to report the sexual and physical abuse he had suffered at Whaley as a child.

122. Plaintiff asked that a welfare check be conducted at Whaley, that his allegations against Jennings be investigated — he knew the man only by his first name — and that the matter be referred to the Sheriff's specialized human-trafficking and exploitation unit.

123. A detective initially indicated to Plaintiff that a referral might be made. Plaintiff waited more than an hour. He then learned that no case number had been assigned and that no report had been taken.

124. Defendant Tocarchick escorted Plaintiff out of the building. Plaintiff alleges that Tocarchick called him "annoying," told him "we don't think anything's happening at Whaley," and told him, "You're going to get yourself in trouble."

125. Tocarchick refused to permit Plaintiff to make a report, refused to cause a case number to be assigned, and refused to document the allegations.

126. Plaintiff subsequently sought review by Defendant Swanson. Swanson declined to investigate, refused to accept the audio evidence Plaintiff offered, and stated that Tocarchick had acted appropriately.

127. Neither Swanson nor Tocarchick notified MDHHS, the facility's licensing authority, or any other agency of Plaintiff's allegations, notwithstanding that Plaintiff's allegations concerned a currently licensed and currently operating child-caring institution housing other children.

128. Plaintiff alleges that the County Defendants' conduct was not a discretionary judgment about investigative priorities. It was a refusal, accompanied by a threat, to allow a survivor of child sexual abuse to create a record of his allegations — and it had the effect of preserving the concealment that Whaley had begun in 2016.

129. Plaintiff alleges that the refusal was consistent with an established practice or custom of the Genesee County Sheriff's Department of discouraging, declining to document, and failing to investigate reports of historical child sexual abuse, particularly reports made by former foster youth, and of failing to train its personnel in the trauma-informed receipt of such reports or in the mandatory notification of licensing authorities.

130. Because the County Defendants refused to document the report, Plaintiff was deprived of the contemporaneous official record, the investigative steps, and the evidence — including the identification of Jennings by full name, the preservation of Whaley personnel and incident records, and the location of other

victims — that such a report would have generated and that he requires to prosecute the civil claims asserted in this action.

**L. Whaley's 2022 admissions and its continuing campaign against Plaintiff.**

131. Within approximately two weeks of Plaintiff's attempt to make a police report, Whaley's Chief Executive Officer summoned Plaintiff to a meeting. Plaintiff attended with an independent victim advocate.

132. At a 2022 meeting with Williams and other Whaley personnel, which was recorded, Whaley administrators acknowledged that in 2016 they had seen Plaintiff injured and bleeding and had not notified law enforcement.

133. At that meeting, Whaley representatives suggested to Plaintiff that he should not speak publicly about what had happened to him.

134. Plaintiff alleges that Whaley thereafter engaged in a continuing effort to discredit him and to portray him as mentally unfit and not credible. After Plaintiff spoke publicly in 2022 about his experiences in State care, former Whaley employees informed him that Whaley administrators had instructed staff to avoid contact with him and to undermine his credibility.

135. Upon information and belief, in 2023 Whaley personnel testified in a criminal proceeding in a manner intended to impeach Plaintiff's credibility.

136. Upon information and belief, in 2024 a former Whaley employee informed Plaintiff that Whaley had held internal meetings concerning Plaintiff and the discrediting of his account.

137. Plaintiff alleges that this conduct was undertaken because of, and in retaliation for, his reports of abuse and his public speech about the treatment of children in Michigan's residential facilities.

138. The 2022 recorded admissions were the first time Plaintiff obtained direct evidence that Whaley's leadership had known of his injuries in 2016 and had chosen not to report them. Until that point, Plaintiff understood only that his reports had gone nowhere; he did not know that they had been affirmatively suppressed.

## TIMELINESS OF PLAINTIFF'S CLAIMS

139. Plaintiff pleads the following facts concerning the timeliness of his claims. These allegations are not asserted as an independent cause of action.

140. **Childhood criminal sexual conduct — MCL 600.5851b.** Plaintiff was born in 2002. He was a minor at the time of the criminal sexual conduct alleged in this Complaint. Under MCL 600.5851b(1)(a), an individual who while a minor was the victim of criminal sexual conduct may commence an action to recover damages sustained because of that conduct at any time before he reaches

the age of 28 years. Plaintiff will not reach the age of 28 until 2030. His claims arising from the criminal sexual conduct alleged herein are therefore timely.

141. Plaintiff was still a minor on June 12, 2018, the effective date of MCL 600.5851b. His claims arising from the 2016 criminal sexual conduct had not lapsed as of that date, whether measured under MCL 600.5805 or under the minority-disability provisions of MCL 600.5851. No question of retroactive revival of an expired claim is presented. *See McLain v. Roman Catholic Diocese of Lansing*, 514 Mich. 1; 22 N.W.3d 284 (2024) (MCL 600.5851b(1)(b) does not apply retroactively to revive expired limitations periods); *MI v. Grace Christian Reformed Church of Grand Rapids*, ___ Mich. App. ___ (2026) (Docket No. 373022) (MCL 600.5851b(1)(a) applies to causes of action that were active when the statute was enacted).

142. Under MCL 600.5851b(2), it is not necessary that a criminal prosecution have been brought, or that any prosecution have resulted in a conviction, for this provision to apply.

143. **Ten-year period for criminal sexual conduct damages — MCL 600.5805(6).** Independently, MCL 600.5805(6) provides a ten-year period of limitations for an action to recover damages sustained because of criminal sexual conduct. Plaintiff's claims arising from the 2016 conduct are timely under that provision as well.

144. **Minority disability — MCL 600.5851.** Plaintiff was under eighteen years of age when each of the claims alleged in this Complaint accrued. Under MCL 600.5851(1), he is entitled to the period provided by that section following the removal of his minority disability with respect to any claim to which it applies.

145. **Fraudulent concealment of the claims — MCL 600.5855.** MCL 600.5855 provides that where a person who is or may be liable fraudulently conceals the existence of a claim or the identity of any person liable for it, the action may be commenced within two years after the person entitled to sue discovers or should have discovered the existence of the claim or the identity of the person liable, notwithstanding that the action would otherwise be barred.

146. Plaintiff alleges the following affirmative acts of concealment. Whaley and Williams observed Plaintiff injured and bleeding in 2016, did not document the incident, did not report it as MCL 722.623 required, did not obtain medical or forensic examination, and kept Jennings in contact with children. Whaley moved to remove Plaintiff's court-appointed advocate when that advocate acted on Plaintiff's reports. Whaley initiated retaliatory criminal charges against Plaintiff, recasting a child's resistance to abuse as the child's own misconduct. Whaley withheld basic necessities and privileges to deter him from reporting. In 2022, Whaley representatives urged him not to speak publicly, and thereafter undertook to portray him as not credible.

147. Plaintiff further alleges that the Lakeside Defendants and the Sequel Parent Defendants concealed the existence of his claims by failing to record and report incidents of restraint and staff misconduct as licensing rules required, by recharacterizing complaints of staff abuse as resident behavioral incidents, and by failing to notify MDHHS or the licensing authority.

148. Plaintiff further alleges that the County Defendants concealed the existence of his claims by refusing to permit him to make a report, refusing to assign a case number, refusing to accept the evidence he offered, and failing to notify the licensing authority — thereby preventing the creation of the official record that would have identified his abuser and preserved the facility's records.

149. Plaintiff did not obtain direct evidence that Whaley's leadership had known of his 2016 injuries and had chosen not to report them until the recorded 2022 meeting described above. He commenced this action within two years of that discovery.

150. **Concealment of the identity of the persons liable.** Separately, Plaintiff alleges that the identity of the persons and entities liable for the conditions at Lakeside Academy was concealed from him by the structure and conduct of the enterprise itself. The facility operated under a name that identified no owner. Its ownership was held through a chain of Delaware holding companies with no public-facing presence. In 2021 the operating business was transferred to a

differently named company owned by the enterprise's own Chairman, and in 2022 the remaining entities were placed into a state-law liquidation that generated no public record identifying who had directed the facilities. Vivant Healthcare and Vivant Holdings maintain no public-facing corporate presence.

151. Plaintiff, who left State custody at sixteen into homelessness and who had no counsel, could not through the exercise of reasonable diligence have identified Altamont as the controlling owner of the enterprise during his confinement, or Ripley and the Vivant entities as the recipients of its operating business, until the facts alleged in this Complaint were assembled from public filings and from records obtained in 2025 and 2026. Those facts include a corporate-disclosure filing made under oath in federal litigation in Alabama, a decision of that court issued in October 2025, records of the Delaware Court of Chancery obtained in May 2026, and the report of the Committee on Finance of the United States Senate.

152. Plaintiff commenced this action within two years of discovering the identity of those persons and entities, and MCL 600.5855 accordingly permits his claims against them.

153. To the extent any claim would otherwise be barred, Plaintiff pleads in the alternative that this amendment relates back to the filing of the original Complaint under Fed. R. Civ. P. 15(c)(1)(A), because Michigan law provides the

applicable period of limitations and permits relation back on the facts alleged; under Rule 15(c)(1)(B), because the claims arise out of the same conduct, transaction, and occurrence set out in the prior pleadings; and under Rule 15(c)(1)(C), because each newly named Defendant knew or should have known that an action arising from the conditions at Lakeside Academy would have been brought against it but for Plaintiff's mistake concerning which entity within the enterprise's ownership and successor structure bore responsibility.

154. Plaintiff further alleges that the retaliatory conduct described above, the refusal of the County Defendants to receive his report in May 2022, and Whaley's conduct in 2022, 2023, and 2024 constitute discrete acts, each of which gave rise to its own claim and its own period of limitations.

## CAUSES OF ACTION

## FEDERAL CLAIMS

### COUNT I

### 42 U.S.C. § 1983 — Fourteenth Amendment Substantive Due Process: Deliberate Indifference to the Safety of a Child in State Custody

**(*Against Doe Defendants 5–8, the Lakeside Defendants, the Sequel Parent Defendants, and Doe Defendants 1–4*)**

155. Plaintiff repeats, reiterates, and realleges each of the foregoing paragraphs as if fully set forth herein.

156. From approximately 2008 until his release in or about July 2019, Plaintiff was a child in the legal custody of the State of Michigan through MDHHS. By removing him from his family and assuming his custody, the State restrained his liberty and rendered him unable to provide for his own safety.

157. Because of that custodial relationship, the Due Process Clause of the Fourteenth Amendment guaranteed Plaintiff the right to be free from the infliction of unnecessary harm while in State-regulated placements, and the right to reasonable safety and bodily integrity while in those placements. That right was clearly established in the Sixth Circuit long before 2016.

158. Doe Defendants 5 through 8 were caseworkers, supervisors, and licensing personnel employed by MDHHS. At all relevant times they acted under color of state law and within the scope of their State employment, and they were responsible for selecting, approving, monitoring, and continuing Plaintiff's placements and for receiving and acting upon reports that he was being abused.

159. Each of Doe Defendants 5 through 8 had actual knowledge of facts from which a substantial risk of serious harm to Plaintiff was obvious, and each actually drew that inference, including knowledge of:

(a) the licensing history of the Whaley Children's Center;

(b) Plaintiff's own reports, made to his MDHHS caseworker while he was at Whaley, that he was being sexually and physically abused by a Whaley staff member;

(c) the concerns raised in court by Plaintiff's court-appointed special advocate, Ken Foyder, about Plaintiff's mistreatment at Whaley, and Whaley's success in having Foyder removed;

(d) the reports in MDHHS's possession, before Plaintiff's 2018 transfer, concerning Lakeside Academy's use of excessive physical restraint, its use of inadequately trained staff, and physical abuse of residents by staff; and

(e) Plaintiff's reports, made to his MDHHS caseworker while he was at Lakeside, concerning his physical mistreatment and the restraint of other children.

160. Despite that knowledge, Doe Defendants 5 through 8 consciously disregarded the risk. They continued Plaintiff's placement at Whaley after he reported abuse; failed to investigate his reports or to ensure that his abuser was removed from contact with him; transferred him to Lakeside Academy notwithstanding the reports then in the State's possession concerning that facility; and disregarded his reports from Lakeside.

161. That conduct was not mere negligence. It constituted deliberate indifference to a known and substantial risk of serious harm to a child in the State's custody.

162. As a direct and proximate result of Doe Defendants 5 through 8's deliberate indifference, Plaintiff remained exposed to, and suffered, continued sexual and physical abuse at Whaley and physical abuse and dangerous restraint at Lakeside.

163. The Lakeside Defendants, the Sequel Parent Defendants, and Doe Defendants 1 through 4 acted under color of state law. Unlike an ordinary foster

home, Lakeside Academy performed the public function of the custodial confinement of children, a function traditionally and exclusively reserved to the State. Upon information and belief:

(a) Lakeside Academy was a residential treatment facility licensed and paid by the State to confine children placed there by order of a court or by MDHHS, including youth placed through the juvenile-justice system, who were housed under the same conditions as youth placed through the child-welfare system;

(b) residents, including Plaintiff, were not free to leave the facility and could not be discharged or leave without the authorization of MDHHS or a court;

(c) residents' movements within the facility were restricted, they were subject to constant staff supervision, and the facility's doors and perimeter were locked, alarmed, or otherwise controlled to prevent residents from leaving;

(d) Lakeside was required by its State contracts and licensing obligations to prevent residents from leaving without authorization and to notify law enforcement when a resident did so;

(e) Lakeside staff were authorized to use physical force and physical restraint, including prone restraint, to control residents and restrict their movements; and

(f) through its treatment reports and discharge recommendations to MDHHS and the court, Lakeside had influence and control over how long a child remained confined at the facility.

164. Lakeside Academy was therefore not a foster home. It was a facility endowed with legal authority to exercise control over children under State-ordered confinement, and in exercising that authority the Lakeside Defendants, the Sequel Parent Defendants, and their employees acted under color of state law.

165. Doe Defendants 1 through 4 violated Plaintiff's right to bodily integrity and to reasonable safety in custody by repeatedly subjecting him to physical force

and physical restraint that was excessive, was not reasonably necessary to protect Plaintiff or others, and was applied as punishment or for staff convenience rather than for any legitimate purpose. Each acted with deliberate indifference to the substantial risk of serious harm that such restraint posed.

166. The Lakeside Defendants and the Sequel Parent Defendants are liable under 42 U.S.C. § 1983 not on a theory of respondeat superior but because their own policies, customs, and practices were the moving force behind the violation of Plaintiff's rights, including:

(a) staffing ratios, wage scales, and staffing budgets set at the enterprise level to meet financial targets, at levels these Defendants knew were inadequate to supervise and protect confined children;

(b) a policy, custom, or practice of using physical restraint, including prone restraint with staff body weight applied to a child lying face-down, as a routine behavior-management technique;

(c) the failure to train staff in de-escalation and in the safe and lawful use of restraint, in circumstances where the need for such training was obvious;

(d) a custom of recharacterizing children's complaints of staff abuse as the children's own behavioral incidents, and of failing to document, investigate, and report restraint incidents and staff misconduct to the State; and

(e) the failure to discipline or remove staff who used excessive restraint.

167. These Defendants adopted and maintained those policies and customs with deliberate indifference. They were on notice of their consequences through repeated reports and findings of excessive restraint, staff-on-resident assault, understaffing, and non-reporting across the Sequel enterprise's facilities, including

the licensing violations accumulated at Lakeside Academy itself in the years before and during Plaintiff's confinement.

168. The Lakeside Defendants, the Sequel Parent Defendants, and Doe Defendants 1 through 4 are private parties and are not entitled to qualified immunity.

169. As a direct and proximate result of the conduct alleged in this Count, Plaintiff suffered physical injury, sexual and physical abuse, severe and lasting psychological injury, loss of educational and developmental opportunity, and the other damages described below. Plaintiff seeks compensatory damages from each Defendant named in this Count and punitive damages from each Defendant whose conduct was malicious or in reckless or callous disregard of his federally protected rights.

**COUNT II**

**42 U.S.C. § 1983 — First Amendment Retaliation**
**(*Against Sheriff Chris Swanson and Undersheriff Michael Tocarchick, in their individual capacities*)**

170. Plaintiff repeats, reiterates, and realleges each of the foregoing paragraphs as if fully set forth herein.

171. On or about May 11, 2022, Plaintiff went to the Genesee County Sheriff's Department to report crimes committed against him as a child at the Whaley Children's Center. In doing so, and in thereafter seeking review by Sheriff Swanson and offering him audio evidence, Plaintiff engaged in conduct protected

by the First Amendment, including the right to petition the government for redress of grievances. Reporting a crime to law enforcement lies at the core of that right.

172. Tocarchick took adverse action against Plaintiff because of that protected conduct. He escorted Plaintiff out of the building; called him "annoying"; told him, "we don't think anything's happening at Whaley"; refused to permit him to make a report or to have a case number assigned; and warned him, "You're going to get yourself in trouble."

173. Swanson took adverse action against Plaintiff because of that protected conduct, and personally participated in, authorized, and approved Tocarchick's conduct. When Plaintiff sought his review, Swanson declined to act on the report, refused the audio evidence Plaintiff offered, and stated that Tocarchick had acted appropriately, thereby adopting Tocarchick's threat as his own.

174. Upon information and belief, Swanson, Tocarchick, or a Sheriff's Department employee acting at the direction or with the knowledge and approval of one or both of them, informed Whaley — the very institution Plaintiff had accused — of Plaintiff's report and of his identity.

175. The basis for that belief includes the following. Plaintiff had had no contact with Whaley for years. Within approximately two weeks after his May 11, 2022 attempt to report, Whaley's Chief Executive Officer, Defendant Williams, contacted Plaintiff and summoned him to a meeting. At that meeting and a

subsequent one, Whaley representatives addressed the very allegations Plaintiff had attempted to report, acknowledged that they had seen him injured and bleeding in 2016 and had not called the police, and suggested that he should not speak publicly about what had happened to him.

176. Each of these actions would deter a person of ordinary firmness from continuing to engage in protected activity. A warning of legal jeopardy from the second-highest-ranking officer of a sheriff's department, delivered to a citizen attempting to report the sexual abuse of a child, and the disclosure of that citizen's report and identity to the institution he accused rather than any investigation of it, are classic forms of intimidation.

177. Plaintiff's protected conduct was a substantial or motivating factor in each adverse action. The threat was made at the moment of, and in direct response to, Plaintiff's attempt to report. The disclosure to Whaley followed within approximately two weeks. Tocarchick's statements expressed hostility to the content of Plaintiff's report itself. No legitimate law-enforcement purpose is served by threatening a crime victim for attempting to report a crime or by alerting the accused institution to his complaint.

178. At all relevant times it was clearly established that public officials may not retaliate against a citizen for exercising First Amendment rights, including the right to report a crime to law enforcement. Any reasonable sheriff or undersheriff

would have known that threatening a complainant and disclosing his complaint to the accused, because of that complaint, was unlawful.

179. Swanson and Tocarchick acted willfully, maliciously, and with reckless and callous indifference to Plaintiff's federally protected rights.

180. As a direct and proximate result of their conduct, Plaintiff suffered injuries caused by their own 2022 conduct: he was chilled and deterred from further efforts to report the crimes committed against him, was exposed to the institution he had accused, and suffered fear, humiliation, emotional distress, and aggravation of his diagnosed psychological conditions. Plaintiff seeks compensatory and punitive damages from Swanson and Tocarchick, and attorney fees and costs under 42 U.S.C. § 1988.

## MICHIGAN STATE-LAW CLAIMS

181. The Michigan state-law claims below are not asserted against Genesee County, Swanson, Tocarchick, MDHHS, or Doe Defendants 5 through 8.

182. Each state-law claim asserted against Jennings, Whaley, or Williams arises out of, and seeks damages sustained because of, criminal sexual conduct committed against Plaintiff while he was a minor, including conduct prohibited by MCL 750.520b, 750.520c(1)(b)(vi), and 750.520e(1)(b), and is timely under MCL 600.5851b(1)(a) and MCL 600.5805(6), as alleged in the Timeliness section above.

## COUNT III

### Sexual Assault and Battery
### (*Against Dante Jennings*)

183. Plaintiff repeats, reiterates, and realleges each of the foregoing paragraphs as if fully set forth herein.

184. Between 2016 and 2018, while Plaintiff was between thirteen and sixteen years old and a resident of the Whaley Children's Center, Jennings — a Whaley employee with custodial authority over him — repeatedly and intentionally touched Plaintiff in a sexual manner, including by molesting him after administering pills to him at bedtime, by attempting to have Plaintiff sit on him and directing Plaintiff to penetrate him, and by digitally penetrating Plaintiff's anus while holding him face-down on the ground after slamming his head into a brick wall and the pavement.

185. The touching was intentional, harmful, offensive, and wholly unprivileged. Plaintiff was a minor in Jennings's custodial care and could not consent as a matter of law, and Jennings used force and coercion to accomplish the sexual contact and penetration.

186. Jennings's conduct constitutes criminal sexual conduct under Michigan law, including MCL 750.520b, MCL 750.520c(1)(b)(vi), and MCL 750.520e(1)(b), and was committed intentionally, maliciously, and in conscious disregard of Plaintiff's rights and safety.

187. As a direct and proximate result, Plaintiff suffered physical injury, pain, humiliation, and severe and permanent psychological injury, and is entitled to compensatory and exemplary damages.

## COUNT IV

### Assault and Battery
**(*Against Dante Jennings and Doe Defendants 1–4*)**

188. Plaintiff repeats, reiterates, and realleges each of the foregoing paragraphs as if fully set forth herein.

189. Jennings intentionally placed Plaintiff in apprehension of immediate harmful contact and intentionally inflicted harmful contact upon him, including by grabbing him by the hair, slamming his head into a brick wall, throwing him to the ground, and pounding his head against the pavement, as part of and in furtherance of the sexual assault described in Count III.

190. Doe Defendants 1 through 4 intentionally inflicted harmful and offensive contact upon Plaintiff at Lakeside Academy by subjecting him to physical force and physical restraint that exceeded any privilege, was not reasonably necessary for the safety of Plaintiff or others, and was used as punishment or for staff convenience.

191. None of this contact was consented to or privileged.

192. As a direct and proximate result, Plaintiff suffered physical injury, pain, and severe psychological injury, and is entitled to compensatory and exemplary damages.

## COUNT V

## Vicarious Liability for Assault, Battery, and Criminal Sexual Conduct (*Against Whaley, the Lakeside Defendants, and the Sequel Parent Defendants*)

193. Plaintiff repeats, reiterates, and realleges each of the foregoing paragraphs as if fully set forth herein.

194. Under Michigan law, an employer is liable for the torts its employee commits within the scope of employment. An employer is also liable for its employee's tortious conduct outside the scope of employment where the employer had actual or constructive knowledge of the employee's prior similar conduct and of the employee's propensity to act in accordance with that conduct.

195. Whaley is vicariously liable for Jennings's physical assault of Plaintiff. Whaley authorized Jennings to use physical force and physical restraint on the children in his care. Jennings's use of force to seize, restrain, and return Plaintiff after he fled the building was an exercise, however excessive, of the restraint authority Whaley had conferred on him and was within the scope of his employment.

196. Whaley is also vicariously liable for Jennings's sexual assaults of Plaintiff, because those assaults were foreseeable to Whaley. Before and during the

assaults alleged in Count III, Whaley had actual or constructive knowledge of Jennings's prior similar conduct and of his propensity to repeat it, including:

(a) Jennings's practice of distributing unidentified pills to children at bedtime and instructing them not to tell anyone, a practice carried out on Whaley's premises during Jennings's shifts;
(b) Plaintiff's own reports of Jennings's sexual abuse, made to Whaley staff;
(c) upon information and belief, reports or observations of Jennings's sexual misconduct with other children in his care;
(d) the observation by Williams, Whaley's Chief Executive Officer, and a supervisor known to Plaintiff as "Brandy," of Plaintiff fleeing Jennings, screaming for help, and later injured and bleeding; and
(e) the admissions of Whaley's administrators, in a recorded 2022 meeting, that they had seen Plaintiff injured and bleeding in 2016 and had not reported it, and their confirmation of institutional knowledge of the abuse.

197. Despite that knowledge, Whaley retained Jennings in a position of unsupervised custodial authority over children, including Plaintiff, in their bedrooms at night. Every assault Jennings committed after Whaley had such knowledge was foreseeable to Whaley.

198. In addition and in the alternative, Whaley ratified Jennings's conduct by failing to investigate, report, discipline, or remove him after its leadership had actual knowledge of the abuse, and by acting instead to discredit and punish Plaintiff.

199. The Lakeside Defendants and the Sequel Parent Defendants are vicariously liable for the batteries committed by Doe Defendants 1 through 4, who used physical force and restraint on Plaintiff in the course of their employment

duties, during working hours, on the employer's premises, and pursuant to the restraint practices those Defendants adopted, trained, and enforced.

200. As a direct and proximate result, Plaintiff suffered the injuries and damages described herein.

## COUNT VI

### Negligent Hiring, Training, Supervision, and Retention
**(*Against Whaley, Williams, the Lakeside Defendants, and the Sequel Parent Defendants*)**

201. Plaintiff repeats, reiterates, and realleges each of the foregoing paragraphs as if fully set forth herein.

202. This Count asserts each Defendant's liability for its or her own negligence, not vicarious liability for the conduct of another.

203. Each of these Defendants voluntarily undertook the custodial care of children who could not leave and could not protect themselves, and therefore owed Plaintiff a duty of reasonable care in the selection, screening, training, supervision, and retention of the persons to whom they gave custodial authority over him.

204. Williams, as Whaley's Chief Executive Officer, personally held and exercised authority over Whaley's hiring, training, supervision, discipline, incident reporting, and response to allegations of abuse, and is liable for her own negligent exercise of that authority.

205. These Defendants breached their duties by, among other things: failing to adequately screen applicants for direct-care positions; failing to train staff in the prohibition on sexual contact with residents, appropriate physical boundaries, de-escalation, the safe and lawful use of physical restraint, and mandatory reporting; failing to supervise staff, including by leaving direct-care workers alone with children in their bedrooms at night without oversight; failing to maintain an adequate system for receiving and investigating residents' complaints of staff misconduct; and failing to remove staff whom they knew, or had particularized reason to know, posed a danger to children. In the case of the Sequel Parent Defendants, the breach included setting staffing ratios and compensation levels that made adequate supervision impossible.

206. Whaley and Williams had particularized notice that Jennings posed a danger of sexual abuse, as alleged in Count V, and nonetheless retained him in unsupervised custodial authority over Plaintiff. The Lakeside Defendants and the Sequel Parent Defendants had particularized notice, through repeated incidents and licensing findings, that their staff were using dangerous and excessive restraint, and nonetheless retained, failed to retrain, and failed to supervise those staff.

207. These breaches were a proximate cause of the sexual and physical abuse Plaintiff suffered and of the injuries and damages described herein.

## COUNT VII

**Gross Negligence and Willful and Wanton Misconduct**
**(*Against Whaley, Williams, the Lakeside Defendants, and the Sequel Parent Defendants*)**

208. Plaintiff repeats, reiterates, and realleges each of the foregoing paragraphs as if fully set forth herein.

209. This Count is pleaded in addition to and in the alternative to Counts V and VI. It is not premised on any Defendant's intentional assault or battery, which is pleaded separately in Counts III and IV.

210. The conduct of each of these Defendants was so reckless as to demonstrate a substantial lack of concern for whether an injury would result, and was undertaken in willful and wanton disregard of Plaintiff's safety.

211. Williams saw a child fleeing an assault, crying and screaming for help, and refused to open the door. Thereafter, she and Whaley declined to call the police, to report the abuse, to obtain medical or forensic care for the child, or to remove the assailant from contact with children. Whaley then responded to the child's reports by having his court-appointed advocate removed and by initiating misdemeanor charges against him that a court dismissed as retaliatory.

212. The Lakeside Defendants and the Sequel Parent Defendants permitted staff to place their body weight on children lying face-down on the floor as a routine

behavior-management technique, after repeated warnings and findings across their facilities, and continued the practice until it killed a child at the same facility.

213. As a direct and proximate result of each Defendant's gross negligence and willful and wanton misconduct, Plaintiff suffered the injuries and damages described herein.

**COUNT VIII**

**Statutory Civil Liability for Failure to Report Child Abuse — MCL 722.623 and MCL 722.633(1)**
**(*Against Whaley, Williams, and the Lakeside Defendants*)**

214. Plaintiff repeats, reiterates, and realleges each of the foregoing paragraphs as if fully set forth herein.

215. The Child Protection Law, MCL 722.623(1)(a), requires the persons it identifies — including social workers, licensed professional counselors, social service technicians, nurses, school administrators and counselors, and regulated child care providers — who have reasonable cause to suspect child abuse or neglect to make an immediate report to centralized intake.

216. MCL 722.633(1) provides that a person who is required by that Act to report an instance of suspected child abuse or neglect and who fails to do so is civilly liable for the damages proximately caused by the failure.

217. Upon information and belief, Williams and the Whaley employees who observed Plaintiff injured and bleeding in 2016 or who received his reports of abuse,

and the Lakeside employees who received his reports and who witnessed the restraints described above, were persons required to report under MCL 722.623(1)(a), including as social workers, licensed professional counselors, social service technicians, nurses, or regulated child care providers.

218. Each had reasonable cause to suspect that Plaintiff was being abused. Whaley's leadership, including Williams, saw him fleeing an assault and saw him injured and bleeding, and it later admitted on a recording that it saw his injuries and did not report them. None of these persons made the report the statute required.

219. Whaley and the Lakeside Defendants are liable for their employees' failures to report, which occurred within the scope of their employment, and Williams is liable for her own failure to report.

220. The failure to report proximately caused damages to Plaintiff, including the continuation of the abuse after the reporting obligation arose, the loss of timely medical, forensic, and psychological care, his continued placement in the facilities where he was being harmed, and the aggravation of his psychological injuries.

**COUNT IX**

**Negligence — Breach of Statutory and Regulatory Duties**
**(*Against Whaley, Williams, the Lakeside Defendants, and the Sequel Parent Defendants*)**

221. Plaintiff repeats, reiterates, and realleges each of the foregoing paragraphs as if fully set forth herein.

222. The Child Care Organizations Act, MCL 722.111 et seq., and the administrative rules for child caring institutions promulgated under it imposed specific duties on these Defendants for the protection of the children in their care. Those duties include: maintaining licensed conditions of care; protecting residents from abuse and exploitation; limiting the use of physical restraint to circumstances of imminent danger and to methods that do not restrict breathing; documenting and reporting incidents of restraint, injury, and alleged staff misconduct; and training staff.

223. These Defendants violated each of those requirements as alleged above, and also violated the reporting duties described in Count VIII.

224. Plaintiff is within the class of persons these statutes and rules were enacted to protect, and the harm he suffered — sexual abuse, physical abuse, and injury from improper restraint — is the harm they were enacted to prevent.

225. These Defendants' violations of statute give rise to a rebuttable presumption of negligence, and their violations of the administrative rules are evidence of negligence. Those violations were a proximate cause of the injuries and damages described herein.

## COUNT X

**Breach of Fiduciary Duty**
**(*Against Whaley, the Lakeside Defendants, and the SequelParent Defendants*)**

226. Plaintiff repeats, reiterates, and realleges each of the foregoing4 paragraphs as if fully set forth herein.

227. These Defendants accepted from the State, for compensation, the custody of a child who could not leave, could not choose his caretakers, could not obtain food, medical care, or contact with the outside world except through them, and could not protect himself.

228. That relationship — Plaintiff's complete dependence and necessary reliance on one side, and these Defendants' complete discretionary control and voluntary undertaking on the other — placed these Defendants in a position of trust and imposed on them fiduciary duties of loyalty, good faith, candor, and protection running to Plaintiff.

229. This Count is distinct from Plaintiff's negligence claims. It rests on these Defendants' disloyalty: their choice to subordinate the interests of the child entrusted to them to their own institutional, reputational, and financial interests.

230. These Defendants breached their fiduciary duties by concealing Plaintiff's abuse rather than reporting it; by acting to discredit him rather than protect him; by having his court-appointed advocate removed rather than investigating his

reports; by causing a child who had reported abuse to be criminally charged; and, in the case of the Lakeside Defendants and the Sequel Parent Defendants, by maintaining staffing and restraint practices chosen for their cost rather than for the safety of the children in their care.

231. As a direct and proximate result, Plaintiff suffered the injuries and damages described herein.

## CLAIMS AGAINST THE CONTROLLING OWNER, THE BOARD CHAIRMAN, AND THE SUCCESSOR DEFENDANTS

## COUNT XI

### Negligence — Direct Liability of the Controlling Owner and the Board Chairman
### (*Against Altamont Capital Partners and John F. Ripley*)

232. Plaintiff repeats, reiterates, and realleges each of the foregoing paragraphs as if fully set forth herein.

233. This Count asserts Altamont's and Ripley's liability for their own conduct. It does not depend on piercing any corporate veil or on vicarious liability for the conduct of another. Under Michigan law, a corporate owner, director, or officer is personally liable for torts in which he or it actively participates, whether acting on its own behalf or on behalf of the corporation.

234. From September 2017 through the 2021 sale of the enterprise's operating business, Altamont held majority ownership of the Sequel enterprise, designated a majority of its board, and possessed and exercised the power to approve

its budgets, its capital structure, its staffing levels, its financial performance targets, and its material operating decisions.

235. Throughout the same period, Ripley — the enterprise's co-founder and former majority owner — served as Chairman of its Board. Upon information and belief, Ripley personally participated in establishing and maintaining the enterprise's staffing model, which he publicly described in substance as making the business profitable by controlling staffing, and personally participated in approving the budgets and staffing levels under which Lakeside Academy operated while Plaintiff was confined there.

236. Having assumed and exercised control over the operations of facilities in which children were involuntarily confined, Altamont and Ripley each owed those children, including Plaintiff, a duty to exercise reasonable care in the exercise of that control.

237. Altamont and Ripley each knew or should have known — through board reporting, financial and operational reporting, pre-acquisition diligence, and the extensive public and regulatory record of findings against the enterprise's facilities — that the facilities were understaffed, that staff were inadequately trained in the use of physical restraint, that residents were being physically and sexually abused, and that incidents were not being reported to State authorities as required.

238. Altamont and Ripley each breached that duty by approving and maintaining budgets and staffing levels they knew or should have known were inadequate to keep confined children safe; by imposing or maintaining financial targets that could be met only by suppressing staffing and training expenditures; by failing to require the enterprise to remedy conditions of which they were aware; and by failing to institute any adequate system of oversight for resident safety, restraint practices, and incident reporting.

239. As a direct and proximate result of Altamont's and Ripley's breaches, Plaintiff was physically mistreated and improperly restrained at Lakeside Academy in 2018 and suffered the injuries and damages described herein.

## COUNT XII

### Alter Ego and Disregard of the Entity Form (Derivative Liability) (*Against Altamont Capital Partners and the Sequel Parent Defendants*)

240. Plaintiff repeats, reiterates, and realleges each of the foregoing paragraphs as if fully set forth herein.

241. Plaintiff pleads this Count not as an independent cause of action but as a basis for imposing liability on Altamont and the Sequel Parent Defendants, as an equitable remedy, for the obligations of the Lakeside Defendants and of any Sequel entity that operated Lakeside Academy on Counts I and IV through X. It is pleaded in addition to and in the alternative to Count XI.

242. Under Michigan law, which applies the same principles to limited liability companies as to corporations, the separate existence of an entity is disregarded where (a) the entity is a mere instrumentality of another, (b) the entity was used to commit a wrong or fraud, and (c) the plaintiff suffered an unjust loss or injury.

243. Upon information and belief, and subject to proof after discovery, each element is satisfied. The entity that operated Lakeside Academy was one node in a chain of holding companies; it did not independently determine its own staffing levels, wage scales, training curricula, restraint policies, or incident-reporting protocols, all of which were set at the enterprise level; the enterprise's cash was managed centrally; the enterprise was loaded with acquisition debt for the benefit of its equity holder while its facilities operated below safe staffing levels; and the operating entities were left without capital adequate to answer for the foreseeable liabilities of caring for confined children.

244. The entity form was then used to commit a wrong. The operating business and management were transferred in 2021 to entities owned by the enterprise's own Chairman; the remaining entities were assigned in 2022, with Altamont's approval, to a liquidating trustee; and that liquidation distributed approximately $1 million against roughly $70 million in secured debt, leaving nothing for the children the enterprise had harmed.

245. Honoring the entity form in these circumstances would sanction a fraud and promote injustice by permitting those who directed and profited from the operation of custodial facilities for children to place the entire cost of the resulting harm on the children, causing Plaintiff an unjust loss.

## COUNT XIII

### Successor Liability — De Facto Merger, Mere Continuation, and Transfer to Escape Liability
### (*Against Vivant Behavioral Healthcare, LLC and Vivant Behavioral Holdings, LLC*)

246. Plaintiff repeats, reiterates, and realleges each of the foregoing paragraphs as if fully set forth herein.

247. Plaintiff pleads this Count as a basis for imposing on the Vivant Defendants the liabilities to Plaintiff of the Sequel Enterprise Defendants on the Counts above.

248. Under Michigan law, a purchaser of a business's assets is liable for the seller's obligations where (a) the purchaser expressly or impliedly agrees to assume them; (b) the transaction amounts to a consolidation or de facto merger; (c) the purchaser is merely a continuation of the seller; or (d) the transaction was entered into fraudulently in order to escape liability. Plaintiff alleges that the September 2021 transaction satisfies exceptions (b), (c), and (d), and that discovery may also establish exception (a).

249. *De facto* merger and mere continuation. The transaction continued the same enterprise: in substantial part the same facilities, the same State licenses and placement contracts, the same programs, the same staff, and — critically — the same senior management. Upon information and belief, Vivant Healthcare retained many members of Sequel's leadership, including executives who held enterprise-wide operating responsibility during the period relevant to this Complaint. There was a common identity of control: the purchaser was formed and is owned by the sitting Chairman of the seller's Board. And, within approximately five months, the selling entities ceased ordinary operations and were assigned for the benefit of creditors.

250. Transfer to escape liability. The transaction was not an arm's-length sale to a stranger. It was a sale to a company formed for that purpose shortly before the sale by the sitting Chairman of the seller's Board, who stood on both sides of it. Upon information and belief, the consideration was structured so that the selling entities and their creditors received nothing of enduring value — a contingent earnout that ultimately produced nothing — and the sale was followed within approximately five months by an assignment for the benefit of creditors that paid approximately $1 million against roughly $70 million in secured debt and nothing to anyone else.

251. The effect, and upon information and belief the purpose, was to move the going concern beyond the reach of claims arising from the treatment of children

in the enterprise's facilities, while leaving those claims with entities that had been emptied of assets.

252. Vivant Healthcare, as the transferee of the operating business, and Vivant Holdings, as its sole member and the entity through which the continuing enterprise is owned and controlled, are liable for the obligations of the transferor entities to Plaintiff.

253. As a direct and proximate result, Plaintiff has been and will be deprived of any effective remedy against the entities that operated Lakeside Academy, and has suffered the injuries and damages described herein.

**DAMAGES**

254. As a direct and proximate result of the conduct alleged above, Plaintiff has suffered and continues to suffer: sexual assault and physical injury; physical pain; post-traumatic stress disorder, major depressive disorder with anxious distress, and obsessive-compulsive disorder; severe emotional distress, humiliation, fear, and loss of the capacity to trust; disruption of and permanent detriment to his education and vocational development; loss of earning capacity; the cost of past and future psychological and medical treatment; loss of the ordinary enjoyment of life; and the loss of a childhood.

255. The conduct of Jennings, Williams, Whaley, the Lakeside Defendants, the Sequel Parent Defendants, Altamont, Ripley, the Vivant Defendants, Swanson,

Tocarchick, and the Doe Defendants was intentional, malicious, or so reckless as to demonstrate a substantial lack of concern for whether an injury would result, and warrants an award of exemplary and punitive damages against each of them to the extent permitted by law. Plaintiff does not seek punitive damages against Genesee County or against MDHHS.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Isaac Anthony Thomas respectfully requests that this Court enter judgment in his favor and against Defendants as follows:

Compensatory damages in an amount to be determined at trial, jointly and severally against all Defendants liable for each claim;

Exemplary and punitive damages against each Defendant against whom such damages are available at law;

A declaration that Defendants' conduct violated Plaintiff's rights under the Constitution and laws of the United States and the laws of the State of Michigan;

Such prospective equitable relief as the Court finds appropriate and available, including relief directed to the policies and practices of Genesee County concerning the receipt, documentation, and referral of reports of child sexual abuse, and to the policies and practices of MDHHS concerning the licensing, monitoring, and use of restraint in child-caring institutions;

Reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable provision of law;

Pre- and post-judgment interest as permitted by law; and

Such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all claims and issues so triable, pursuant to Fed. R. Civ. P. 38(b) and the Seventh Amendment to the United States Constitution.

Dated: October 14, 2026
New York, New York

Respectfully submitted,

METCALF & METCALF, P.C.

/s/ Steven A. Metcalf II

STEVEN A. METCALF II, ESQ.
Attorney for Plaintiff
99 Park Avenue, Suite 810
New York, New York 10016
Tel: (646) 253-0514
metcalflawnyc@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 15, 2026, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel of record. Defendants not yet appearing will be served with the summons and this pleading in accordance with Fed. R. Civ. P. 4.

/s/ Steven A. Metcalf II
STEVEN A. METCALF II, ESQ.